# In the United States Court of Appeals for the Eleventh Circuit

PENGUIN RANDOM HOUSE, ET AL.,
*Plaintiffs-Appellees,*

v.

BEN GIBSON,
IN HIS OFFICIAL CAPACITY AS CHAIR OF THE FLORIDA
STATE BOARD OF EDUCATION, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 6:24-cv-01573-CEM-RMN

## STATE DEFENDANTS' INITIAL BRIEF

JAMES UTHMEIER
*Attorney General of Florida*

JEFFREY PAUL DESOUSA
*Acting Solicitor General*
JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*
THOMAS F. KELLY
*Solicitor General Fellow*
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jason.muehlhoff@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

December 10, 2025                    *Counsel for Defendants-Appellants*

## ORAL ARGUMENT STATEMENT

State Defendants respectfully request oral argument, which will help the Court decide the important First Amendment issues raised in this case. This case presents novel questions about the government's ability to curate library collections in the context of public-school libraries—issues that have split other circuits and generated fractured decisions from the Supreme Court.

# TABLE OF CONTENTS

Oral Argument Statement ...........................................................................i

Table of Authorities .................................................................................iv

Statement of Jurisdiction .......................................................................... 1

Issues Presented........................................................................................ 2

Introduction .............................................................................................. 3

Statement of the Case .............................................................................. 6

    A.    HB 1069 ......................................................................... 6

    B.    Procedural History........................................................ 10

Standard of Review ................................................................................. 12

Summary of Argument ............................................................................ 13

Argument ................................................................................................ 16

I.    The government's selection of books in its public-school libraries
is not regulated by the First Amendment. ............................................ 16

    A.    The curation of a public-school library's collection is
government speech. ...................................................... 16

        1.    The State controls the books in its public-school
libraries........................................................ 20

        2.    Public-school library collections have traditionally
communicated the government's message. ..................... 23

        3.    The public would reasonably believe the government
endorsed the message communicated through library
collections. ................................................... 29

    B.    Alternatively, public-school libraries are an optional
government benefit that can be revoked without implicating
the First Amendment. .................................................. 36

II.    Even if the First Amendment applies, the government is permitted to restrict in-school speech activities if doing so is reasonably related to legitimate pedagogical concerns. ...........................................................39

Conclusion...........................................................................................................43

Certificate of Compliance ...............................................................................45

Certificate of Service ........................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ................................................................ 35

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .............................................................................. 37

*Alachua Cnty. Educ. Ass'n v. Carpenter*,
  741 F. Supp. 3d 1202 (N.D. Fla. 2024) ...................................................... 38

*Alves v. Bd. of Regents of the Univ. Sys. of Georgia*,
  804 F.3d 1149 (11th Cir. 2015) .............................................................. 13

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982) ..................................................................... 3, 34, 35

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) .............................................................................. 42

*Bryan v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ................................................................ 28

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
  115 F.4th 1266 (11th Cir. 2024) ................................................. 13, 19, 29

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
  942 F.3d 1215 (11th Cir. 2019) .............................................................. 24

*City of S. Miami v. Governor*,
  65 F.4th 631 (11th Cir. 2023) ................................................................ 13

*Dean v. Warren*,
  12 F.4th 1248 (11th Cir. 2021) ........................................................ 19, 29

*Downs v. Los Angeles Unified Sch. Dist.*,
  228 F.3d 1003 (9th Cir. 2000) ................................................................ 35

iv

*GLBT Youth in Iowa Sch. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) .................................................28

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ..............................................4, 16, 39, 40, 41

*Horne v. Flores,*
557 U.S. 433 (2009) ..................................................................3

*Houchins v. KQED, Inc.,*
438 U.S. 1 (1978) ....................................................................17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ................................................................28

*Johanns v. Livestock Mktg. Ass'n,*
554 U.S. 550 (2005) ................................................................23

*Leake v. Drinkard,*
14 F.4th 1242 (11th Cir. 2021) ............................13, 14, 18, 20, 26, 27, 30, 32

*Leathers v. Medlock,*
499 U.S. 439 (1991) ................................................................38

*Little v. Llano Cnty.,*
138 F.4th 834 (5th Cir. 2025) ...................4, 13, 14, 15, 17, 24, 25, 28, 29, 33, 34, 38

*McGriff v. City of Miami Beach,*
84 F.4th 1330 (11th Cir. 2023) ...............................14, 18, 26, 27, 28, 29, 31

*Mech v. Sch. Bd. of Palm Beach Cnty.,*
806 F.3d 1070 (11th Cir. 2015) ...........................14, 19, 26, 28, 29

*Miller v. California,*
413 U.S. 15 (1973) ....................................................................6

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................27

*Morse v. Frederick,*
551 U.S. 393 (2007) ................................................................42

*Murthy v. Missouri,*
603 U.S. 43 (2024) ...................................................................35

*Nussbaumer v. Secretary*,
    150 F.4th 1371 (11th Cir. 2025) ...................................................................31

*Parnell v. Sch. Bd. of Escambia Cnty., Fla.*,
    No. 4:23-CV-414-AW-MAF, 2025 WL 2957001 (N.D. Fla. Sept. 30, 2025) ...........18

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    414 F.3d 23 (D.C. Cir. 2005) ............................................................... 14, 28

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) ..............................................................33

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ...............................................14, 17, 20, 29, 31

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................38

*Regan v. Tax'n With Representation of Washington*,
    461 U.S. 540 (1983) ...................................................................36

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................19

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ...........................................................15, 36, 39

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) ...................................................................19

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ...........................................................17, 32, 33

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ............................................................... 42, 43

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003) ............................................................... 15, 25

*United States v. 12 200-Foot Reels of Super 8mm. Film*,
    413 U.S. 123 (1973) ...................................................................33

*Virgil v. Sch. Bd. of Columbia Cnty.*,
    862 F.2d 1517 (11th Cir. 1989) ............................................16, 40, 42

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ............................................................ 13, 17, 19, 20, 21, 23

*Wood v. Fla. Dep't of Educ.*,
   142 F.4th 1286 (11th Cir. 2025)........................................................................19

*Ysursa v. Pocatello Educ. Ass'n,*
   555 U.S. 353 (2009) ................................................................ 15, 26, 35, 37, 38

## Statutes

Fla. Stat. § 1006.28(2)(a) ........................................................................3, 7, 8, 22

Fla. Stat. § 1006.28(2)(d)1................................................................14, 20, 21

Fla. Stat. § 1006.28(4)(b)........................................................................22

## Other Authorities

Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev.
   84 (1998).............................................................................................39

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

The State of Florida enacted HB 1069 to ensure that, among other things, it would not provide pornographic or sexually descriptive materials in its own public-school libraries. HB 1069 does not limit access to these books through any other outlet; it ensures only that those books would not be acquired and maintained through public funds and housed in public-school libraries. Even so, the district court found that the State's modification to its own collection of books violated the First Amendment rights of authors, publishers, parents, and students. The issues on appeal are:

1.      Whether the government's curation of books in a public-school library is government speech not subject to scrutiny under the First Amendment; or conversely, whether Plaintiffs' First Amendment rights extend to compelling the government to speak their desired message.

