No. 25-13181

---

## United States Court of Appeals
## for the Eleventh Circuit

---

PENGUIN RANDOM HOUSE LLC, *et al.*,
*Plaintiffs-Appellees,*

v.

BEN GIBSON, in his official capacity as Chair of the Florida State Board of
Education, *et al.,*
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Middle District of Florida
No. 6:24-cv-01573 (Hon. Carlos E. Mendoza)

---

**Brief of *Amici Curiae* Arkansas, Alabama, Alaska, Georgia, Idaho, Indiana,
Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio,
Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West
Virginia Supporting Defendants-Appellants and Reversal**

---

TIM GRIFFIN
Arkansas Attorney General

AUTUMN HAMIT PATTERSON
Solicitor General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-2700
autumn.patterson@arkansasag.gov

*Counsel for Amicus Curiae State of Arkansas*

*Penguin Random House LLC v. Gibson*
*No. 25-13181*

## Certificate of Interested Persons and Corporate Disclosure Statement

Amici States certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1.1 through 26.1-5:

1. Alvarez, Julia

2. Anderson, Laurie Halse

3. Bird, Brenna

4. Brenson, Kirstie

5. Brosemer, Donna

6. Brown, Derek

7. Burnette, Anita

8. Byrd, Esther

9. Byrd, Melissa

10. Carr, Chris

11. Christie, Grazie P.

12. Colon, Ruben

13. Cox, Stephen J.

14. Dentel, Karen Castor

C-1

*Penguin Random House LLC v. Gibson*
*No. 25-13181*

15. DeSousa, Jeffrey

16. Diederich, Adam

17. Douglas, Anne

18. Drummond, Gentner

19. Farrant, Alicia

20. Felder, Vicki-Elaine

21. Florida State Board of Education

22. Gallo, Angie

23. Garcia, Kelly

24. Gibson, Ben

25. Goodrich, Krista

26. Gould, Pam

27. Green, John

28. Griffin, Tim

29. Hachette Book Group, LLC

30. Hanaway, Catherine

31. HarperCollins Publishers LLC

32. Hayes, Judith Anne

33. Haynes, Jamie

*Penguin Random House LLC v. Gibson*
*No. 25-13181*

34. Hilgers, Michael T.

35. Jackley, Marty

36. Jacobs, Teresa

37. Karp, David

38. Kellogg, Heidi

39. Kelly, Thomas

40. Knudson, Austin

41. Kobach, Kris W.

42. Labrador, Raúl R.

43. Macmillan Publishing Group, LLC

44. Magar, MaryLynn

45. Marks, Howard

46. Marshall, Steve

47. McCuskey, John B.

48. Mendoza, Judge Carlos E.

49. Murrill, Liz

50. Muehlhoff, Jason

51. Norway, Magistrate Judge Robert M.

52. Orange County School Board

C-3

*Penguin Random House LLC v. Gibson*
*No. 25-13181*

53. Patterson, Autumn Hamit

54. Paxton, Ken

55. Penguin Random House LLC

56. Persis, Carl

57. Petty, Ryan

58. Picoult, Jodi

59. Rokita, Theodore E.

60. Salamanca, Maria

61. Simon & Schuster, LLC

62. Skrmetti, Jonathan

63. Sourcebooks LLC

64. Sperling, Frederick

65. Thakrar, Sheena

66. Thomas, Angie

67. Thompson, Jessie

68. Uthmeier, James

69. Vanos, Stephanie

70. Volusia County School Board

71. Wilson, Alan

72. Wrigley, Drew H.

73. Yost, Dave

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ............................................................................. C-1

Table of Authorities ...................................................................... ii

Statement of Interests of Amici Curiae ................................... 1

Summary of the Argument ........................................................ 2

Argument ...................................................................................... 3

    I.    Curation Decisions for Public-School Libraries Are Government Speech, Which Cannot Violate the Free Speech Clause .......................................................................... 3

        A.  HB 1069 regulates government speech. ............................. 3

        B.  Although there are some restrictions on government speech, the Free Speech Clause does not constrain the government's curation decisions ................................ 12

    II.   The First Amendment Does Not Compel a State to Provide Certain Books in Its Libraries ................................ 14

Conclusion ................................................................................... 16

Certificate of Compliance ......................................................... 19

Certificate of Service .................................................................. 20

i

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ........................................................................ 15

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ....................................................................13, 14

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ...........................................................5