2.      Whether the government's alteration to the collection of books it maintains in public-school libraries is a government benefit not subject to First Amendment scrutiny.

3.      If First Amendment scrutiny does apply, whether the State is entitled to regulate expressive activities in the school setting that bear the school's imprimatur and are reasonably related to legitimate pedagogical concerns.

## INTRODUCTION

The State of Florida, like every other State, has decided to create and maintain public-school libraries for the benefit of its students. Yet "[u]nlike university or public libraries, [public] school libraries are not designed for freewheeling inquiry; they are tailored . . . to the teaching of basic skills and ideas" and to "the selective conveyance of ideas." *Bd. of Educ. v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting). And given that "public education" is ultimately a "core state responsibility," *Horne v. Flores*, 557 U.S. 433, 448 (2009), it is for Florida to decide what ideas its public-school libraries should convey.

HB 1069 is one outworking of Florida's vision for its public-school libraries. It requires the exclusion and removal of any material that contains pornographic or sexually depictive content. Fla. Stat. § 1006.28(2)(a)2.b.(I)–(II). The prohibition reflects the State's determination that those materials are not compatible with the education it seeks to provide students. HB 1069 does not ban any books, and individuals remain free to circulate or obtain these materials anywhere else they desire. HB 1069 merely establishes that these books will not be acquired and maintained with public funds and housed on government property.

The district court nonetheless declared that the State's removal of these books violated Plaintiffs' First Amendment right. It did so only after a series of errors, any one of which is sufficient to warrant reversal. Most basically, the district court wrongly concluded that the curation of school library books is protected *private* speech, rather than

3

*government* speech unregulated by the First Amendment. When the State selects books for inclusion in school libraries, it sends a message: These books are appropriate literary material for the K-12 audience, and they have legitimate pedagogical value. The State controls every book that enters its libraries, library collections have historically been understood to express a government message, and the public would reasonably assume that the government approves the speech—here, the library collection. That is dispositive because the First Amendment does not govern the government's presentation of its own message. Put another way, the First Amendment does not "obligate[] the government to provide information to anyone." *Little v. Llano Cnty.*, 138 F.4th 834, 843 (5th Cir. 2025) (en banc), *cert. denied* No. 25-284 (U.S. Dec. 8, 2025). Relatedly, the First Amendment is not implicated when the government merely offers a public benefit—like library books.

But even if the district court were right that First Amendment scrutiny applies, HB 1069 still easily survives. "[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quotation omitted). Under *Hazelwood*, schools may regulate "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," if doing so is "reasonably related to legitimate pedagogical concerns." *Id.* at 272–73. That is squarely the case here.

The truly radical implications of the district court's holding bear emphasis. If public-school libraries lack the power to curate their collections, then *every* decision about *any* book—including whether to acquire it in the first instance or not—is subject to First Amendment scrutiny. That includes all manner of works, even those the State determines are inappropriate for children. Upholding the judgment here would mean that, upon request, schools *must provide* students with books promoting Nazi ideology, championing slavery, or depicting adult sexual themes, unless the State proves in litigation that the book's omission satisfies First Amendment scrutiny. To name just one example from this case, public-school libraries would have to offer grade-schoolers *Let's Talk About It*—a book removed by Polk County after HB 1069's passage—which graphically depicts "butt plugs," recommends anal masturbation, likens pornography to a "sugary treat," and portrays novel sexual positions:

 

Erika Moen & Matthew Nolan, *Let's Talk About It*, 119, 165 (2021).

That is not the First Amendment our Framers gave us. This Court should reverse and remand with instructions to grant the State Defendants' motion for summary judgment and allow the State to control the content in its own libraries.

## STATEMENT OF THE CASE

### A.    HB 1069

Florida enacted HB 1069 to increase transparency in public schools and to address "pornographic and inappropriate materials that have been snuck into our classrooms and libraries." DE107-4 at 2 (statement of Governor Ron DeSantis). As relevant here, HB 1069 regulates what materials schools can use in their libraries. It bars materials that contain content which:

(I)    Is pornographic or prohibited under s. 847.012;[1]

(II)    Depicts or describes sexual conduct as defined in s. 847.001(19),[2] unless such material is for a course required by s. 1003.46 or s. 1003.42(2)(o)1.g. or 3., or identified by State Board of Education rule;

---

[1] Section 847.012(3)(a) specifically prohibits the distribution of certain categories of sexually explicit material that is "harmful to minors." Section 847.001(7), in turn, defines "harmful to minors" by reference to the obscenity test established in *Miller v. California*, 413 U.S. 15 (1973), as modified for minors.

[2] Section 847.001(19) defines "[s]exual conduct" to include "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual

(III)   Is not suited to student needs and their ability to comprehend the material presented; or

(IV)   Is inappropriate for the grade level and age group for which the material is used.

Fla. Stat. § 1006.28(2)(a)2.b.(I)–(IV). Only the first two categories are at issue here.

HB 1069 delegates enforcement responsibility to school districts by making them responsible for materials "made available in a school or classroom library." *Id.* § 1006.28(2)(a)1. If any material violates subsection (I), then the school district "shall discontinue use of the material." *Id.* § 1006.28(2)(a)2.b. And if the school district determines that the material violates subsections (II)–(IV), it "shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable." *Id.* § 1006.28(2)(a)2.b.

To ensure that districts' material complies with these requirements—including books acquired before HB 1069 was enacted—the statute also creates a procedure for parents, guardians, or community members to object to and present evidence to the district about any book they believe violates HB 1069. *Id.* § 1006.28(2)(a)2. Districts must use a standard objection form for individuals to lodge a complaint. *Id.*; *see also* DE107-59 (Specific Material Objection Form).[3] Once an objection has been filed, the

---

battery is being or will be committed." "A mother's breastfeeding of her baby does not under any circumstance constitute sexual conduct." Fla. Stat. § 847.001(19).

[3] HB 1069 requires the State Board of Education to promulgate the objection form. Fla. Stat. § 1006.28(2)(a)2.

school district must convene a committee to hold a public hearing, allow the objector to present and read any relevant portion of the challenged material, and resolve the objection. *See* Fla. Stat. § 1006.28(2)(a)2.b.4.–5.

HB 1069 took effect on July 1, 2023. School districts immediately began removing, for preliminary review, materials that violated HB 1069's substantive provisions. Polk County, for example, removed *Let's Talk About It* (mentioned above), a book dedicated to "whoever needs it, whatever your age." DE107-36 at 3. *Let's Talk About It* features pornographic and sexually explicit content, including:



Erika Moen & Matthew Nolan, *Let's Talk About It*, 78, 91 (2021).