*Cajune v. Indep. Sch. Dist. 194*,
  105 F.4th 1070 (8th Cir. 2024) ...........................................................8

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
  114 F.4th 660 (8th Cir. 2024) ....................................................... 9, 10

*Little v. Llano County*,
  103 F.4th 1140 (5th Cir. 2024) ..................................................... 4, 13

*Little v. Llano County*,
  138 F.4th 834 (5th Cir. 2024) (en banc) ....................... 4, 6, 11, 14, 15

*Matal v. Tam*,
  582 U.S. 218 (2017) ..........................................................................8

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ..............................................2, 3, 4, 5, 10

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ........................................................................ 16

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
  414 F.3d 23 (D.C. Cir. 2005) ..............................................................4

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ............................................................. 5, 11, 12

*Pulphus v. Ayers*,
  249 F. Supp. 3d 238 (D.D.C. 2017) ....................................................9

*Raven v. Sajet,*
    334 F. Supp. 3d 22 (D.D.C. 2018) ........................................................9

*Raven v. United States,*
    2019 WL 2562945 (D.C. Cir. May 17, 2019) ................................9

*Regan v. Tax'n with Representation of Wash.,*
    461 U.S. 540 (1983) ............................................................... 8, 15

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022) ............................................................. 5, 11, 13

*Sutliffe v. Epping Sch. Dist.,*
    584 F.3d 314 (1st Cir. 2009) .............................................................4

*United States v. Am. Libr. Ass'n, Inc.,*
    539 U.S. 194 (2003) ........................................................... 4, 5, 6

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ...............................................2, 5, 6, 8, 9, 10, 12

## Rules & Statutes

Fla. Stat. § 1006.28 ................................................................... 2, 3, 6

Fed. R. App. P. 26.1 ..........................................................................1

Fed. R. App. P. 29 .............................................................................1

Eleventh Circuit Rule 26.1 ................................................................1

Eleventh Circuit Rule 26.2 ................................................................1

Eleventh Circuit Rule 26.3 ................................................................1

Eleventh Circuit Rule 26.4 ................................................................1

Eleventh Circuit Rule 26.5 ................................................................1

## Other Authorities

*Board votes to keep 8 controversial books on St. Johns County
school shelves*, News4JAX, https://tinyurl.com/33eady28
(Aug. 25, 2022) ................................................................................. 10

C. B. Joeckel, *The Government of the American Public Library* (1935),
https://tinyurl.com/3c9znvd7 .......................................................... 16

C. L. Osborne, *Freedom of Expression,Collection Management, and
Ethical Decision-Making: Censorship of the Good, the Bad, the
Ugly, and Our Obligations to Preserve A Culture's Story*,
117 Law Libr. J. 191 (2025) ................................................................ 4

J. H. Shera, *Foundations of the Public Library: The Origins of the Public
Library Movement in New England 1629–1855* (1949),
https://tinyurl.com/mwzzcfzn .......................................................... 7

*Protesters argue against banned books in Brevard County*,
Fox 35 Orlando, https://tinyurl.com/3z29vtef (Mar. 7, 2023) ........................ 10

U.S. Dep't of Interior, *Public Libraries in the United States: Their
History, Condition, and Management* (1876),
https://tinyurl.com/vjdp9x5p............................................................. 7

## STATEMENT OF INTERESTS OF AMICI CURIAE

Arkansas and 20 States file this amicus brief under Rule 29(a)(2) of the Federal Rules of Appellate Procedure. The *amici* States have a strong interest in the proper interpretation of the First Amendment, especially when courts misconstrue the Free Speech Clause to restrict the States' own speech. The Free Speech Clause has no application when States and their political subdivisions make editorial choices about what materials to include and what materials to omit from public-school libraries. Reaching the contrary conclusion has grave consequences, not just for *amici* States but also for our Nation's constitutional structure.

Refusing to recognize that public-library curation decisions are government speech subverts the democratic process. Rather than having democratically accountable officials decide the content of public-school libraries, unelected federal courts will become the decisionmakers forced to referee countless disputes between students, parents, publishers, and various associations over what books should and should not be in schools. This case therefore also implicates *amici* States' interest in preserving our constitutional structure.