Or take Alachua County, which removed *Gender Queer: A Memoir* by Maia Kobabe, a memoir about her life and decision to ultimately identify as "nonbinary and asexual" and use the pronouns "e, em, eir.":



Maia Kobabe, *Gender Queer: A Memoir*, 61, 167 (2019); DE107-11 at 2.

As a final example, Marion County removed *This Book is Gay* by Juno Dawson, a self-described "instruction manual" for any "young lesbian, gay guy, bisexual, or trans person." Juno Dawson, *This Book is Gay*, 2–3 (2015); DE107-28 at 4. The book contains a chapter on "the ins and outs of gay sex," which among other things explains that a "blowie" is "about sliding your mouth up and down the shaft of his cock" and anal sex is best prepared for by "[s]quirt[ing] the lukewarm water up your bum, hold for a few moments before releasing into the toilet." *This Book is Gay* at 173, 174. And for women, the book suggests that "a hand can do the job of five penises" and "[s]omething in your

arse, withdrawn shortly before a clitoral orgasm can feel AMAZING for some people."
*Id.* at 179, 182.

### B.  Procedural History

Over a year after HB 1069 went into effect, a collection of publishers, authors, parents and students sued the Florida State Board of Education and two County School Boards. DE1. Plaintiffs sought only a declaratory judgment that two of HB 1069's substantive provisions—its prohibition on any material that is (I) "pornographic or prohibited under s. 847.012" or (II) "[d]epicts or describes sexual conduct as defined in s. 847.001(19)"—violated the First Amendment. DE1 ¶¶ 14–15. Plaintiffs alleged that those provisions are an impermissible and overbroad content-based restriction. *See* DE1 ¶¶ 164–184; 197–234; 247–84. Plaintiffs alternatively raised a "statutory interpretation" cause of action against the State Defendants and Volusia County, seeking a declaration that the provision banning "pornographic" materials must be interpreted as synonymous with "harmful to minors" to avoid a First Amendment issue. *See* DE1 ¶¶ 185–96; 235–46.

The parties each moved for summary judgment. The State Defendants argued that the complaint was a shotgun pleading, that Plaintiffs lacked standing, and that they lacked a cause of action to seek a declaration on the proper interpretation of state law. *See* DE109 at 3–16. On the merits, the State Defendants argued that the curation of books in public-school libraries is government speech immune from First Amendment scrutiny; that funding and maintaining a library is alternatively a government benefit

that grants the government discretion over what content to subsidize; and that even if Florida's removal of certain books did implicate the First Amendment, it is constitutional under Supreme Court and Eleventh Circuit precedent. *See* DE109 at 16–38.

The district court disagreed and ruled for Plaintiffs. DE129 at 50. The district court first concluded that Plaintiffs had standing to raise their First Amendment claims. The court found an injury in fact because "[t]he right to receive information is protected by the First Amendment" and the district's removal of books under HB 1069 impaired that right for the publishers, authors, and parents. DE129 at 9–10. The court then found causation and redressability against all Defendants given that each defendant played some role in enforcement and a declaration finding the challenged provisions of HB 1069 would redress Plaintiffs' harms. DE129 at 9–12.[4]

The district court found that the State's curation of books in a school library is neither government speech nor a government benefit. The court was skeptical that a law modifying the curation of books in public-school libraries "would constitute government speech." DE129 at 19–27. To the court, the removals are "the objecting parents' speech, not the government's." DE129 at 22. As for the State Defendants' government-benefit argument, the court determined that the State's modification of the

---

[4] The district court also found that the Authors' Guild had established organizational standing. DE129 at 12–13.

library collections it funded and maintained "discriminate[d] based on content" and ensured "speech itself is being abridged." DE129 at 27–29.

Finding First Amendment scrutiny applied, the district court rejected the contention that the State is afforded greater control over expression in the school context. DE129 at 30–34. The library, the court concluded, should instead be evaluated as a non-public forum, and the law's impermissible applications outweighed the constitutional applications. DE129 at 40–49. It reached this conclusion even after determining that the statute's ban on pornographic content should be interpreted to mean content "harmful to minors," which avoids any First Amendment concern. DE129 at 34–40.

The district court therefore entered a declaratory judgment that (1) HB 1069's prohibition on books depicting sexual conduct is an overbroad content-based restriction in violation of the First Amendment (Counts I, IV, and VII), and (2) for the purposes of statutory construction, "pornographic" is synonymous with "harmful to minors" (Counts II and V). DE129 at 50. Defendants timely appealed.

## STANDARD OF REVIEW

When both parties move for summary judgment, this Court will "review *de novo* the district court's grant of summary judgment and view the facts in the light most favorable to the non-moving party on each motion." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1287 (11th Cir. 2024). Summary judgment is appropriate when, "after viewing the record in the light most favorable to the" non-moving party, "there is no genuine dispute as to any material fact" that the moving

party "is entitled to judgment as a matter of law." *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) (citing Fed. R. Civ. P. 56(a)).

This Court also reviews "issues of subject-matter jurisdiction *de novo.*" *City of S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023). Likewise, pure questions of law involving the First Amendment are reviewed *de novo. Alves v. Bd. of Regents of the Univ. Sys. of Georgia,* 804 F.3d 1149, 1159 (11th Cir. 2015).

## SUMMARY OF ARGUMENT

For several independent reasons, this Court should reverse and order the entry of summary judgment for the State Defendants.

**I.** To start with, Plaintiffs have no First Amendment right to demand that the government convey their desired message. The First Amendment protects against government interference with private expression—yet HB 1069 fully permits publishers and authors to reach their desired audience through any available means. Plaintiffs would stretch that right against interference into an affirmative obligation on the government to facilitate their preferred expression in its own public-school libraries. That they cannot do. *See Little v. Llano Cnty.*, 138 F.4th 834, 848 (5th Cir. 2025) (en banc).

Rather than regulate protected private expression, HB 1069 regulates the State's curation of its own library books, government speech that is immune from First Amendment scrutiny. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Indeed, "[w]ith respect to the public

library, the government speaks through its selection of which books to put on the shelves and which books to exclude." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005); *see also Little*, 138 F.4th at 864 (plurality opinion) ("[T]he library conveys its *own* message (which books are worth reading) by collecting third-party speech (books)."). Under this Court's three-prong test for identifying government speech, the State's control over its library collection, the history of public-school libraries conveying the State's message about which books are worth reading, and the State's endorsement of its library collection all confirm that. *See McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (outlining government speech framework).

**A.** The State controls the books in public-school libraries. It is required by statute to select and approve any book made available in a public-school library. Fla. Stat. § 1006.28(2)(d)1. That "final approval authority over the[] selection" of the material in question is the tell-tale sign of control needed to establish government speech. *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009).

**B.** Public-school libraries have also traditionally communicated the government's message. Since the genesis of public libraries, government employees have curated books "to foster education and virtue" for the benefit of the community. *Little*, 138 F.4th at 861 (plurality opinion); *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (plurality opinion). HB 1069 further aids the government's message by removing books that hinder this mission.