## SUMMARY OF THE ARGUMENT

Florida passed a law, HB 1069, prohibiting books that describe sex acts from lining the shelves of public-school libraries. Fla. Stat. § 1006.28(2)(a)2.B.(I)-(II). Selecting what books belong in public-school library collections necessarily involves making editorial decisions about which books—out of millions—are age-appropriate, educational, and worthy of expending taxpayer funds. Because exercising "editorial discretion" is "speech activity," *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024), those curation decisions are speech. And because the curator of the public-school library collection is the government, those curation decisions are *government* speech. That resolves this appeal because the government "is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Accordingly, the district court was wrong to conclude the curation decisions were not government speech because Florida gives parents a role in the process. *See* DE129 at 23–25. Allowing parents to raise an objection regarding material in a public-school library and requiring a school board to decide whether the objected-to material should be on public-school library shelves based on state law does not change the fact that, at the end of the day, it is the government making the ultimate curation decision.

Even apart from the government-speech issue, the district court's analysis is

flawed.  A person's right to *receive* information under the First Amendment is not a right to *compel* information at taxpayer expense.  There is no First Amendment right to compel public-school libraries to furnish certain books—much less to require public schools to stock library shelves with graphic depictions of sex acts that elementary students can access without their parents' knowledge or consent.  The Court should therefore hold that HB 1069 regulates government speech and does not violate the First Amendment.

## ARGUMENT

### I.   CURATION DECISIONS FOR PUBLIC-SCHOOL LIBRARIES ARE GOVERNMENT SPEECH, WHICH CANNOT VIOLATE THE FREE SPEECH CLAUSE.

#### A.    HB 1069 regulates government speech.

Florida's law restricts how government entities (public-school districts and school boards) make curation decisions.  Among other restrictions, HB 1069 generally prohibits the government from retaining books for public-school libraries that describe sex acts.  *See* Fla. Stat. § 1006.28(2)(a)2.B.(I)-(II).  The law reflects the Florida Legislature's judgment that certain books are not age-appropriate materials worthy of study and its desire to avoid promoting such books to K-12 children through its public-school library shelves.

Florida's law is an exercise of "editorial discretion," which "itself is an aspect of speech."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (quoting *Denver*

*Area Ed. Tele. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality op.)).  That is because a decision regarding "the third-party speech that will be included in or excluded from a compilation . . . is expressive activity."  *Id.*  Library curation decisions are speech because they necessarily involve editorial choices and the "exercise of judgment in selecting the material" provided to library patrons.  *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality op.).

When a government entity or official (whether a State, local government, or public-library staff) is making those curation decisions, it is government speech.  *See Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 330 (1st Cir. 2009) (explaining *American Library Association* "appl[ied] the government speech doctrine").  As the D.C. Circuit has put it: "With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."  *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005).[1]  That is exactly right.  "As the case law makes clear, 'government

---

[1] *See Little v. Llano County*, 103 F.4th 1140, 1182 (5th Cir. 2024) (Duncan, J., dissenting) ("[T]he government speaks by choosing certain books over others for the library's collection."), *vacated*, 138 F.4th 834 (5th Cir. 2024) (en banc); C. L. Osborne, *Freedom of Expression, Collection Management, and Ethical Decision-Making: Censorship of the Good, the Bad, the Ugly, and Our Obligations to Preserve A Culture's Story*, 117 Law Libr. J. 191, 221 (2025) (explaining that "government speech is evident through the selection process" of a public library and that "[t]he decision to acquire, exclude, or deaccession . . . is thus government speech").

4

speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as *libraries*, broadcasters, newspapers, museums, *schools*, and the like." *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (quoting *Gittens*, 414 F.3d at 28) (emphases added). That means HB 1069's regulation of what books will be part of public-school libraries' collections is government speech. This commonsense conclusion is compelled by *NetChoice*, along with other Supreme Court precedent regarding editorial decisions, and by the Supreme Court's government-speech precedent.

In *Pleasant Grove City v. Summum*, 555 U.S. 460, 470–72 (2009), *Walker*, 576 U.S. at 209–10, and *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022), the Supreme Court outlined three indicia of government speech: (1) history of the expression, (2) likely perception regarding the speaker, and (3) government control. All three demonstrate that the government's public-library curation decisions, including HB 1069, which regulates such decisions, are government speech.