14

**C.** Finally, the public would reasonably believe the government has endorsed its collection of books. Every book is selected and maintained by government employees and housed on government property. *See Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1076 (11th Cir. 2015) ("[G]overnment property is often closely identified in the public mind with the government unit that owns the land." (quotation marks omitted)); *Leake*, 14 F.4th at 1250 (noting that governments "typically do not organize and fund events that contain messages with which they do not wish to be associated" (quotation marks omitted)). Any reasonable observer would think that the government approves of a book acquired and maintained by state employees and housed on school grounds as worthy of being in its collection.

**II.** Alternatively, the State's decision to fund and maintain a public-school library is a government benefit. And "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). Even if, as here, the State's continued funding and maintenance of select books would "enhance the [individual's] exercise of First Amendment rights," the State "is under no obligation to" do so. *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 359 (2009). Florida's decision to no longer maintain a library with pornographic or sexually depictive material was a permissible adjustment to the benefit it offers public-school students.

**III.** Finally, even if First Amendment scrutiny does apply, HB 1069 would be permissible "in light of the special characteristics of the school environment."

*Hazelwood*, 484 U.S. at 266. The school environment affords the government more discretion to regulate expression, including content that is "sexually explicit but not legally obscene." *Id.* (quotation marks omitted). This Court has already confirmed that a school can properly remove a text that subjects students to "potentially sensitive topics such as sex," *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1523 (11th Cir. 1989) (quotation marks omitted), exactly what HB 1069 does here.

## ARGUMENT

### I. The government's selection of books in its public-school libraries is not regulated by the First Amendment.

No student, parent, author, or publisher has the constitutional right to demand that public-school libraries contain books depicting sexual material—or any book at all. For two independent reasons, HB 1069 does not implicate First Amendment scrutiny. First and foremost, when the State curates public-school library collections, it engages in government speech. Governments have the right to dictate their own messages, and no one can force Florida to speak a message with which it disagrees. On top of that, library books are a government benefit. The government is not constitutionally obligated to continue conveying benefits that it deems inappropriate. Either ground justifies reversal.

#### A. The curation of a public-school library's collection is government speech.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. That language does not require the

government to provide information to the public; it only prevents the government from restricting private expression. To be sure, the First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But it does so only in a particular way. It ensures that the government will not interfere with the right to speak, yet it does nothing to "compel[] others—private persons *or governments*—to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (plurality opinion) (emphasis added).

As a consequence, the Free Speech Clause "does not regulate government speech." *Summum*, 555 U.S. at 467; *see also Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Instead, "government actions and programs that take the form of speech[] do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker*, 555 U.S. at 207. Put another way, the Free Speech Clause does not "obligate[] the government to provide information to anyone." *Little*, 138 F.4th at 843.

HB 1069 does not infringe or otherwise prevent any author or publisher from reaching their intended audience or prevent any parent from accessing a book for their child. Plaintiffs remain free to purchase, circulate, or otherwise obtain any book at issue here. HB 1069 simply ensures that it will not be the government that subsidized and facilitated that interaction when those books contained impermissible content. *See Parnell v. Sch. Bd. of Escambia Cnty.*, No. 4:23-CV-414-AW-MAF, 2025 WL 2957001, at *2 (N.D. Fla. Sept. 30, 2025) ("[A] public library's removal of books does not implicate

the First Amendment right to receive information," "[n]or does it implicate any author's First Amendment rights.").

This rule properly finds its footing in the government-speech doctrine. When a public-school library selects books for inclusion on its shelves, it conveys a message: These books are suitable reading material for the K-12 audience; these books are appropriate educational material for those age levels. Florida cannot be made to suggest that books like *Let's Talk About It*—with its depictions of "butt plugs," anal masturbation, and new oral sex positions—are appropriate for elementary-, middle-, or even high-school students, any more than it can be compelled to offer books promoting Holocaust denialism or teen suicide.

There is no "precise test" for determining whether speech is the government's, *Leake*, 14 F.4th at 1248, but this Court looks mainly to three factors: "(1) whether the government maintains control over the speech; (2) whether the type of speech has traditionally communicated government messages; and (3) whether the public would reasonably believe that the government has endorsed the speech," *McGriff*, 84 F.4th at 1334.

Under this framework, this Court has repeatedly held that expression in the educational context is government speech. *See, e.g.*, *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1288 (11th Cir. 2024) (speech over public announcement system at football stadium); *Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021) (separate opinion) (cheerleading for public university); *Mech v. Sch. Bd. of Palm*

*Beach Cnty., Fla.*, 806 F.3d 1070, 1071 (11th Cir. 2015) (school's removal of math tutor's banner advertising services); *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1288 (11th Cir. 2025) (teacher's attempted use of preferred pronouns). Or as the Supreme Court has neatly summarized, "[w]hen the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).

This case falls comfortably within this line of precedent. HB 1069 reflects the State's reasoned decision that it should not actively provide books containing pornographic or sexual material in its own libraries. Rather, the State concluded that it should steer clear of those materials and allow parents and guardians to facilitate access when they deem it best for their child. That decision was the State's to make, but it does not leave Plaintiffs optionless; they—like everyone else—can engage the "democratic electoral process" to "provide[] a check on government speech" with which they disagree. *Walker,* 576 U.S. at 207; *see also Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) ("The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks."). What Plaintiffs cannot do is exactly what the district court below blessed—wield the First Amendment to ensure the State keeps and maintains their preferred books on its bookshelves.

### 1. The State controls the books in its public-school libraries.

The first government-speech factor is whether the government "maintains direct control over the messages conveyed through the speech in question." *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021). The key indication of government control is when it maintains "final approval authority over the[] selection" of the material in question. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 473 (2009); *Leake*, 14 F.4th at 1250 (holding city controlled parade's content because it possessed "[f]inal approval authority" over parade applications).

The State here maintains complete control over the selection of books in public-school libraries. Under Florida law, "[e]ach book made available to students through a school district library . . . must be selected by a school district employee," "regardless of whether the book is purchased, donated, or otherwise made available to students." Fla. Stat. § 1006.28(2)(d)1. On the other side of the equation, the State controls which books should be culled or removed from its collection. *See* DE107-9 at 23 (Department of Education Training Materials). This means that, without exception, it is the government that decides every book that enters into and remains in public school libraries. Nothing more is needed to establish government control over its message.

*Walker* confirms this intuitive point. There, the Supreme Court held that custom license plates issued under Texas' statutory regime were government speech. *Walker*, 576 U.S. at 219. Texas' law allowed private parties to submit custom license plates ideas,

but when government rejected an application that included a Confederate flag, the applicant sued. *Id.* at 206.

In ruling for Texas, the Court found that "Texas maintains direct control over the messages conveyed on its specialty plates" because it "must approve every specialty plate design proposal before the design can appear on a Texas plate." *Id.* at 213. It did not matter that the license plate designs "were initially proposed by private parties," *id.* at 215, or that the State "desire[d] to communicate numerous messages," *id.* at 217. What mattered was that "the State exercises final authority over each specialty license plate design." *Id.* at 216.