*First*, public libraries have a long history of making curation decisions to "provide materials that would be of the greatest direct benefit or interest to the community." *Am. Library Ass'n*, 539 U.S. at 204 (plurality op.). The fact that private parties write the books in the library collection or that the books express

differing opinions does not change the fact that the government speaks through its editorial choices. *See Walker*, 576 U.S. at 216 (rejecting argument that license plates are a limited public forum despite private parties' designing the plates); *id.* at 221–22 (Alito, J., dissenting) (discussing the 350 plate designs that feature competing schools and different views). Nor does the fact that the law allows parents to bring certain materials to the school board's attention, so the public can obtain a specific determination from the elected school board (and not just unelected school officials) about whether an item is appropriate for a public-school library. *See* Fla. Stat. § 1006.28(2)(a)2.

Public libraries do *not* "collect[] books in order to provide a public forum for the authors of the books to speak." *Am. Library Ass'n*, 539 U.S. at 207 (plurality op.). Instead, public libraries "collect only those materials" they "deem[] to have 'requisite and appropriate quality,'" which will "give the public, not everything it wants, but the best that it will read or use to advantage." *Id.* at 204 (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980), and F. Drury, Book Selection xi (1930)). Public libraries' selection of books expresses a view "about which books are worth reading and which are not, which ideas belong on the shelves and which do not." *Little v. Llano County*, 138 F.4th 834, 838 (5th Cir. 2025) (en banc) (plurality op.), *cert. denied*, No. 25-284, 2025 WL 3507000 (U.S.

6

Dec. 8, 2025).  And this has been true throughout American history.  Public libraries have long shaped their collections to express the government's view regarding what materials are "edifying" and would be likely to promote morality and civil virtue. *See id.* at 861–63 (discussing the history of public libraries).

Indeed, a prominent advocate arguing in support of an 1851 Massachusetts law authorizing public libraries touted that public libraries would "be favorable to all the moral reforms of the day" by encouraging the reading of worthwhile books and drawing young people away from "low and immoral publications."  J. H. Shera, *Foundations of the Public Library: The Origins of the Public Library Movement in New England 1629–1855* 239 (1949).[2]  And this view appears widespread in the 1800s: public libraries were expected to be managed in such a way that they would "draw young readers away from merely frivolous reading" and provide "that which will do them good"—books that are "instructive and stimulating to the better nature." U.S. Dep't of Interior, *Public Libraries in the United States: Their History, Condition, and Management* 412, 416 (1876).[3]  Moreover, there is a history of public libraries, even ones outside of a school, being "viewed as an adjunct of the public school system" that would help "direct the reading of the young."  *Id.* at 417–18.  Curation

---

[2] This text is available at https://tinyurl.com/mwzzcfzn.
[3] This text is available at https://tinyurl.com/vjdp9x5p.

decisions are thus unlike public-library meeting rooms, which are sometimes limited public forums, or school walls that might be a limited public forum if a school district decides to "create[] a limited public forum" by allowing private persons to display their posters. *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1075–76, 1083 (8th Cir. 2024).

*Second*, the public's likely perception is that public-school libraries' curation decisions are government speech—that the government is expressing its views regarding what materials are worthwhile. The government promotes its collection as containing materials with educational and literary value for K-12 students, *cf. Am. Library Ass'n*, 539 U.S. at 203–04, and stamps, affixes a sticker, or uses another method to physically mark the books as being its property, *compare Walker*, 576 U.S. at 218 (noting the license plate is "stamped with the imprimatur of Texas"), *with Matal v. Tam*, 582 U.S. 218, 236–37 (2017) (explaining a trademark is not owned by the State like license plates and "it is unlikely" that most of the public knows any more about federal "trademark registrations" than "about legal title to the land and buildings [they] pass[]" (quotation omitted)). It has thus always been apparent that the government is the editor of a public library's collection.

To be sure, books in public-school libraries will sometimes express diametrically opposed ideas. But the public understands that the government's

speech is the editorial decisions about what materials are included on the bookshelves, *not* the messages in the books themselves. If including diverse viewpoints meant editorial decisions could not be government speech, then *Walker* would have come out the other way. *See* 576 U.S. at 221–22 (Alito, J., dissenting) (describing diverse messages on license plates, such as rival universities). So too would cases concluding that government art competitions are government speech that "convey a kind of message about the government's support for art—or at least the art the government chooses to sponsor." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 248 (D.D.C. 2017); *see Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019). And although the Eighth Circuit expressed "doubt[] that the public would view the placement and removal of books in public school libraries as the government speaking" given the diverse viewpoints expressed in those books, *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024), that court was deciding only a standing issue, not a merits issue, *see id.* at 667–68 (emphasizing the "forgiving" nature of "[t]he First Amendment standing inquiry" and cautioning against conflating the standing analysis with the merits of potential causes of

action).[4]  So there is no reason for this Court to apply the reasoning of that decision here, especially when it conflicts with the analysis in *Walker*.