So too here. Florida maintains complete control over every book that appears in its library. *See* Fla. Stat. § 1006.28(2)(d)1. The books themselves and the suggestions to remove certain books may come from private third parties, but like specialty license plates proposals, the final decision comes from the government.

The district court rejected this straightforward conclusion by interpreting HB 1069 to give parents,[5] not the State, control over which books were removed. *See* DE129 at 24 ("If, historically, the state has actively controlled the selection of school library books as Defendants claim, the instant statute repudiates that role.");

---

[5] The district court repeatedly focused on *parents* in its analysis, *see e.g.*, DE129 at 4, 9, 22, 23, but HB 1069 explicitly allows parents, guardians, or any resident of the county to file an objection. Fla. Stat § 10068(2)(a)2.b.

DE129 at 2 ("many removals at issue here are the objecting parents' speech, not the government's").

That is a plain misreading of the statute. HB 1069 requires the removal of any material from a school library that, among other things, is "pornographic" or "[d]epicts or describes sexual conduct." Fla. Stat. § 1006.28(2)(a)2.b.(I)–(II). To help identify any existing materials that run afoul of these requirements, the law created a procedure where parents, guardians, or "[a] resident of the county" can raise these materials for government review. *See id.* § 1006.28(2)(a)2.b. But the law is clear that "[i]f the district school board finds that any material meets the requirements . . . *the school district shall discontinue use of the material.*" *Id.* § 1006.28(2)(a)2.b. (emphasis added). While the greater community might help identify potential violations of the law, it is unequivocally the government that determines whether there is indeed a violation and removes the book. In fact, parents, guardians, or any private individual would face fines if they took it upon themselves to remove a library book. *See* Fla. Stat. § 1006.28(4)(b) (authorizing schools to collect costs from student or parent for any lost or damaged books). It is the Legislature that sets policy regarding the messages that Florida's public-school libraries will communicate, and school districts that enforce that policy.

The district court's fixation on parents' role in the process also ignores the basic fact that solicitation of information from private parties is commonplace in statutory schemes. Whistleblowers and hotlines are routine mechanisms for helping the government enforce its laws, but the use of private parties at the beginning of an investigation

leaves no uncertainty about *who* is enforcing the law. And here, Florida's Legislature determined the best and most efficient way to enforce HB 1069 was to allow citizens in the relevant community to identify books for review. The district court seemed to assume that the only way the State could maintain control here would be to manually review the countless books in each public-school library to enforce HB 1069, but nothing in the government-speech doctrine requires the State do everything itself. *See Walker*, 576 U.S. at 217 ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message."); *Johanns v. Livestock Mktg. Ass'n*, 554 U.S. 550, 561 (2005) ("nongovernmental entity" developing an advertisement for the government remains government speech because the federal government "exercises final approval authority.").

2. **Public-school library collections have traditionally communicated the government's message.**

The second government-speech factor asks "whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1232 (11th Cir. 2019). The history of public-school libraries confirms that governments used their book collections to convey messages about which books are worth reading and which books can assist in the formation of virtuous and knowledgeable citizens.

Public libraries in America first took shape in the mid-19th century, but they are "rightly considered a twentieth century development." Tom J. Cole, *The Origin and*

*Development of School Libraries*, 37 Peabody J. Educ. 87, 87 (Sept. 1959), https://ti-nyurl.com/447v3mak. From the start, public libraries were often "funded and con-trolled by the government and meant to strengthen the educational mission of social libraries." *Little*, 138 F.4th at 861 (plurality opinion). That mission was reflected in the government's selection of books, which were "curated to foster education and virtue." *Id.*

It follows that, as early as 1920, it was standard for school officials to make all "[b]ook selections" to ensure library collections reflected the government's view. *See* Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Dif-ferent Sizes* 21 (1920), https://tinyurl.com/y82zxxdytiny. And crucially, that responsibil-ity included "weed[ing] books promoting 'improper' morality." *Little*, 138 F.4th at 862.

"The lesson from this historical sketch is obvious: by shaping their collections, public libraries were speaking, loudly and clearly, to their patrons. 'These books will educate and edify you.'" *Id.*; *see also* Am. Library Ass'n, *Standard Library Organization* 22 (libraries should help ensure students choose "books helpful to an understanding of social well-being."). Indeed, the goal for a public library was never "universal coverage," but rather to curate a collection of "requisite and appropriate quality" "that would be of the greatest direct benefit or interest to the community." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (plurality opinion). If anything, that mission is more critical for children's libraries. Or as the federal government explained almost 150 years ago:

[I]f there is any truth in the idea that the public library is not merely a storehouse for the supply of the wants of the reading public, but also and especially an educational institution which shall create wants where they do not exist, then the library ought to bring its influences to bear on the young as early as possible.

Dep't of the Interior, *Public Libraries in the United States of America: Their History, Condition, and Management* 414 (1876), https://tinyurl.com/adadzrmp.

In this same vein, HB 1069 makes clear that books containing pornographic or sexually descriptive material distracts from Florida's educational mission and therefore should not be made available. And, as is the case here, "[p]atrons might have disagreed" with the decision to remove any particular book, but "the public library's view on edifying literature was quintessential government speech." *Little*, 138 F.4th at 862.

The district court agreed with much of this argument, concluding that "public school librarians—state employees certainly—have a history of selecting school library books." DE129 at 23. But the district court ruled against the State based off a series of misunderstandings about HB 1069 and the nature of government speech. Starting with HB 1069, the district court again focused not on the public school's history of selecting books, but rather if "*parents* have" had that same history of selecting books for public-school libraries. *See* DE129 at 23. Of course not. But parents do not select or remove any books here under Florida's statutory scheme. *See supra* 22–23.

The district court's second objection was that "[h]istorically, librarians curate their collections based on their sound discretion not based on decrees from on high." DE129 at 25. That observation is not legally or constitutionally relevant. "Political

subdivisions of States—counties, cities, or whatever—" are "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009). It is therefore up to the State to delegate specific educational responsibilities. But for purposes of the government-speech doctrine, all that matters is "whether the type of speech has traditionally communicated *government* messages." *McGriff*, 84 F.4th at 1335; *see also Leake*, 14 F.4th at 1248 ("whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the *government*") (emphasis added). And here, there is no doubt that the government, whether it be the Legislature or the local librarian, is communicating through its curation of books. The district court erred in requiring the same exact type of government employee that historically engaged in the speech at issue to engage in that speech here.[6]

The district court further concluded that removing books according to a statutory command meant "the government is not engaging in expressive activity." DE129 at 22. The court explained that "the statutory provision at issue does not

_____

[6] Even accepting the district court's premise that judgments about book collections made "from on high" are meaningfully different, the Eleventh Circuit has already established that government speech can occur in new contexts and circumstances: "For example, if the School Board posted a message about school closings for inclement weather on Facebook or Twitter, we would have little difficulty classifying the message as government speech, even though social media is a relatively new phenomenon." *Mech*, 806 F.3d at 1076.

involve discretion of government employees in curating an appropriate collection of library books that are 'worth reading'" because it "mandate[d]" a books removal "regardless of the holistic value of the book . . . ." DE129 at 22; *see also id.* at 27 ("A blanket content-based prohibition on materials, rather than one based on individualized curation, hardly expresses any intentional government message at all.").