In any event, if there was ever any confusion about who has been speaking through curation decisions, there no longer is.  That is because there has been widespread media coverage and heated discussions at school-board meetings the past several years regarding the materials that are in public libraries and public-school libraries.[5]  This controversy has made it increasingly apparent that the government—whether a State, county officials, public-school boards, or public-library administrators—is the one deciding what books are worth adding and retaining in their library collections, regardless of whether parents are given a role in the process.

---

[4] That the plaintiffs in that case could allege "future conduct" that is "*arguably* affected with a constitutional interest" does not tell us whether—on the merits—there was an *actual* First Amendment violation or whether the speech at issue was government speech.  *Id.* (citation modified) (emphasis added).  And the court did not address the government-speech argument when considering the plaintiffs' likelihood of success on the merits because the district court misunderstood how facial challenges work.  *See id.* at 670 ("The district court did not perform the necessary inquiry set forth in *NetChoice*.").

[5] *See, e.g.*, *Board votes to keep 8 controversial books on St. Johns County school shelves*, News4JAX, https://tinyurl.com/33eady28 (Aug. 25, 2022); *Protesters argue against banned books in Brevard County*, Fox 35 Orlando, https://tinyurl.com/3z29vtef (Mar. 7, 2023).

*Third*, public libraries and governing bodies actively "maintain[] control over the selection" of materials in the public-library collection. *See Walker*, 576 U.S. at 210. Unlike the City of Boston's approach to flags, Florida's public-school libraries do not have a "come-one-come-all attitude" to books. *See Shurtleff*, 596 U.S. at 257. Florida schools do not buy every book in existence with taxpayer funds, nor do they accept and place every donated book to place on their shelves. And like the monuments in *Summum*, the government is the owner of the books in the library collection. *See id.* (distinguishing *Summum*).

All government-speech factors thus point the same way: a public "library's collection decisions are government speech and not the regulation of private speech." *Little*, 138 F.4th at 860 (plurality).[6] HB 1069 therefore regulates government speech.

---

[6] The district court emphasized that "only" a plurality joined the portion of the en banc opinion that "concluded library collection decisions are government speech." DE129 at 21; *see id.* at 25. But a well-reasoned holding on the government-speech issue in an opinion joined by seven circuit judges is persuasive authority. Moreover, three circuit judges simply declined to opine on the government-speech issue, *Little*, 138 F.4th at 835 n.†, presumably concluding they did not need to reach that issue as the case could be resolved on another ground—that the plaintiffs had no First Amendment right to receive "a book of their choice at taxpayer expense," *id.* at 848 (majority op.).

**B.    Although there are some restrictions on government speech, the Free Speech Clause does not constrain the government's curation decisions.**

Because HB 1069 regulates government speech, Plaintiffs' First Amendment claim fails right out of the gate.  That is because "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207. Nor is the government required to "maintain viewpoint neutrality."  *Summum*, 555 U.S. at 479.  It is instead "the very business of government to favor and disfavor points of view."  *Id.* at 468 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment)).  To put it simply, the Free Speech Clause "does not regulate government speech," so HB 1069's instruction about how the government will speak through public-school libraries cannot violate it.  *See Summum*, 555 U.S. at 467.

That conclusion, however, does not mean "that a government's ability to express itself is without restriction."  *Walker*, 576 U.S. at 208.  Indeed, other "[c]onstitutional and statutory provisions" may provide significant limits. *Id.*  For example, "government speech must comport with the Establishment Clause." *Summum*, 555 U.S. at 468.

The "first and foremost" guardrail on government speech, however, is "the democratic electoral process."  *Walker*, 576 U.S. at 207.  Our Constitution relies "on

12

the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff*, 596 U.S. at 252.  It is therefore the "good sense of the citizens" who provide the main check on the State and on local governments. *Little*, 103 F.4th at 1185 (Duncan, J., dissenting).  That is how our structure of government works; democratically accountable officials are supposed to be the decisionmakers.