This conclusion runs head-on into two well-established principles. Start with the oft-cited idea that the curation of third-party content can itself be unique expression. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own."). True to that idea, this Court and the Supreme Court have repeatedly found expressive activity when a party crafts its own message by compiling third-party speech in analogous contexts. *See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (organization's selection of parade participants was expressive conduct); *see Leake v. Drinkard*, 14 F.4th 1242, 1245 (11th Cir. 2021) (similar); *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (City's curation of art for city event was expressive conduct); *cf. Bryan v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("'[G]overnment speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries."); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C.

Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").[7] Next, these cases also make clear that a government may "speak[] through the removal of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (cleaned up); *McGriff*, 84 F.4th at 1334 ("Having bought the artwork, the City's decision to display it, or not display it, was classic government speech.").

Putting these pieces together, an entity—government or otherwise—can express itself through the curation and removal of third-party content. That is precisely what happened here. Florida elected to remove select categories of books from its own bookshelves, and in doing so expressed its view that the government should not make available to students books addressing controversial or objectionable topics related to pornography or sexuality. If anything, the fact that it did so by means of a categorical law—instead of a totality-of-the-circumstance analysis—makes that expression more emphatic, not less, as the district court assumed.

_____

[7] The Eighth Circuit misunderstood the nature of the government's speech when it warned that "if placing these [disparate] books on the shelf of public school libraries constitutes government speech, the State is babbling prodigiously and incoherently." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (quotation marks omitted); DE129 at 20. But as the Fifth Circuit clarified, "[t]he library is not babbling incoherently in the voices of Captain Ahab, Hester Prynne, Odysseus, Raskolnikov, and Ignatius J. Reilly. Rather, the library speaks by selecting some books over others and presenting that collection to the public—just as a museum does when it curates a collection of various schools of art." *Little*, 138 F.4th at 837.

**3. The public would reasonably believe the government endorsed the message communicated through library collections.**

The third factor asks whether "observers reasonably believe the government has endorsed the message." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1290 (11th Cir. 2024).

Here too the answer is yes. Public-school libraries are funded and operated by the government, and every book added to the library is purchased and approved by a government employee. *See supra* 24–25; *see also Little*, 138 F.4th at 864 (plurality opinion) ("People know that publicly employed librarians, not patrons, select library materials for a purpose."). And the "expressive activity at issue is choosing some books and presenting them as worthwhile literature." *Id.* at 865. Its decisions to remove books that clash with that purpose are simply the other side of the same coin. *See, e.g., Mech*, 806 F.3d at 1073 (school validly removed banner from school grounds deemed "inconsistent with the educational mission").

Further corroborating this point is the fact that the books at issue are housed in libraries on government property. Expression on "government property is often closely identified in the public mind with the government unit that owns the land." *Mech*, 806 F.3d at 1076; *see also Dean*, 12 F.4th at 1265 (separate opinion) (finding government endorsement of cheerleaders' expression in part because it occurred "on government property at government-sponsored school-related events."). This is even more acute when the expression at issue "related to the schools' educational mission." *Mech*, 806

F.3d at 1078. Or, as the Supreme Court explained, housing expression on one's own property leads others to "routinely" and "reasonably" interpret that expression "as conveying some message on the property owner's behalf." *Summum*, 555 U.S. at 471; *see also McGriff*, 84 F.4th at 1334 (noting art installation was government speech in part because city "provide[d] the space in which the exhibition was housed.").

To access these books, a student enrolled at a public school must walk onto school grounds, go into the school library, and select a book that was acquired and approved by the district. That is more than enough for a reasonable observer to believe the message at hand was approved by the government. *See Leake*, 14 F.4th at 1250 (noting governments "typically do not organize and fund events that contain messages with which they do not wish to be associated.") (quotation marks omitted).

Even the district court agreed "in the abstract" that "the public may believe the state is speaking through its the curation of school library books," but concluded that HB 1069 somehow undid that public perception because the law "requires the school boards to advertise on the school district website that parents have the power to have books removed." DE129 at 24. Again, however, it is the government—not parents— that dictates the library's overall message and removes any schoolbook. *See supra* 24–25. And there is no reason to believe that giving adults the right to petition for a book's removal would change public perception about the government endorsing its collection.

The district court's other justification was that "it is unclear what the government seeks to express by allowing a book to be removed on the given statutory grounds without any consideration of the book's holistic value." DE129 at 24. Such a categorical prohibition, the district court concluded, "conflict[s] with the sound discretion of school librarians necessary for the expressive activity . . . ." *Id.* This rule-versus-discretion distinction is foreign to the case law. Or put differently, Florida's law prohibiting any books containing pornographic or sexually descriptive content is an expression about what is appropriate for children—specifically that no book with even one instance of pornographic or sexual content is worth exposing to children. The district court may disagree with that determination, but that categorical rule is no less expressive than a totality-of-the-circumstances standard.[8]

The district court's rationale is also hard to square with cases like *Nussbaumer v. Secretary*, 150 F.4th 1371, 1373–74 (11th Cir. 2025), where this Court held that excluding Christian counseling from a state-mandated educational program because of its policy barring any "faith-based ideology associated with a particular religion or denomination" was government speech. *See also Summum*, 555 U.S. at 472 (holding city's selection of

---

[8] The district court also distinguished *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1333 (11th Cir. 2023) "because the city removed the painting in its own discretion—not an outsider's input—and after considering the artwork in its entirety—not based on a single criterion excised from the work as a whole." DE129 at 23. Again, it is unclear why this distinction matters, especially when the Eleventh Circuit did not rule on this basis.

monuments is government speech and noting that "[a]cross the country, municipalities generally exercise editorial control over donated monuments through . . . written criteria[] and legislative approvals of specific content proposals." (quotation mark omitted)). Neither *Nussbaumer* nor *Summum* even hint at the idea that a government is less likely to speak when following a pre-established rule, yet the district court imposed exactly that requirement on the State here.

*　　*　　*

The government-speech doctrine neatly explains why no one can force the government to convey a message it disagrees with. As this Court explained, "the First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them." *Leake*, 14 F.4th at 1247.