If every student, publisher, and association can bring a First Amendment challenge when they disagree with a public-library curation decision, unelected judges will effectively replace democratically accountable state and local officials as the curators.  They will be forced to decide which books should go on public-school library shelves and which should be removed.  *See id.* at 1160–62, 1186 (warning the federal judiciary against becoming "the Library Police" and pointing out that the judges in the majority in the overruled panel disagreed about whether half of the challenged books could be removed); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 885 (1982) (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.) (warning that expanding the First Amendment's scope and weighing into "a school board's decision concerning what books are to be in the school library," "an area traditionally left to the states," would turn the Supreme Court into "a 'super censor' of school board library decisions").

Fortunately, that is not the law because public-library curation decisions are government speech. The district court erred in concluding otherwise.

## II. THE FIRST AMENDMENT DOES NOT COMPEL A STATE TO PROVIDE CERTAIN BOOKS IN ITS LIBRARIES.

The district court also erred by concluding that Florida is constitutionally required to promote books describing sex acts by shelving them in public-school libraries. DE129 at 27–29. HB 1069's prohibition on public-school libraries housing sexually explicit and pornographic books does not implicate the First Amendment's right to receive information. HB 1069 does not prevent or prohibit students from receiving those books from their parents (or any source other than public-school libraries), nor does it restrict student speech. It simply prohibits age-inappropriate books describing sex acts from being in K-12 public-school libraries at taxpayer expense.

The Supreme Court's right-to-receive-information cases "h[o]ld that the First Amendment limits the government's power to prevent one person from receiving another's speech"; they do not hold that a person has "a right to receive information from the *government*." *Little*, 138 F.4th at 843 (majority op.). As Chief Justice Burger put it, "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (Burger, C.J., dissenting) (citation

modified); *see Little*, 138 F.4th at 844 & n.15 (majority op.,) (noting "[t]hree Justices (Powell, Rehnquist, and O'Connor) joined Burger's opinion in full, and a fourth (Blackmun) agreed with this point"). The First Amendment does not force "public broadcasters to allow third parties access to their programming," *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 675 (1998), and it does not "require[] a library to shelve particular books" or allow publishers or children to "tell the government which books it must keep in the library," *Little*, 138 F.4th at 844–45 (majority op.).

This is common sense. Prohibiting books that describe sex acts from elementary-, middle-, and high-school libraries "does not prevent anyone from 'receiving' the information in [them]," but rather prevents children from accessing those books at public schools—without their parents' knowledge—"at taxpayer expense," which is "not a right guaranteed by the First Amendment." *Id.* at 848. The Supreme Court has repeatedly (and rightly) "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (citation modified). Those who wish to read or write books describing sex acts "are as unconstrained now as they were before the enactment of this statute"; "they are merely deprived of the additional satisfaction of having [Florida citizens] taxed to

pay for it." *Finley*, 524 U.S. at 595–96 (Scalia, J., concurring). So no First Amendment right of students or publishers is infringed by Florida's decision that it will not subsidize inappropriate books about sex acts in its public-school libraries.[7] This is yet another basis for concluding that HB 1069 creates no First Amendment problems.

## CONCLUSION

For the foregoing reasons, the Court should reverse and hold that curation decisions for public-school libraries are government speech and that the First Amendment does not dictate what books the State must provide in its public libraries. Doing so helps ensure that important decisions regarding the education of children and the contents of public-school libraries remain with the constitutionally appropriate decisionmakers: democratically accountable state and local officials.

---

[7] This is not the first time that a State has had to take a stand against publishers that seek to use public libraries as cash cows to subsidize their businesses. *See* C. B. Joeckel, *The Government of the American Public Library* 11–12 (1935), available at https://tinyurl.com/3c9znvd7 (noting that book selection "presented many difficulties" and describing how the libraries "provided a rich harvest" for publishers, which necessitated laws "forbidding school commissioners" from acting as publishers' agents and requiring "the superintendent of public instruction to make lists of books suitable for the district libraries" (citation modified)).

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2700
autumn.patterson@arkansasag.gov

*Counsel for Amicus Curiae State of Arkansas*

17

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

CATHERINE HANAWAY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DREW H. WRIGLEY
North Dakota

DAVE YOST
Ohio Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General

KEN PAXTON
Texas Attorney General

DEREK BROWN
Utah Attorney General

JOHN B. MCCUSKEY
West Virginia Attorney General

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 3,644 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Equity A, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Autumn Hamit Patterson*
Autumn Hamit Patterson

**CERTIFICATE OF SERVICE**

I certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Autumn Hamit Patterson*
Autumn Hamit Patterson