The district court could cite no precedent undoing that basic truth. *Stanley v. Georgia* addressed Georgia's law criminalizing the possession of obscene material in one's home. 394 U.S. 557, 585 (1969); DE129 at 9. The Supreme Court in *Stanley* noted a right to receive information, but that right was implicated only because Georgia sought to completely ban such access to the obscene material. *Stanley*, 394 U.S. at 564–65. Put differently, Stanley's First Amendment right protected him "from unwanted

governmental intrusions into one's privacy," *id.* at 564, it did not require Georgia to make the obscene material readily available to Stanley.[9]

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) is even further afield. DE129 at 9. The district court cited *Pernell* only for the uncontroversial point that the student plaintiffs' right to receive classroom information was coextensive with the professor plaintiffs' right to express information. 641 F. Supp. 3d at 1244–45. In other words, the two sets of plaintiffs' arguments would rise and fall together. That says nothing about the merits of the plaintiffs' claims or how that would apply in a context like this.

The Fifth Circuit's recent en banc opinion *Little v. Llano County* offers the better view. Plaintiffs there sued Llano County for removing several books after it received objections from the community regarding those books' sexual and racial content. 138 F.4th 834, 838 (5th Cir. 2025) (en banc). Plaintiffs argued, and the lower court agreed, that removing such books implicated their "First Amendment rights to access and receive information and ideas." *Id.* at 838, 841.

---

[9] The Supreme Court later elaborated on *Stanley*, describing its holding as an "explicitly narrow and precisely delineated privacy right," which "reflects no more than what Mr. Justice Harlan characterized as the law's 'solicitude to protect the privacies of the life within (the home).'" *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 127 (1973). *Stanley* therefore cannot be extended from the privacy of one's own home into a public-school library operated by the government.

The en banc Fifth Circuit squarely rejected that claim. The court concluded that the "right to receive information" cases "limit[] the government's power to prevent one person from receiving another's speech," but those cases cannot be extended to "invoke a right to receive information from the *government*." *Id.* at 843. Plaintiffs' claim that the government cannot remove books from its own library "would stretch the [First Amendment] right far beyond its roots." *Id.* at 845. Given that these books remain available elsewhere, the "only thing disappointed patrons are kept from 'receiving' is a book of their choice at taxpayer expense." *Id.* at 848.[10]

The district court's view of the right to receive information also proves too much. If the right to receive information affirmatively requires the government to provide that information, then Plaintiffs would equally be allowed to challenge book *purchases* as well as removals. *Id.* at 846 ("[O]nce courts arm plaintiffs with a right to contest book removals, there is no logical reason why they cannot contest purchases too."); *Pico*, 457 U.S. at 892 (Burger, C.J., dissenting) ("[I]f the First Amendment commands that certain books cannot be *removed*, does it not equally require that the same books be *acquired*?"). Such a position would make it impossible for the government to curate the

---

[10] The district court interpreted *Little* to hold that plaintiffs "lacked standing to bring their claim." DE129 at 21. It does not appear that the en banc Fifth Circuit framed its holding as addressing plaintiffs' standing, but rather a ruling about the scope of the First Amendment and the merits of plaintiffs claim. But regardless of how the issue is conceived, the end result is the same—Plaintiffs have no First Amendment right to dictate which books the government puts in its library.

books it deems best to further its educational mission, bog down library collection decisions in endless litigation, and erase the basic principle that individuals have "no First Amendment right to speak for the government." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1017 (9th Cir. 2000). Any library operating under this regime "would be a warehouse, not a library." *Little*, 138 F.4th at 848; *accord Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (holding that the plaintiffs' "boundless" right-to-listen theory proved too much and that they lacked standing).

This was all confirmed in *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion). In *Pico*—a case about the removal of "anti-American, anti-Christian, anti-Semitic, and just plain filthy" books from public-school libraries, *id.* at 857 (cleaned up)—a majority of Justices rejected the notion that the First Amendment right to receive ideas applies in the school library context. *See Little*, 138 F.4th at 844 & n.15 (counting five supporting votes).[11] The principal dissent explained the view well: "[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide continuing access to certain books." *Pico*, 457 U.S. at 889 (Burger, C.J., dissenting). Otherwise, a public school would be "made a slavish courier of the material of third parties." *Id.*

---

[11] *Pico* was a highly fractured decision that has no precedential weight in the Eleventh Circuit. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1201–02 (11th Cir. 2009). But the basic point remains: The majority of Justices in *Pico* rejected the idea that the First Amendment required schools to produce and maintain objectionable books in their libraries.

Because the State's curation of a public-school library collection is government speech, the First Amendment has nothing to say about HB 1069. The Court should reverse on that basis alone.

**B.    Alternatively, public-school libraries are an optional government benefit that can be revoked without implicating the First Amendment.**

Plaintiffs' arguments separately fail because public-school libraries are a government benefit. There is no constitutional obligation to provide school libraries, so the size and scope of public-school libraries are matters of government discretion. *See Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("[W]hen the Government appropriates public funds to establish a program it is entitled to define the limits of that program."). This remains true when the underlying benefit is speech or expression-adjacent. *See Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358 (2009) ("A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." (cleaned up)). It is of course true that continued government expenditure "can enhance the [individual's] exercise of First Amendment rights," but the State "is under no obligation to" do so. *Id.* at 359; *see also Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 546 (1983) ("We again reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." (quotation omitted)).

Those principles independently resolve the issue here. Florida funds and maintains public-school libraries, and the creation of that benefit entails the discretion to modify the contours of the benefit as the State deems fit. HB 1069 did just that: The

Legislature decided that the government would no longer fund and maintain books with content that the State deemed inappropriate for children to access in public-school libraries.

The district court concluded otherwise by relying on inapt law. DE129 at 27–29. It started by citing *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), for the proposition that "the Government may not deny a benefit to a person on the basis that it infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Id.* at 214; DE129 at 27. But the fatal flaw in the government's funding program in that case was that it conditioned the money on the recipient adopting "a policy explicitly opposing prostitution and sex trafficking," thereby "demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern." *Agency*, 570 U.S. at 210, 218.

*Agency* is a far cry from this case. HB 1069's provisions do not require any party to formally espouse any position. It does not require any author or publisher to adopt any position about pornography or sexually descriptive material as a condition of selling or maintaining their books, the State is simply curating the books it already owns to align with its view of what books are best suited for Florida's public-school students.

*Ysursa* is the more relevant precedent. *See* 555 U.S. at 355. That decision upheld Idaho's decision to remove a previous government benefit—payroll deductions from employees to help fund union political activities—from the union's First Amendment challenge. *Id.* Because the First Amendment "does not confer an affirmative right to

use government payroll mechanisms for the purpose of obtaining funds for expression," Idaho's elimination of that government benefit did not trigger heightened First Amendment scrutiny. *Id.*

The district court distinguished *Ysursa* because the unions there "were not prevented from making political speech, the law merely prevented them from enlisting the State in support of that endeavor," whereas "[h]ere, speech itself is being abridged." DE129 at 28 (cleaned up). That distinction does not hold. The unions in *Ysursa* were still able to engage in political speech, just without government funding. *See* 555 U.S. at 359. And here too, the publishers and authors can circulate their books—Florida has just chosen not to buy them for its public-school libraries.[12]

Finally, the district court relied on two cases—both of which upheld State laws against a First Amendment challenge—to conclude that HB 1069's "differential subsidization" is impermissible because it "threatens to suppress the expression of particular ideas or viewpoints." DE129 at 28–29 (citing *Alachua Cnty. Educ. Ass'n v. Carpenter*, 741 F. Supp. 3d 1202, 1243 (N.D. Fla. 2024) and *Leathers v. Medlock*, 499 U.S. 439, 447 (1991)). That concern proves far too much. "To hold that the Government

---

[12] The district court then hedged by claiming "[e]ven if *Ysursa* was on point, this law goes further because it discriminates based on content." DE129 at 28. But *Ysursa*'s removal of a payroll deductions for "political activities" was a content-based distinction because it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect." *Rust*, 500 U.S. at 194. Any idea, as the district court seems to assert here, that the government cannot take sides on any particular view leads to untenable views. *See Little*, 138 F.4th at 850 ("[One] would hardly disagree . . . with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence.") (citing Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998)).

## II. Even if the First Amendment applies, the government is permitted to restrict in-school speech activities if doing so is reasonably related to legitimate pedagogical concerns.

Even if HB 1069 did implicate Plaintiffs' First Amendment rights, the statute would still survive First Amendment scrutiny given the unique context of public schools and public libraries. "[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, (1988). This affords schools greater latitude to regulate and restrict speech within the school setting "even though the government could not censor similar speech outside the school." *Id. Hazelwood* thus establishes the principle that schools may regulate "expressive activities that students, parents, and

members of the public might reasonably perceive to bear the imprimatur of the school," if doing so is "reasonably related to legitimate pedagogical concerns." *Id.* at 271, 273.

In *Hazelwood*, student newspaper staffers sued the school district and school officials alleging First Amendment violations after the school removed the students' articles discussing "sexual activity and birth control." *Id.* at 263. The Supreme Court ruled for the school officials. *Id.* at 276. Schools have greater control over student expression that "may be inappropriate for their level of maturity" or may "erroneously [be] attributed to the school." *Id.* at 271. The school's concern over sexually explicit news articles implicated these concerns, so the school's decision to remove those articles did not violate any First Amendment right. *Id.*

This Court confirmed these same basic principles in *Virgil v. Sch. Bd. Of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989). There, this Court applied the *Hazelwood* standard to hold that the school board's decision to remove a textbook containing inappropriate sexual content after a parent objected did not violate the First Amendment. *Id.* at 1518–20. The school board's concern about exposing students to "potentially sensitive topics such as sex" was plainly a "legitimate concern" that justified the book's removal. *Id.* at 1523. It did not matter that the removed works were "widely acclaimed masterpieces of Western literature," because it is ultimately for the school board to determine what materials best accomplish its pedagogical mission. *Id.*

HB 1069 is no different. Public-school library collections—located on school property and curated by government employees—bear the imprimatur of the school,

and the Legislature's decision to shield children from sexually graphic material is a valid pedagogical concern. Nothing more is needed to uphold HB 1069 under *Hazelwood* and *Virgil*.

The district court skirted this deferential standard by concluding that *Hazelwood* did not apply.[13] It concluded that *Hazelwood* is "out of place where, as here, it is not students speaking" and applied only to expression "disseminated to other students in captive settings." DE129 at 30–31; *see also id.* at 31 ("[S]hould students here not wish to read a book that runs afoul of this statute, they need not.").

*Hazelwood*'s analysis is not so limited. In authorizing the school to curtail a student drafted newspaper article, the Supreme Court articulated the general principle that schools may curtail "expressive activities" on campus if doing so "reasonably relate[s] to legitimate pedagogical concerns." 484 U.S. at 271, 273. In fact, *Hazelwood* warned that narrowing the school's authority to control expression would mean "schools would be unduly constrained from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Id.* at 272 (quotation marks omitted).

It is no surprise then that this Court has already extended *Hazelwood*'s framework to "curricular decisions." *See Virgil*, 862 F.2d at 1521 (finding *Hazelwood* to be the "most direct guidance from the Supreme Court"). And the Supreme Court has also confirmed

---

[13] Worse, the district court did not engage with *Virgil* at all in its Order.

that *Hazelwood* applies more broadly to "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," *Morse v. Frederick*, 551 U.S. 393, 405 (2007), not only to student speech for a captive audience.

The district court instead favored the standard articulated in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 3, which limits school's ability to restrict student expression unless officials reasonably conclude it will "materially and substantially disrupt the work and discipline of the school." 93 U.S. 503, 513 (1969).[14] But *Tinker* was a "quite stark" case about punishing students who engaged in select "political speech" about the Vietnam war. *Morse*, 551 U.S. at 403. Given the uniqueness of that case, it follows that multiple later cases about the regulation of student speech specifically declined to use *Tinker*'s framework. *See id.* at 403–05 (noting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) and *Hazelwood* did not use *Tinker*'s framework).[15]

This, of course, is not a case about the State punishing student expression; it is about the State removing books from its own libraries that it thinks do not further the

---

[14] The district court never explained why *Tinker* is the better framework when *Tinker*—like *Hazelwood*—addressed "student expression." *Morse v. Frederick*, 551 U.S. 393, 403 (describing *Tinker*).

[15] The district court also found that the impact of HB 1069—removing "vast swathes of literature"—further supported using *Tinker*'s standard. DE129 at 33. Yet nothing in *Tinker* addressed or turned on the how broad impact of the State's regulation (the school in *Tinker* suspended only five students for protesting the Vietnam war). *See Tinker*, 393 U.S. at 508.

State's pedagogical mission. *Tinker* is inapt, and the district court erred in failing to address this case under the standard adopted in *Hazlewood* and reaffirmed in *Virgil*.

Even then, after finding that *Tinker* "appears" to be the proper standard, the district court erred by evaluating HB 1069 under the "lower level of scrutiny contained in the non-public forum standard." DE129 at 33. For the reasons articulated above, the non-public forum standard is inapplicable because the curation of books in this context is government speech, a government benefit, or assessed under the *Hazlewood* standard. The district court's application of the overbreadth doctrine, its interpretation of the pornographic standard in HB 1069, and its weighing of constitutional versus unconstitutional applications was error. *See* DE129 at 33–49.

## CONCLUSION

At bottom, the district court subscribed to a vision of the First Amendment that cannot possibly be right. Public-school libraries are not constitutionally compelled to offer their students pornographic works, any more so than they are required to offer literature denying the Holocaust or lauding the benefits of teen suicide. This Court should reverse the district court's order and remand with instructions to grant summary judgment for the State Defendants.

Dated: December 10, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

/s/ *Jason J. Muehlhoff*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
THOMAS F. KELLY
  *Solicitor General Fellow*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*jeffrey.desousa@myfloridalegal.com*
*jason.muehlhoff@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,467 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Jason J. Muehlhoff*
Chief Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on December 10, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Jason J. Muehlhoff*
Chief Deputy Solicitor General
