No. 25-13181

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Penguin Random House, LLC, et al.,
Plaintiffs-Appellees
v.
Ben Gibson, in his official capacity as Chair
of the Florida State Board of Education, et al.,
Defendants-Appellants

On Appeal from the United States District Court for the
Middle District of Florida
Case No. 6:24-cv-01573-CEM-RMN

## **PLAINTIFFS-APPELLEES' BRIEF**

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100
Chicago, Illinois 60606
(312) 258-5500
frederick.sperling@afslaw.com

David A. Karp
CARLTON FIELDS, P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
(305) 539-7280
dkarp@carltonfields.com

*Counsel for Plaintiffs-Appellees*

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal has been assigned to tentative calendar number 14 in Atlanta, Georgia, for oral argument the week of April 20, 2026.

**TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CITATIONS .........................................................................................v

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

INTRODUCTION ..................................................................................................2

STATEMENT OF THE CASE ...............................................................................4

     I.       The Prohibitions Mandate The Removal Of School-Library
             Books Regardless Of Their Value.........................................................4

          A.      The Prohibition On Content That "Describes Sexual
                  Conduct." ....................................................................................5

          B.      The Prohibition On So-Called "Pornographic" Content. ..........6

          C.      Defendants Implement And Enforce The Prohibitions. ............7

     II.     Under The Prohibitions, Florida Educators Face Harsh
             Penalties.................................................................................................8

     III.    The Prohibitions Are A Solution In Search Of A Problem. ................9

     IV.    Procedural History...............................................................................11

STANDARD OF REVIEW ..................................................................................12

SUMMARY OF ARGUMENT .............................................................................12

ARGUMENT ........................................................................................................14

     I.       Plaintiffs Have Standing.....................................................................14

          A.      Plaintiffs Are Suffering First Amendment Injuries At The
                  Hands Of Defendants.................................................................15

ii

1. The Student Plaintiffs And Their First Amendment Injuries. ..................................................15

2. The Publisher And Author Plaintiffs And Their First Amendment Injuries. ..............................19

B. Plaintiffs' Injuries Are Traceable To And Redressable By The School Districts. .................................20

C. Plaintiffs' Injuries Are Traceable To And Redressable By The State. ..........................................22

II. Neither The Government-Speech Doctrine Nor The Government-Subsidy Argument Applies To Public-School Libraries. ..............................................................23

A. School Libraries Are Not Compulsory. ...................23

B. The State Of Florida Does Not Speak Through School-Library Books. ..........................................25

1. The State Of Florida Has Not Historically Communicated Through School-Library Books. ..........27

2. School-Library Books Do Not Convey State-Endorsed Messages. ......................................28

3. The State Of Florida Does Not Control The Contents Of School-Library Books. ..............................30

C. The State's Government-Subsidy Argument Does Not Supplant Plaintiffs' First Amendment Rights. ........................32

III. The Prohibitions Are Unconstitutionally Overbroad. ..........................33

A. The Scope Of The Prohibitions Is School-Library Books. .......37

B. The Prohibitions Have Limited Constitutional Applications. ........................................38

C. The Prohibitions' Unconstitutional Applications Vastly Outweigh Their Constitutional Applications. ..........................43

iii

1. The Prohibition On Content That "Describes Sexual Conduct." ...............................44

2. The Prohibition On So-Called "Pornographic" Content.................................................44

3. The Substantial Unconstitutional Applications Of The Prohibitions. .........................................46

IV. In The Alternative, Construing The Term "Pornographic" To Be Consistent With "Harmful To Minors" Would Save That Provision.................................................................50

CONCLUSION .................................................................53

ADDENDUM .................................................................54

iv

**TABLE OF CITATIONS**

<strong>Page(s)</strong>

**Cases**

*ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009)...........................................................................17

*Adams v. Matanuska-Susitna Borough School Dist.*, No. 3:23-cv-00265-SLG
(D. Alaska Aug. 6, 2024), Order On Motion For Preliminary Injunction............17

*Am. Booksellers Ass'n, Inc. v. Virginia*,
882 F.2d 125 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990) ......................46

\* *Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ............................................................................ 34, 36, 50

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ...........................................................................................33

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ...........................................................................................36

*Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*,
65 F.4th 1261 (11th Cir. 2023).............................................................................42

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .............................................................................................19

\* *Board of Education v. Pico,*
457 U.S. 853 (1982) ...................................................... 18, 24, 25, 33, 38, 40, 48

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ...........................................................................................16

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008).............................................................................26

*Cambridge Christian School, Inc. v. Florida High Sch. Athletic Association*,
115 F.4th 1266 (11th Cir. 2024) ........................................................30

*Case v. Unified Sch. Dist. No. 233*,
908 F. Supp. 864 (D. Kan. 1995) ........................................................17

\* *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........................................................39

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ............................... 17, 38, 40, 48

*Dimmitt v. City of Clearwater*,
985 F.2d 1565 (11th Cir. 1993) ........................................................34

\* *Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ............................................... 41, 44, 45

*Fayetteville Public Library v. Crawford County, Arkansas*,
684 F. Supp. 3d 879 (W.D. Ark. 2023) ............................... 17, 24, 25

*Free Speech Coalition, Inc., v. Rokita*,
No. 1:24-cv-00980-RLY-MG, 2024 WL 5055864 (S.D. Ind. July 25, 2024) ......35

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ........................................................43

\* *GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ............................... 16, 17, 19, 29

*Gundy v. City of Jacksonville*,
50 F.4th 60 (11th Cir. 2022) ........................................................27

*Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*,
922 F.2d 756 (11th Cir. 1991) ........................................................15

*Hazelwood School Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ................................... 25, 39, 40

*Hunt v. Washington State Apple Advert. Comm'n,*
432 U.S. 333 (1977) .........................................14

*Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) .........................................28

*In re Wild,*
994 F.3d 1244 (11th Cir. 2021).........................52

*Jacobellis v. Ohio,*
378 U.S. 184 (1964) .........................................49

*Johanns v. Livestock Marketing Ass'n,*
544 U.S. 550 (2005) .........................................31

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
385 U.S. 589 (1967) .........................................40

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) .........................................16

*Little v. Llano County,*
138 F.4th 834 (5th Cir. 2025) ..................... 16, 17

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .........................................14

*Martin v. City of Struthers, Ohio,*
319 U.S. 141 (1943) .........................................15

\* *Matal v. Tam,*
582 U.S. 218 (2017) ....................... 26, 28, 29, 30, 31

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.,*
   851 F.3d 1076 (11th Cir. 2017)..................................................................... 51, 52

*McGriff v. City of Miami Beach,*
   84 F.4th 1330 (11th Cir. 2023)...........................................................................31

*Mech v. City of Palm Beach County, Florida,*
   806 F.3d 1070 (11th Cir. 2015)..........................................................................29

\*  *Miller v. California,*
   413 U.S. 15 (1972) ..................................................................... 5, 6, 7, 41, 44

\*  *Minarcini v. Strongsville City Sch. Dist.,*
   541 F.2d 577 (6th Cir. 1976) ..................................................... 16, 17, 19, 38, 48

*Minnesota Voters All. v. Mansky,*
   585 U.S. 1 (2018) ................................................................................................39

*Moms for Liberty – Brevard County, FL v. Brevard Public Schools,*
   118 F.4th 1324 (11th Cir. 2024)........................................................................34

\*  *Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................................................................ 28, 34, 35

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ..............................................................................................16

*N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.,*
   124 F.4th 1322 (11th Cir. 2025).........................................................................12

*Parnell, et al. v. School Board of Escambia County, Florida,*
   802 F. Supp. 3d 1361 (N.D. Fla. 2025) .............................................................17

*PEN American Center, Inc. v. Escambia County School Board,*
   711 F. Supp. 3d 1325 (N.D. Fla. 2024) .............................................................17

\* *Penguin Random House v. Robbins*,
  774 F. Supp. 3d 1001 (S.D. Iowa 2025) ................................................. 38, 46, 48

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
  414 F.3d 23 (D.C. Cir. 2005) ........................................................................26

\* *Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009) ......................................................................................26

*Pope v. Illinois*,
  481 U.S. 497 (1987) ......................................................................................41

*Reno v. Am. C. L. Union*,
  521 U.S. 844 (1997) ......................................................................................16

*Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*,
  454 F. Supp. 703 (D. Mass. 1978) ...............................................................17

*Ruckh v. Salus Rehab., LLC*,
  963 F.3d 1089 (11th Cir. 2020)............................................................... 12, 27

*Rumsfeld v. Forum for Acad. & Inst'l Rights., Inc.*,
  547 U.S. 47 (2006) ........................................................................................15

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................ 32, 51

*Salvail v. Nashua Bd. of Ed.*,
  469 F. Supp. 1269 (D.N.H. 1979).................................................................17

*Sch. Bd. Of Collier Cnty. v. Fla. Dep't of Educ.*,
  279 So. 3d 281 (Fla. 1st DCA 2019) ............................................................21

\* *Searcey v. Harris*,
  888 F.2d 1314 (11th Cir. 1989).....................................................................39

*Sheck v. Baileyville Sch. Comm.*,
530 F. Supp. 679 (D. Me. 1982) ........................................................................17

\*   *Shurtleff v. City of Boston, Massachusetts*,
596 U.S. 243 (2022) ............................................................................ 29, 30

*Simmons v. State*,
944 So.2d 317 (Fla. 2006) ........................................................................42

*Singleton v. City of Montgomery, Ala.*,
No. 23-11163, 2025 WL 1042101 (11th Cir. Apr. 8, 2025)................................34

*Solomon v. City of Gainesville*,
763 F.2d 1212 (11th Cir. 1985)........................................................................34

*Stanley v. Georgia*,
394 U.S. 557 (1969) ........................................................................15

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
117 F.3d 1278 (11th Cir. 1997)........................................................................12

*Support Working Animals, Inc. v. Governor of Fla.*,
8 F.4th 1198 (11th Cir. 2021)........................................................................23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........................................................................16

*United States v. Am. Library Ass'n, Inc.*,
539 U.S. 194 (2003) ............................................................................ 24, 40

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................................................35

\*   *United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................ 35, 50

*Virgil v. School Board of Columbia County, Fla.*,
862 F.2d 1517 (11th Cir. 1989)..................................................................... 17, 24

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) .................................................................................45

*Virginia v. Hicks*,
539 U.S. 113 (2003) .................................................................................36

\* *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ..................................................................... 26, 30, 31

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019)..................................................................20

*Wright v. Waste Pro USA, Inc.*,
69 F.4th 1332 (11th Cir. 2023)..................................................................12

*Yates v. United States*,
574 U.S. 528 (2015) .................................................................................52

*Ysursa v. Pocatello Education Association*,
555 U.S. 353 (2009) .................................................................................32

**Statutes**

Fla. Stat. s. 1001.03...................................................................................... 8, 23

Fla. Stat. s. 1006.28.................................... 1, 2, 4, 5, 6, 7, 9, 21, 22, 37, 41, 44, 52

Fla. Stat. s. 1008.32...................................................................................... 8, 23

Fla. Stat. s. 1012.796..................................................................................... 8, 49

Fla. Stat. s. 847.001 ...................................................................... 1, 5, 41, 44, 51

Fla. Stat. s. 847.012 ...................................................................... 5, 6, 44, 52

**Other Authorities**

Fla. Admin. Code r. 6A-7.0714(3) .................................................................... 21, 45

**Rules**

Fed. R. Civ. P. 56.................................................................................................12

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.     Is Florida Statutes Section 1006.28(2)(a)(2)(b)(II), which requires the removal of all non-obscene school-library books that contain any content describing sexual conduct without consideration of the value of the book as a whole or the age of the reader, unconstitutionally overbroad in violation of the Free Speech Clause?

2.     Should the term "pornographic" in Florida Statutes Section 1006.28(2)(a)(2)(b)(I) be construed to be consistent with the term "harmful to minors" as defined by Florida Statutes Section 847.001(7), which incorporates the existing Supreme Court obscenity standard for minors?

3.     If the term "pornographic" is not construed to be consistent with the term "harmful to minors" as defined by Florida Statutes Section 847.001(7), is Florida Statutes Section 1006.28(2)(a)(2)(b)(I), which requires the removal of all non-obscene school-library books that contain any so-called "pornographic" content without consideration of the value of the book as a whole or the age of the reader, unconstitutionally overbroad in violation of the Free Speech Clause?

4.     Does the government-speech doctrine apply to school-library books, rendering the Free Speech Clause inapplicable?

1

**INTRODUCTION**

Florida Statutes Section 1006.28 is a statewide mandate that requires and has resulted in the removal of hundreds of school-library books that are not remotely obscene. It prohibits school librarians and other local school district officials from curating school libraries based on educational objectives, community standards, and the First Amendment, as they are trained to do and as they have done for decades prior to this law. Plaintiffs are high school students, award-winning authors, and the world's five largest trade publishers who challenged the law as overbroad in violation of the First Amendment.

There have long been procedures in place in Florida school districts to permit parents to regulate their own children's access to library books. But under the guise of protecting students from obscene materials, the State mandated the removal of a wide range of books by proscribing two extremely broad and poorly defined categories of content (the "Prohibitions"). Examples of the books that school districts concluded must be removed and that have been removed under the Prohibitions include Kurt Vonnegut's *Slaughterhouse-Five*, Richard Wright's *Native Son*, Anthony Burgess's *A Clockwork Orange*, and Alice Walker's *The Color Purple*. (DE 107-10 at 6.)

In the district court, Defendants offered *no* evidence whatsoever in support of their summary-judgment arguments and did not dispute any of Plaintiffs' facts. Nor

did Defendants conduct any overbreadth analysis under their preferred First Amendment standard of scrutiny. In contrast, Plaintiffs met their burden on summary judgment by offering undisputed facts that (1) demonstrated that they have suffered First Amendment injury that is traceable to and redressable by both sets of Defendants; (2) explained the thoughtful consideration given to library book selection and removal by Florida educators in their professional discretion—discretion that the Prohibitions eliminate; and (3) set forth categories of applications of the Prohibitions, which illustrate that the unconstitutional applications vastly outweigh the few, if any, constitutional applications.

In this appeal, Defendants again fail to engage with Plaintiffs' arguments that the Prohibitions are unconstitutionally overbroad. Instead, Defendants devote most of their brief to their extreme argument that the First Amendment has no application to the state-mandated removal of school-library books. Lacking sound arguments in their favor, Defendants also attempt to distract this Court by including in their brief three images that are gratuitous, meant to inflame, and entirely irrelevant to the issues in this case. As the district court recognized, Plaintiffs did not challenge the portion of the statute that prohibits visual depictions of sexual conduct. (DE 107 at

3

35; DE 129 at 36 n.4.)[1]  Because visual depictions of sexual conduct were not at issue before the district court, they have no relevance whatsoever to this appeal.  (*See* Dkt. 37, Motion To Strike; Dkt. 39, Reply In Support Of Motion To Strike.)

Publishers and authors disseminate information and ideas of interest and value to students.  Matching students to books is a subjective and inherently individual exercise.  Not every book is for every person at every point in their life.  For that reason, each student has the right to choose whether to read any particular book from a school library.  If the First Amendment has any force in public schools, the district court's holding must be affirmed.

## STATEMENT OF THE CASE

### I.     The Prohibitions Mandate The Removal Of School-Library Books Regardless Of Their Value.

Section 1006.28's prohibitions on content that "describes sexual conduct" and so-called "pornographic" conduct (the "Prohibitions") are across-the-board mandates that disregard the value of each book as a whole; the interests and needs of the particular community served by the library; and the discretion and training of Florida educators.[2]  Plaintiffs do not seek to prevent school districts from prohibiting

---

[1] The State's Opening Brief is cited as "Br.," the School Districts' Opening Brief is cited as "Dist. Br.," other filings on the appellate docket are cited as "Dkt.," and the record below is cited as "DE."

[2] The complete text of Section 1006.28 is attached as an Addendum.

obscene school-library books or to require school libraries to stock any particular book. Instead, Plaintiffs take issue with the State-mandated removal of hundreds of school-library books regardless of their value and in circumvention of the Supreme Court's standard for obscenity as applied to minors.[3]

### A. The Prohibition On Content That "Describes Sexual Conduct."

Section 1006.28's new prohibition on content that "describes sexual conduct" prohibits school-library books with *any* description of *any* sexual conduct as defined by statute. Fla. Stat. s. 1006.28(2)(a)(2)(b)(II) (enacted in H.B. 1069).[4] Section 1006.28 separately forbids material containing "sexual conduct" that is "harmful to minors," which is defined in conformance with the Supreme Court's standard for obscenity set forth in *Miller v. California*, 413 U.S. 15 (1972), as applied to minors, and requires a finding that the book, "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for minors" as required by the First Amendment.[5] Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), 847.001(7), 847.012. In contrast,

---

[3] As used herein, the term "school libraries" encompasses both traditional school libraries or media centers and also classroom collections of books, which are essentially classroom libraries. As used herein, the term "books" refers to individual titles, not numbers of copies of books.

[4] That provision prohibits "[a]ny material … made available in a school or classroom library" that "(II) Depicts or describes sexual conduct as defined in s. 847.001(19)."

[5] The Supreme Court has defined obscenity as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a

the new prohibition on content that "describes sexual conduct" precludes any consideration of the value of the book as a whole. Moreover, because the statute does not define the word "describes" in relation to the term "sexual conduct," its scope is unclear, which exacerbates its overbreadth.

**B.     The Prohibition On So-Called "Pornographic" Content.**

Section 1006.28 also prohibits school-library books that contain content that "[i]s pornographic or prohibited under s. 847.012 [as 'harmful to minors']." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).[6]     Florida law does not define the term "pornographic." The State[7] has construed "pornographic" (without proffering any specific definition) to be distinct from "harmful to minors" and has imposed that erroneous construction on Florida school districts. The State is responsible for promulgating a mandatory objection form for all school districts to use. Fla. Stat. s. 1006.28(2)(a)(2); DE 107-59. That objection form includes separate categories for "pornographic" content and content that is "harmful to minors," meaning that a book could be removed because it contains content that is deemed to be "pornographic" but not "harmful to minors"—namely, not obscene under *Miller*. The following

---

patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.

[6] That provision prohibits "[a]ny material … made available in a school or classroom library" that "(I) Is pornographic or prohibited under s. 847.012."

[7] As used herein, the "State" refers to the State Defendants.

chart compares the statute to the objection form.

| Categories in Statute | Categories in Objection Form |
|---|---|
| "(I) Is pornographic or prohibited under s. 847.012 [harmful to minors]"<br><br>"(II) Depicts or describes sexual conduct as defined in s. 847.001(19)" | "☐The material is pornographic."<br><br>"☐The material is prohibited under Section 847.012 [harmful to minors]"<br><br>"☐The material depicts or describes sexual conduct as defined in Section 847.001(19)" |

As explained in Argument Section IV, if the term "pornographic" were construed to be synonymous with "harmful to minors" (consistent with the district court's decision, DE 129 at 49) it would be consistent with *Miller* and therefore constitutional.

Under the prohibition on so-called "pornographic" content, the State treats high school seniors the same as younger students and prohibits all students regardless of age, maturity, or reading level from accessing certain books in their school libraries.

### C. Defendants Implement And Enforce The Prohibitions.

The State plays a foundational role in implementing and enforcing the Prohibitions. Section 1006.28(2)(a)(2) requires that the State prescribe an objection form that every school district must use for parents and residents to object to library books based on the Prohibitions (and other grounds). The State is also responsible

7

for enforcing school districts' compliance with state law and State Board rules, including the Prohibitions, and has authority to punish school districts' noncompliance. Fla. Stat. s. 1001.03(8), 1008.32(1)–(4).

Florida law and the State mandate that district school boards remove school-library books that are prohibited under the Prohibitions. Plaintiffs bring claims against the members of the Orange County School Board and the members of the Volusia County School Board (collectively the "School Districts"). As the Prohibitions require, the School Districts have removed hundreds of books that are not remotely obscene from their school libraries. (DE 107-32; DE 107-41; DE 107-46.)

## II. Under The Prohibitions, Florida Educators Face Harsh Penalties.

The Prohibitions unleashed fear and chaos upon the Florida education community, which has struggled to determine what the Prohibitions require. The State enforces the Prohibitions against educators through a harsh system of penalties, including loss of teaching licenses. *See* Fla. Stat. s. 1012.796(1)(a)–(f). Moreover, the State urges educators to "err on the side of caution"—by removing more rather than fewer books—when implementing the Prohibitions. (DE 107-9 at 12.) The Governor has publicly stated that educators who fail to remove enough books under the Prohibitions may face felony charges. (DE 107-3 at 4; DE 107-4 at 3.)

8

Because of the Prohibitions, school districts have removed or identified for removal award-winning and classic books that have been in school libraries for decades, including books that are commonly addressed on Advanced Placement exams. (*See*, *e.g.*, DE 107-10 at 6.) Districts erred on the side of removing books to avoid penalties.[8] (*See*, *e.g.*, DE 107-5; DE 107-6; DE 107-48 at 9.) The vague, overbroad Prohibitions have led to extensive First Amendment violations through the removal of protected literature.[9]

## III. The Prohibitions Are A Solution In Search Of A Problem.

Florida media specialists (school librarians) are trained to understand the importance of exposing students to diverse authors, perspectives, and topics, and they look to professional review journals and standards to help them to make those decisions. (DE 107-48 at 11.) When deciding which books to include in or exclude from their school libraries, teachers and librarians consider the particular populations who are likely to read the books. (*Id*. at 14.) This focus on community standards results in a compilation of school-library books that reflect the values and needs of that school's community. (*See*, *e.g.*, *id*.) In contrast, statewide mandates like the

---

[8] The law requires that all books to which a school district receives an objection for describing sexual conduct be removed for students of all ages within five days pending further review. Fla. Stat. s. 1006.28(2)(a)(2). In stark contrast, the statute does not require a prompt review to determine whether the book should be returned.

[9] DE 107-11 through DE 107-42 and DE 107-46 are lists of books that Florida school districts determined must be removed under Section 1006.28 since July 1, 2023.

Prohibitions prohibit librarians from applying "professional judgment and experience to select books on sensitive subjects for students at a variety of age levels." (*Id*. at 12.) Because the Prohibitions require the removal of books following the objection of a sole parent or community member, they "limit[] many parents' rights." (*Id*. at 10.)

Students develop fluency and confidence in reading skills when they are permitted to choose books that interest them. (*Id*.) For many students, the school library is the only means of doing so. (*Id*. at 11.) Some of the prohibited books—such as books concerning sexual assault or abuse—permit students to process similar experiences in their own lives or learn about life-altering experiences through others, all in a safe environment. (*Id*. at 12.)

Florida parents have long had the power to determine which books their children can and cannot access in school libraries. (DE 107-6; DE 107-7.) These rights enable Florida parents to ensure that their own children can access only the school-library books that those parents deem appropriate for their own children. Florida's longstanding prohibition on school-library books containing content that is "harmful to minors" also ensures that school libraries do not contain books that are obscene for minors.

## IV.    Procedural History.

All parties moved for summary judgment.  (DE 107–DE 109.)  Plaintiffs—publishers, authors, and students—sought a declaratory judgment that the Prohibitions are unconstitutionally overbroad or, in the alternative to a finding of unconstitutionality for the prohibition on so-called "pornographic" content, a declaratory judgment that "pornographic" is consistent with "harmful to minors." (DE 107.)

Defendants neither contested the facts set forth in Plaintiffs' summary judgment motion nor offered any facts to support their arguments—despite the district court's admonition that the State would need to provide a "robust enough record" to carry its burden on the "fact-intensive" government-speech analysis.  (DE 106 at 21.)  Defendants argued that the Prohibitions do not violate the First Amendment but did not conduct any overbreadth analysis under their preferred First Amendment standard of scrutiny or any other standard.  (DE 108 at 13–14; DE 109 at 35–38.)  On August 13, 2025, the district court granted Plaintiffs' motion, holding that the prohibition on content that "describes sexual conduct" is unconstitutionally overbroad and that the term "pornographic" should be construed as consistent with "harmful to minors."  (DE 129 at 48.)

11

**STANDARD OF REVIEW**

This Court reviews a district court's legal determinations *de novo* and is bound by a district court's factual findings unless they are clearly erroneous. *Wright v. Waste Pro USA, Inc.*, 69 F.4th 1332, 1336 (11th Cir. 2023).

District courts grant summary judgment under Federal Rule of Civil Procedure 56(a) where there is "no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." A genuine issue of material fact precluding summary judgment exists only if the nonmoving party presents evidence sufficient for a factfinder to return a verdict for that party. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997).

Any argument that was not clearly presented to the district court cannot be considered on appeal absent special circumstances. *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1110–11 (11th Cir. 2020). By omitting an argument from its opening brief, a party abandons that argument and cannot raise it in reply, and by merely referring to an argument in passing without more, a party waives that argument. *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1336 n.5 (11th Cir. 2025).

**SUMMARY OF ARGUMENT**

The district court correctly ruled for Plaintiffs on their First Amendment claims. The Prohibitions violate Plaintiffs' First Amendment rights. They harm

students by undermining their right to receive information in school libraries. They also harm publishers and authors by requiring the removal of their books from school libraries based on constitutionally impermissible, overbroad content-based restrictions.

Contrary to the substantial body of authority holding exactly the opposite, Defendants insist that the First Amendment does not apply to school-library books. According to them, the State of Florida speaks through school-library books and the Prohibitions merely withdraw funding for a government benefit that schools are not required to provide. Under the Supreme Court's government-speech test, school-library books—which communicate a diverse array of messages from authors and publishers and over which the State has never exercised control—are not government speech. The Prohibitions, which require the removal of books that have already been purchased, are an attempt to restrict speech, not funding.

The Prohibitions are incompatible with the purpose of school libraries, contravene the *Miller* obscenity standard as applied to minors, and serve no valid educational basis. Moreover, because there are few, if any, obscene books in school libraries, the many unconstitutional applications of the Prohibitions substantially outweigh their constitutional applications. The Prohibitions are therefore unconstitutionally overbroad in violation of the First Amendment.

With regard to the prohibition on so-called "pornographic" content, however, the Court need not enter a declaratory judgment that it is unconstitutional. Instead, the Court could adopt a different and better construction of that term, as the district court did—one that would save it from a declaration of unconstitutionality. The term "pornographic" is included in the same statutory category as "harmful to minors," which, under Florida law, is consistent with the constitutional test for obscenity. Based on canons of statutory interpretation, "pornographic" should be construed to be synonymous with "harmful to minors."

This Court should affirm the district court's decision.

## ARGUMENT

## I. Plaintiffs Have Standing.

Plaintiffs have standing to bring their claims against Defendants. To establish standing, a plaintiff must demonstrate that (1) she suffered an "injury in fact" that (2) was likely caused by the defendant and that (3) could likely be redressed by judicial relief.[10] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Because they seek non-monetary relief, Plaintiffs need only demonstrate that one party has

---

[10] The Authors Guild, an association, has standing because (1) its members would "otherwise have standing to sue in their own right," (2) it seeks to protect interests that are "germane to the organization's purpose," and (3) its claims and the declaratory relief it seeks do not require the participation of its members. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

standing to pursue their claims. *See Rumsfeld v. Forum for Acad. & Inst'l Rights., Inc.*, 547 U.S. 47, 52 n.2 (2006). Plaintiffs satisfy these requirements.

**A. Plaintiffs Are Suffering First Amendment Injuries At The Hands Of Defendants.**

Plaintiffs are suffering First Amendment injuries at the hands of Defendants as a result of the Prohibitions because (1) the Student Plaintiffs intended to check out books from their school libraries that have been removed under those provisions in violation of their rights and (2) books published by the Publisher Plaintiffs or written by the Author Plaintiffs (including members of the Authors Guild) have been removed from Florida school libraries under the Prohibitions in violation of their rights.

For First Amendment claims, the "injury requirement is most loosely applied" because of "the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991).

**1. The Student Plaintiffs And Their First Amendment Injuries.**

The Student Plaintiffs have First Amendment rights that are violated by school-library book removals. The right to receive information is well-established in constitutional law,[11] and that right exists for students like the Student Plaintiffs in

---

[11] *See*, *e.g.*, *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Reno v. Am. C. L. Union*, 521 U.S. 844, 874

school libraries.  *See, e.g., GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (finding that student plaintiffs had standing for First Amendment challenge to statute requiring removal of school-library books); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (recognizing the "right of students to receive information which they and their teachers desire them to have").  *See also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (holding that the right to receive information is "nowhere more vital" than in "schools and universities").  Students do not "shed their constitutional rights" at "the schoolhouse gate" and they "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 511 (1969).  A state's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (rejecting ban on selling violent video games to minors).

Defendants rely heavily on the Fifth Circuit's *en banc* decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025), to assert that readers in public libraries lack First Amendment rights.  That holding, however, directly contradicts this

_____

(1997).  Contrary to the State's argument, the Supreme Court in *Murthy v. Missouri*, 603 U.S. 43 (2024), noted its repeated recognition that a "First Amendment right to receive information and ideas" exists.  *Id.* at 75 (citation and internal quotation omitted).

Court's prior decisions.  *See, e.g.*, *ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) (finding parent, on behalf of his child, had standing for a First Amendment claim concerning removal of a particular school-library book); *Virgil v. School Board of Columbia County, Fla.*, 862 F.2d 1517, 1525 (11th Cir. 1989) (addressing merits of student-plaintiffs' First Amendment claims challenging their school district's removal of a textbook).[12]  Moreover, *Little* is an outlier among countless other cases that have addressed this issue.[13]  Although the justices in *Board of Education v. Pico*—the sole Supreme Court decision concerning

---

[12] Also contrary to this Court's prior decisions is *Parnell, et al. v. School Board of Escambia County, Florida*, 802 F. Supp. 3d 1361 (N.D. Fla. 2025), *appeal pending* No. 25-13485.  In an as-applied challenge, the district court in *Parnell* found that the First Amendment did not prohibit a local school librarian from removing one book from a school district's libraries.  *Id.* at 1369–370.  Central to the decision in *Parnell* was the district court's reluctance to "substitute [its] own findings and opinions about education suitability for those of a school board."  *Id.* at 1369.  Here, it is not a federal court imposing its findings and opinions concerning one book in one school district, but the State doing so for hundreds of books in every school district in the state.

[13] *See, e.g.*, *GLBT Youth*, 114 F.4th 660 at 667–68 (affirming rejection of the government-speech doctrine); *Minarcini*, 541 F.2d at 582–83; *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024); *Fayetteville Public Library v. Crawford County, Arkansas*, 684 F. Supp. 3d 879, 909–910 (W.D. Ark. 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874–76 (D. Kan. 1995); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–89 (D. Me. 1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272–73 (D.N.H. 1979); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710–11 (D. Mass. 1978); *Adams v. Matanuska-Susitna Borough School Dist.*, No. 3:23-cv-00265-SLG (D. Alaska Aug. 6, 2024), Order On Motion For Preliminary Injunction at 14.

the removal of public-school-library books—disagreed on the extent to which the First Amendment applies in school libraries, seven of the nine justices recognized that there are First Amendment rights concerning the removal of school-library books. 457 U.S. 853, 866, 879–880, 907 (1982).

Defendants extensively argue that the Student Plaintiffs' right to receive information necessarily also provides them with a "right to dictate which books the government puts in its library." (Br. at 21, 40–42, 42 n.10.) But Plaintiffs do not claim—and have never claimed—a right to have school libraries acquire any particular book.[14] As a practical matter, acquisition decisions are unlikely to be subject to judicial review because there are millions of books from which to choose, countless factors that schools and their librarians consider in deciding which books to acquire, and finite space and resources. *See Pico*, 457 U.S. at 878 n.1 (Blackmun, J., concurring in part and concurring in the judgment) ("There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity.").

---

[14] In fact, Plaintiffs have expressly stated so several times throughout the course of this litigation. (*See*, *e.g.*, DE 94 at 9 n.6.)

**2.** **The Publisher And Author Plaintiffs And Their First Amendment Injuries.**

Publishers like the Publisher Plaintiffs and authors like the Author Plaintiffs also have First Amendment rights in school libraries. The First Amendment "embraces the circulation of books as well as their publication." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963). Publishers and authors have the right to speak through their books without the State censoring those books through impermissible content-based restrictions. *See id.* at 71 (rejecting as unconstitutional a content-based restriction on publishers' right to distribute books). That right also exists in school libraries. *See, e.g.*, *GLBT Youth*, 114 F.4th at 667–68; *Minarcini*, 541 F.2d at 583 (holding that the removal of school-library books was unconstitutional because "[f]reedom of speech presupposes a willing speaker [but] where a speaker exists" the "protection afforded is to the communication, to its source and to its recipients both").

The Prohibitions removed a key forum through which the Publisher Plaintiffs and the Author Plaintiffs reach young readers. School libraries are an important channel for publishers and authors to speak to students—the intended audiences for many of their books—through those books. (*See, e.g.*, DE 107-2 at 5; DE 107-49 at 4–5.) Particular books appeal to students at particular times in their lives, so the opportunity to speak to those students may be lost if the Publisher Plaintiffs' or Author Plaintiffs' books have been removed from school libraries due to the

19

Prohibitions.  (DE 107-2 at 5.)  Censorship of library books not only reduces readership for the specific books being removed; it also reduces readership of publishers' and authors' other works because a student who reads one of their books is more likely to read another.  (*Id.*)

Further, by falsely labeling books that the Publisher Plaintiffs and Author Plaintiffs have made available to students as "pornography," the State has stigmatized those books.  (DE 107-53 at 5.)  This stigmatization "travels … beyond the school setting" and decreases the likelihood that students will read the Publisher Plaintiffs' and Author Plaintiffs' books.  (DE 107-2 at 5; DE 107-49 at 4–5.)  Moreover, the stigma chills the creative process.  (*Id.*)  Authors who have been stigmatized by the Prohibitions may—consciously or subconsciously—self-censor their future works to avoid those works being wrongly labelled as "pornography."  (*Id.*)

### B.     Plaintiffs' Injuries Are Traceable To And Redressable By The School Districts.

Plaintiffs' injuries are traceable to and redressable by the School Districts because they are acting as agents of the State in implementing and enforcing the Prohibitions.  To satisfy the traceability requirement, plaintiffs need show only that their injuries are "connected with the conduct of which they complain."  *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (brackets omitted).  Even injuries that are indirect can satisfy traceability.  *Id.*

20

The School Districts contend that they bear no responsibility for Plaintiffs' injuries because those injuries can be traced to the State, but as the district court held they ignore that Plaintiffs' injuries can also be traced to them.  (Dist. Br. at 21–24.)  The Prohibitions require the School Districts to remove books regardless of whether they have received an objection to any particular book.  (*See id.* at 23–24 (explaining that Section 1006.28 requires "school boards to discontinue use of material prohibited by the [Prohibitions] *even if an objection has not been made*" (emphasis in original)).)  Under Section 1006.28, the School Districts are "responsible for the content" of materials "made available in a school or classroom library," including by removing school-library books that contain content that "describes sexual conduct" or is "pornographic."  *See* Fla. Stat. s. 1006.28(2)(a)(1), (2)(a)(2)(b)(I)–(II).

The book removals are traceable to the School Districts, which are required under the law to use the objection form that the State prescribed.  *See* Fla. Admin. Code r. 6A-7.0714(3).  Florida law and the Florida Constitution require school districts to follow state law, including by implementing and enforcing that law where required by statute.  *See, e.g.*, *Sch. Bd. Of Collier Cnty. v. Fla. Dep't of Educ.*, 279 So. 3d 281, 286–87 (Fla. 1st DCA 2019).

Because Plaintiffs have suffered First Amendment injuries that are traceable to the School Districts, Plaintiffs have also satisfied the redressability requirement.

As the district court explained, a declaratory judgment against the School Districts that the Prohibitions violate the First Amendment would require them to return books that they had previously removed from school-library shelves under those unconstitutional provisions, thereby remedying the harms suffered by Plaintiffs. (*See* DE 129 at 11 (instructing that "if [the School Districts] do not reshelve the books removed under the provisions at issue, they will have removed the books on unconstitutional grounds").) A declaratory judgment would also require the School Districts not to remove books under the Prohibitions going forward.

## C. Plaintiffs' Injuries Are Traceable To And Redressable By The State.

Plaintiffs' injuries are fairly traceable to and redressable by the State. On appeal, the State appears to concede traceability and redressability—as it should—because it plays an indispensable role in implementing and enforcing the Prohibitions. It is the State's objection form that imposes the Prohibitions on school districts, unconstitutionally eliminates school librarians' and school districts' discretion to evaluate the value of each book as a whole, and results in the district school boards' removal of books following an objection. In addition, the State is ultimately responsible for "approv[ing] or reject[ing]" a special magistrate's recommendation (following review of a school district's decision) not to remove a library book based on an objection. Fla. Stat. s. 1006.28(2)(a)(6). The State also has coercive authority to ensure that school districts comply. *See* Fla. Stat. s.

22

1001.03(8), 1008.32(1)–(4).  As the district court held in denying the State's motion to dismiss, due to their mandatory objection form, the State is "at the root of Plaintiffs' alleged injury."  (DE 106 at 7.)

Because the State's role in implementing and enforcing the Prohibitions is more than sufficient to satisfy traceability, Plaintiffs have also demonstrated redressability.  *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (noting that traceability and redressability "often travel together").

## II.  Neither The Government-Speech Doctrine Nor The Government-Subsidy Argument Applies To Public-School Libraries.

As discussed above, numerous courts agree: the First Amendment right to freedom of speech exists in public libraries, including public-school libraries.  (*Supra* at 17 n.13.)  Moreover, the First Amendment applies with more force in school libraries than it does in the compulsory curricular environment.  Those First Amendment rights are not nullified by the government-speech doctrine because, under the Supreme Court's test for government speech, that doctrine does not apply to school-library books.  Nor are they abrogated by the State's government-subsidy argument because the Prohibitions restrict speech, not funding.

### A.  School Libraries Are Not Compulsory.

While the State has substantial discretion in compulsory functions of public schools, school libraries are different.  School libraries are places of voluntary

learning in which student participation is self-driven and optional. In contrast, other aspects of the educational experience such as curriculum and instruction are compulsory and require participation. *See*, *e.g.*, *Virgil*, 862 F.2d at 1522–25 (distinguishing between removal of curricular and school-library books and explaining that the materials that the school board removed from the curriculum "have not been banned from the school" and "are available in the school library").

School libraries serve an important purpose. As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868–69 (1982) (plurality) (explaining that "students must always remain free to inquire" and the "school library is the principal locus of such freedom"). Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville*, 684 F. Supp. 3d at 889, 891 (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("*ALA*")).

The discretion afforded to librarians in overseeing their library collections is crucial to well-functioning libraries. Librarians are tasked with "curat[ing] the collections of public libraries to serve diverse viewpoints" and must be "commit[ted] to freedom of speech." *Id*. That task requires librarians to have "broad discretion to decide what material to provide to their patrons," and librarians are "afforded

24

significant professional responsibility and deference with respect to their area of expertise." *Id*. at 890–91. Authors, publishers, students, and parents rely on trained librarians to facilitate voluntary book discovery through individualized consideration of a student's maturity, reading level, interests, and life experiences. The Prohibitions replace librarians' discretion with the dictates of the State and disregard community standards and the value of each book as a whole.

Because students are voluntary participants in school libraries, they are not compelled to read any particular book or any book at all, including the books that the Prohibitions now mandate be removed from every school library. The Supreme Court has recognized this distinction between voluntary aspects of a school environment and the compulsory curricular environment. *See Pico*, 457 U.S. at 868–870 (contrasting the "compulsory environment of the classroom," in which the state may "claim [] absolute discretion" to "inculcate community values," with "the school library and the regime of voluntary inquiry that there holds sway"); *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 269 (1988) (concerning a school newspaper that was part of the school's "curriculum" and over which "school officials retained ultimate control").

## B. The State Of Florida Does Not Speak Through School-Library Books.

As the Supreme Court has recognized, because the government-speech doctrine is a "doctrine that is susceptible to dangerous misuse," courts "must

exercise great caution" when considering whether to "extend[] government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017) (Alito, J.). The doctrine is a limited exception to the First Amendment: when the government-speech doctrine applies, the Free Speech Clause does not. The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts must consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that it "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–213 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472–73 (2009); *Matal*, 582 U.S. at 238 (applying the "three factors [*Walker*] distilled from *Summum*").[15] The State's regulation of school-library books does not satisfy any of the three factors.

Defendants bear the burden of providing a "robust enough record" to determine whether the government-speech doctrine applies, but they did not produce *any* evidence in the district court and failed to meet their burden. *See Gundy v. City*

---

[15] The statements in *Gittens* and in the concurrence in *Gates* about library books are dicta because neither case involves library books. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 25 (D.C. Cir. 2005); *Bryant v. Gates*, 532 F.3d 888, 898, 891 (D.C. Cir. 2008). Moreover, both cases predate—and therefore do not apply—the three-part test for government speech the Supreme Court applied in *Summum* and reaffirmed in *Walker*.

*of Jacksonville*, 50 F.4th 60, 77 (11th Cir. 2022).[16]  The undisputed evidence demonstrates that school-library books are not government speech.

### 1. The State Of Florida Has Not Historically Communicated Through School-Library Books.

School libraries have not historically communicated messages from the State. Instead, school libraries have long served as vehicles to expose students to a broad array of ideas from authors who express unique, personal points of view.  (DE 107-2 at 5.)  In the district court, the State admitted that local school librarians—not the State—have historically decided which library books to make available to the students in their local schools.  (DE 83 at 18.)  In making those decisions, librarians are not "speaking" on behalf of themselves, their schools, or the State, but rather are making available to interested students books that are worth reading.  (DE 107-48 at 11–12.)  It would make no sense for a library book, written by an independent author and selected for library shelves by a local librarian, to be understood as communicating a message from the State of Florida.

The State's primary argument to the contrary appears to be that—because school librarians are government employees—the State speaks through schools'

---

[16] In their Initial Brief, Defendants cite for the first time factual sources that they contend support their government-speech argument.  (*See* Br. at 31–33.)  These sources were not presented to the district court for consideration and therefore are not properly considered on appeal. *See Ruckh*, 963 F.3d at 1110–11.

collections of books on library shelves without regard to the messages in the books themselves. Although a *private* actor "presenting a curated compilation of speech" is protected by the First Amendment, *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024), that is not the test for government speech. Contrary to the State's assertion, the government's exercise of discretion over speech on its property does not by itself mean that the government-speech doctrine applies. (Br. at 37–38.) The doctrine applies only when the Supreme Court's three-part test has been satisfied.[17] The State's construction of the government-speech doctrine requires such a high level of generality that the government-speech doctrine could be applied virtually without limitation, "constitut[ing] a huge and dangerous extension of the government-speech doctrine." *See Matal*, 582 U.S. at 239.

> **2. School-Library Books Do Not Convey State-Endorsed Messages.**

Second, messages conveyed in school-library books are diverse and contradictory—not endorsed by the State, as government speech must be. As Justice Alito explained in rejecting the application of the government-speech doctrine to trademarks, the doctrine generally does not extend to speech that expresses "contradictory views." *See Matal*, 582 U.S. at 236, 238; *Shurtleff v. City of Boston,*

---

[17] For the same reason, the private-speech cases on which the State relies are unavailing. *See*, *e.g.*, *Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 576–77 (1995).

*Massachusetts*, 596 U.S. 243, 272–73 (2022) (Alito, J., concurring) (explaining that "flags flown [from a city flagpole] reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message" of the government).

The result would be the same if the government-speech doctrine were applied to school libraries. The State contends that "a reasonable observer" would believe that school-library books convey messages that were "approved by the government." (Br. at 38.) That makes no sense. The Eighth Circuit soundly rejected the same argument:

> [I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking. Take routine examples of historic tomes on political science. A well-appointed school library could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*. As Plaintiffs noted, if placing these books on the shelf of public school libraries constitutes government speech, the State "is babbling prodigiously and incoherently."

*GLBT Youth*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 236). In contrast, in *Mech v. City of Palm Beach County, Florida*, this Court found that high school banners were government speech, because they were "printed in school colors," suggested that the banner's sponsor had a close relationship with the school and was its "Partner in Excellence," and bore "the initials of the school." 806 F.3d 1070, 1076–77 (11th Cir. 2015). No such indication of government endorsement is found on or in library books.

### 3. The State Of Florida Does Not Control The Contents Of School-Library Books.

The State does not "maintain[] direct control over the messages conveyed" in school-library books. *See Walker*, 576 U.S. at 213. The State conceded this point in the district court. (DE 83 at 23 n.6 ("Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations.").)

The State of Florida does not "dream up" the books or "edit [books] submitted for" inclusion in school libraries. *See Matal*, 582 U.S. at 235. *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' *content and meaning*" (emphasis added)). Rather, authors and publishers control the contents of their books. In contrast, in *Cambridge Christian School, Inc. v. Florida High School Athletic Association*, loudspeaker announcements at a high-school championship football game were government speech because the State hand-selected an announcer to read aloud messages that were "entirely scripted" by the State. 115 F.4th 1266, 1293–94 (11th Cir. 2024). Similarly, in *Walker*, "Texas specialty license plates" were government speech because Texas's control over the plates extended to "the design, typeface, color, and alphanumeric pattern for all license plates"; the license plates served as "government-issued IDs"; and the state "place[d] the designs directly below the large letters identifying 'TEXAS' as the issuer of the IDs." *Walker*, 576 U.S. at 213–14.

As the Supreme Court has instructed, *Walker* "likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238. *See also Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 561 (2005) (promotional campaigns by the Department of Agriculture were government speech because the government "exercise[d] final approval authority over *every word* used in *every* promotional campaign" (emphasis added).)

For similar reasons, *McGriff v. City of Miami Beach* does not support the State's government-speech arguments. (Br. at 34–36, 38, 39 n.8.) *McGriff* involved a city art exhibition in which the city commissioned and funded artists' work and required artists and production companies to relinquish all rights to the artwork, including right of dissemination, in order to exhibit the work. 84 F.4th 1330, 1332–34 (11th Cir. 2023). In other words, the artists had to cede *all* control, including concerning any future dissemination of the artwork, in order to do so. In contrast, school libraries—by definition—do not have such control over authors or publishers whose books are on their shelves.

Library books are fundamentally different than the limited media that constitute government speech. Application of the government-speech doctrine to school-library books makes no sense and would drastically expand the reach of this doctrine.

**C.    The State's Government-Subsidy Argument Does Not Supplant Plaintiffs' First Amendment Rights.**

The State's government-subsidy argument would yield the same extreme result as their government-speech argument: the First Amendment would not apply to libraries.  No court has ever found that government-spending powers supplant the First Amendment in school libraries and justify the otherwise-unconstitutional removal of books from library shelves.  (*See supra* at 17 n.13.)

The Prohibitions are regulations of school libraries, not a government subsidy.  This is not a case where the government has "merely chosen to fund one activity to the exclusion of another."  *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991).  Instead, the Prohibitions mandate that school librarians, schools, and school districts remove library books from their shelves without consideration of the value of the book as a whole.[18]  The State does not argue that the Prohibitions provide a stream of funds for school libraries to use to purchase certain types of books (and not other books).  Instead, the State has required schools to *remove* library books that were *already purchased*—and, in many instances, have long been on school-library shelves.

---

[18] *Ysursa v. Pocatello Education Association* upheld a prohibition on payroll deductions for political services, finding that the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining [private] funds for expression."  555 U.S. 353, 355 (2009).  There is no claim in this case regarding any payment mechanism.

Moreover, the State's argument that the Prohibitions merely modify government funding and therefore the First Amendment does not apply is inconsistent with Supreme Court precedent. The Supreme Court has rejected government attempts to restrict speech even where government funding is involved, such as in nonpublic forum cases involving government property. *See*, *e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669 (1998) (holding that a candidate debate sponsored by a "state-owned public television broadcaster" was "subject to constitutional [First Amendment] constraints applicable to nonpublic fora"). Similarly unconvincing is the State's contention that government-funding of school libraries allows them to discriminate on the basis of viewpoint. (Br. at 46–47.) That position cannot be reconciled with the limitations on content- and viewpoint-based restrictions endorsed by seven justices in *Pico*. (*Supra* at 17–18 .)

Ultimately, the State seeks to eliminate the First Amendment from school libraries, whether under the government-speech doctrine or their government-subsidy argument. Neither argument has support in existing law.

## III. The Prohibitions Are Unconstitutionally Overbroad.

The Prohibitions are unconstitutionally overbroad. Defendants do not (1) include in their briefs the standard for constitutional overbreadth claims, (2) assess overbreadth under that standard, or (3) substantively dispute the district court's application of that standard to the undisputed facts aside from one brief statement:

"The district court's application of the overbreadth doctrine, … and its weighing of constitutional versus unconstitutional applications was error." (Br. at 51.) Defendants' failure to address this fundamental issue illustrates the weakness of their position and should forfeit any argument that the Prohibitions are not unconstitutionally overbroad, even under their preferred First Amendment standard.

The overbreadth test demonstrates that the Prohibitions sweep substantially broader than is constitutionally permissible. A statute that burdens otherwise-protected speech is invalid as overbroad if a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 603 U.S. at 723 (citing *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021) (finding provision facially unconstitutional)). To decide an overbreadth claim, a court "must [1] evaluate the full scope of the law's coverage[,] [2] decide which of the law's applications are constitutionally permissible and which are not, and [3] finally weigh the one against the other." *Id*. at 744.[19]

---

[19] This Court regularly invalidates unconstitutional laws on First Amendment overbreadth grounds. *See, e.g., Singleton v. City of Montgomery, Ala.*, No. 23-11163, 2025 WL 1042101, at *5 (11th Cir. Apr. 8, 2025); *Moms for Liberty – Brevard County, FL v. Brevard Public Schools*, 118 F.4th 1324, 1335 (11th Cir. 2024); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993); *Solomon v. City of Gainesville,* 763 F.2d 1212, 1213–14 (11th Cir. 1985) (per curiam).

In the district court, Defendants contended that *NetChoice* requires "layer[s] of factual inquiry" and places on the plaintiff a burden to "catalogue the books in public-school libraries." (DE 109 at 36–37.) That is wrong. *NetChoice* asks the Court to consider applications of the Prohibitions to determine their overbreadth, but it does not require Plaintiffs to litigate overbreadth challenges as mass-scale as-applied challenges.[20] 603 U.S. at 717. Just as the *NetChoice* parties are not required to analyze how the laws apply to technology companies' moderation of specific posts by specific users on various platforms, the parties here are not required to document every school-library book that implicates the Prohibitions. *See United States v. Hansen*, 599 U.S. 762, 783, n.5 (2023) ("Overbreadth doctrine trafficks in hypotheticals"); *United States v. Stevens*, 559 U.S. 460, 475–77 (2010) (analyzing *categories* of protected speech swept up in the overbroad statute, such as depictions of hunting and livestock slaughter). As this Court recently explained, it is appropriate under *NetChoice* to assess a statute's "full range of applications" by considering examples of protected and unprotected speech that the statute implicates. *Singleton*, 2025 WL 1042101, at *3. The categories of non-obscene books that have been removed under the Prohibitions—identified by Plaintiffs in

---

[20] The Supreme Court's opinion in *NetChoice* "did not break new ground; the Court has long espoused these requirements for a facial overbreadth challenge." *Free Speech Coalition, Inc., v. Rokita*, No. 1:24-cv-00980-RLY-MG, 2024 WL 5055864, at *3 (S.D. Ind. July 25, 2024) (citing cases).

their motion for summary judgment, supported by undisputed evidence, and relied upon by the district court—are more than sufficient to demonstrate overbreadth. (*See* DE 107 at 44–45.)

Facial challenges are critical for protecting First Amendment rights when a law restricts a substantial amount of protected speech. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (Facial challenges are important because "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech[,] harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas."). The Supreme Court has held that facial overbreadth challenges are particularly appropriate and important where, as here, the "pertinent facts … are the same across the board." *Bonta*, 594 U.S. at 618. The Prohibitions, which in every situation require the removal of books with no consideration of the book's value as a whole (as is constitutionally required), are the epitome of statutory provisions for which a facial challenge is appropriate. The district court properly granted summary judgment for Plaintiffs because the unconstitutional applications of the Prohibitions vastly outweigh any constitutional applications.

**A.    The Scope Of The Prohibitions Is School-Library Books.**

The Prohibitions require the removal of school-library materials with any content that "describes sexual conduct" or is purportedly "pornographic." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II). Plaintiffs do not challenge the portion of the statute concerning *visual depictions* of sexual conduct. *Id*. s. 1006.28(2)(a)(2)(b)(II). Despite the fact that Plaintiffs restrict their challenge to written descriptions—which the district court recognized (*see* DE 129 at 36 n.4)—Defendants include and regularly refer to visual depictions in their brief. (*See*, *e.g.*, Br. at 11, 13, 16, 17, 20, 23, 24, 26.) Visual depictions are irrelevant to Plaintiffs' claims and this appeal.

The scope of the Prohibitions is materials in Florida school libraries that contain a description of sexual conduct or so-called "pornographic" content. Those materials primarily consist of books.[21] (DE 107-48 at 7–8.) These are books—both fiction and nonfiction—that were specifically selected for school-library shelves by trained professionals who regularly consider educational appropriateness, community standards, and literary value in making library curation decisions. (*See*, *e.g.*, *id*. at 14.) The Prohibitions reach award-winning and other educationally valuable books, classics, books that have been on school-library shelves for years, and even books that are commonly addressed on Advanced Placement exams. Those

---

[21] References to "books" also include magazines, newspapers, and audiobooks, and the same overbreadth analysis that applies to books also applies to those materials.

provisions sweep far too broadly.

**B.     The Prohibitions Have Limited Constitutional Applications.**

The Prohibitions' constitutional applications are few, if any, because those provisions mandate the content-based removal of library books without regard for the value of each book as a whole.  No exigency of the educational environment justifies the Prohibitions, which are inconsistent with the purpose of school libraries.

Courts agree that the government cannot require the content-based removal of library books to impose a "pall of orthodoxy" or to rid libraries of messages with which they disagree.  *See Pico*, 457 U.S. at 870, 877; *Minarcini*, 541 F.2d at 580; *Counts*, 295 F. Supp. 2d at 1004–1005 (quoting *Pico*); *Penguin Random House v. Robbins*, 774 F. Supp. 3d 1001, 1021, 1032 (S.D. Iowa 2025).  While the most recent Supreme Court decision concerning the removal of school-library books—*Board of Education v. Pico*—was a plurality decision, it instructs that the government does not have unlimited authority to remove school-library books without running afoul of the First Amendment.  (*Supra* at 17–18.)  *Pico* also involved a much less extreme situation than at issue here—there, the Court considered whether a local school board's decision to remove nine books from a single school library violated students' First Amendment rights.  457 U.S. at 858.  In contrast, the Prohibitions are a statewide mandate that eliminates the discretion that Florida school districts and educators have by requiring the removal of hundreds of books that schools and

38

educators had selected for library shelves. (*See, e.g.*, DE 107-11–DE 107-42, DE 107-46.)

When the government restricts speech on government property, courts typically assess those restrictions based on the nature of the forum and the type of speech that is restricted. *See, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). The standard used to assess speech restrictions in nonpublic forums is consistent with the standards that courts apply to assess the removal of library books. Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint-neutral. *Id.* at 806. *See also Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]").

Defendants erroneously state that "the non-public forum standard is inapplicable because the curation of books in this context is … assessed under the [*Hazelwood*] standard," referring to *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). (Br. at 51.) But as this Court has held, *Hazelwood* applies the nonpublic forum standard to the compulsory curricular environment—which fundamentally differs from the voluntary school-library environment at issue in this case. *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989) ("We fail to see how [the *Hazelwood*] standard differs from the *Cornelius* standard for nonpublic forums;

39

instead it is merely an application of that standard to a curricular program," requiring that "regulations be reasonable in light of the pedagogical purposes of the particular activity."). Moreover, the Court in *Hazelwood* deferred to the discretion of local educators.[22] 484 U.S. at 273. The Prohibitions do just the opposite by overriding and removing that discretion. Therefore, an application of the Prohibitions is constitutional only if it is reasonable in light of the purpose of a school library. *See also Counts*, 295 F. Supp. 2d at 1002 (requiring the State to show that book-removal decisions were "justified by some exigency").

The purpose of school libraries is inconsistent with the broad content-based restrictions imposed by the Prohibitions that do not account for the value of the book as a whole. Libraries are places of voluntary inquiry that provide students with access to "areas of interest and thought not covered by the prescribed curriculum" and the opportunity for exploration, discovery, and growth. *See Pico*, 457 U.S. at 868–69. Critical to the success of libraries is the lack of "any kind of authoritative selection" of ideas by the State. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–604 (1967); *ALA*, 539 U.S. at 204 ("To fulfill their

---

[22] The issue in *Hazelwood* was whether to defer to a local school principal who had removed an article in a school newspaper (written as part of a journalism course) because it would reveal sensitive personal information, including the identity of pregnant students and details about a divorce in the community. 484 U.S. at 262–63.

traditional missions, public libraries must have broad discretion[.]").

Given these purposes, the reasonable and therefore constitutional applications of the Prohibitions are minimal. Because the Prohibitions are a statewide mandate with the purported purpose of keeping sexually explicit content out of school libraries, their reasonableness must be evaluated using the Supreme Court's standard that governs speech concerning sexual content—the obscenity standard. The Supreme Court has defined obscenity as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *See Miller*, 413 U.S. at 24. The first and second parts of the *Miller* obscenity test are to be determined "applying contemporary community standards." *Pope v. Illinois*, 481 U.S. 497, 500 (1987). When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

The *Miller* obscenity standard as applied to minors is not novel in Florida school libraries. Section 1006.28 has long prohibited Florida school libraries from containing content that is "harmful to minors," which Florida law defines as consistent with the *Miller* obscenity standard.[23] *Simmons v. State*, 944 So.2d 317,

---

[23] *Compare* Fla. Stat. s. 847.001(7) *with Miller*, 413 U.S. at 24.

41

329 (Fla. 2006) ("[T]he term 'harmful to minors' is adequately defined by reference to the three-prong *Miller* standard, albeit modified to apply to minors.").

The constitutional applications of the Prohibitions are therefore any school-library books that are obscene under the *Miller* standard accounting for the age of the minor. Because Florida law has long prohibited obscene materials in Florida school libraries, any constitutional applications are necessarily extremely limited. As the district court explained, the prohibition on material that "describes sexual conduct" must mean something "different than what is permissibly censored as obscenity by the *Miller*-for-minors standard. Any other interpretation would violate the basic premise of statutory construction that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." (DE 129 at 39 (quoting *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1271 (11th Cir. 2023)) (quotation marks and ellipses omitted).)

Moreover, library collections are curated by trained professional librarians who—consistent with the Supreme Court's obscenity standard—account for community standards. (*See, e.g.,* DE 107-48 at 14.) As a result, it would be the rare exception that a school library would contain an obscene book. (*Id.* (explaining that educators' "professional training requires [that] books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students").) The district court

correctly concluded "that there is no constitutional application of a prohibition against books containing material that 'describes' sexual conduct." (DE 129 at 39.) Defendants offered no evidence on summary judgment to dispute this. Rather, as the district court noted, the State merely "speculat[ed] that surely a plethora of obscene materials must exist in Florida school libraries if the legislature passed HB 1069." (*Id*. at 42.) Therefore, the constitutional applications of the Prohibitions are few, if any.

**C. The Prohibitions' Unconstitutional Applications Vastly Outweigh Their Constitutional Applications.**

In contrast, the vast unconstitutional applications of the Prohibitions substantially outweigh any potential constitutional applications. While the State has a legitimate interest in prohibiting students from accessing books that are obscene for minors in school libraries, a book is not obscene merely because it describes sexual content or includes so-called "pornographic" content as that term has been construed by the State. The Supreme Court has "rejected the approach previously adopted by some courts, which would permit the banning of an entire literary work on the basis of one or several passages that in isolation could be considered obscene." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 250 (1990) (Scalia, J., concurring). Moreover, the State cannot suppress "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription" solely "to protect the young from

ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14.  For these reasons, the Prohibitions are unconstitutional.

**1. The Prohibition On Content That "Describes Sexual Conduct."**

The prohibition on content that "describes sexual conduct" prohibits school-library books with *any* description of *any* sexual conduct as that term is defined by statute.  Long before the July 2023 effective date of the prohibition on content that "describes sexual conduct," the statute forbade material containing "sexual conduct" that was "harmful to minors."  Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).  That prior proscription required a finding that the book, "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for minors" as required by the First Amendment under *Miller*.  Fla. Stat. s. 847.001(7), 847.012.  In contrast, the new proscription totally disregards the value of the book taken as a whole.

**2. The Prohibition On So-Called "Pornographic" Content.**

Section 1006.28's prohibition on so-called "pornographic" content in school-library books, as interpreted and implemented by Defendants, similarly bears no relation to the Supreme Court's obscenity test.  Nor does it account for the age of the minor reader, as the First Amendment requires.

Florida law does not define the term "pornographic," but the State has construed the term "pornographic" as distinct from the *Miller* obscenity standard. (*Supra* at 6–7.)  The State's mandatory objection form includes separate categories

44

for "pornographic" content and content that is "harmful to minors," meaning that a book could contain content that is considered "pornographic" under the statute but that is not "harmful to minors" (obscene). (*See* DE 107-59; Fla. Admin. Code r. 6A-7.0714(3)(e).) Because the State requires all Florida school districts to adopt its objection form with no substantive modifications, it has imposed this unconstitutional construction of the term "pornographic" on school districts.

The prohibition on so-called "pornographic" content also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors. In that way, the State treats high school seniors the same as third graders and prohibits all students regardless of age, maturity, or reading level from accessing certain books in their school libraries. The First Amendment requires that books be considered in relation to the age and maturity of the students who may access them. *See Erznoznik*, 422 U.S. at 214 n.11 ("[T]he age of a minor is a significant factor."). A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395–96 (1988) (certifying case to state supreme court for determination of how a state prohibition on displaying sexually explicit material to minors accounted for minors' "differing ages and levels of maturity," which would "drastically alter[]" the constitutional challenge); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–

45

28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990) (rejecting challenge to state statute that was construed to account for the rights of older minors).  Nevertheless, the prohibition on so-called "pornographic" content applies to all school libraries and all students without differentiating based on the age of the prospective reader— even if the reader is an adult under Florida law—and therefore prevents older minors from accessing non-obscene school-library books that contain any so-called "pornographic" content, in violation of the First Amendment.

### 3.  The Substantial Unconstitutional Applications Of The Prohibitions.

The unconstitutional applications of the Prohibitions are many.  Those provisions require the removal of numerous categories of non-obscene books,[24] many of which have been in school libraries in Florida and throughout the nation for decades:

- Historical classics (*e.g.*, *Native Son* by Richard Wright; *Slaughterhouse-Five* by Kurt Vonnegut) (*see* DE 107-23; DE 107-41; DE 107-46);

- Modern award-winners or highly acclaimed books (*e.g.*, *Herzog* by Saul Bellow; *Beloved*, *Song of Solomon* and *The Bluest Eye* by Toni Morrison; *The Kite Runner* by Khaled Hosseini; *Looking for Alaska* by John Green; *Last Night at the Telegraph Club* by Malinda Lo) (*see* DE 107-15; DE 107-21; DE 107-23; DE 107-36; DE 107-41; DE 107-46);

- Books on Advanced Placement exams or that serve important educational purposes (*e.g.*, *The Color Purple* by Alice Walker, *Native Son* by Richard

---

[24] Courts commonly take "judicial notice of the contents of artistic works" for the purpose of evaluating facial challenges under the First Amendment.  *See Robbins*, 774 F. Supp. at 1026–27 (collecting cases).

Wright, *The Handmaid's Tale* by Margaret Atwood; *Slaughterhouse-Five* by Kurt Vonnegut, *A Clockwork Orange* by Anthony Burgess) (*see* DE 107-15; DE 107-21; DE 107-23; DE 107-41; DE 107-46);

- Non-fiction history books about important historical events (*e.g.*, *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa* by Mark Mathabane, *The Splendid and the Vile* by Erik Larson, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell) (*see* DE 107-23; DE 107-27; DE 107-41; DE 107-46);

- Non-fiction books to help minors avoid being victimized by sexual assault (*e.g.*, *You Too? 25 Voices Share Their #MeToo Stories* edited by Janet Gurtler) (*see* DE 107-41);

- Books that address bullying, racism, and sexual assault (*e.g.*, *The Bluest Eye* and *Song of Solomon* by Toni Morrison; *Last Night at the Telegraph Club* by Malinda Lo; *Looking for Alaska* by John Green, *Nineteen Minutes* by Jodi Picoult, *Homegoing* by Yaa Gyasi) (*see* DE 107-15; DE 107-21; DE 107-23; DE 107-36; DE 107-41);

- Books that address trauma and grief (*e.g.*, *Shout* by Laurie Halse Anderson, *This is Where it Ends* by Marieke Jijkamp, *My Sister's Keeper* by Jodi Picoult) (*see* DE 107-15; DE 107-23);

- Books that address injustice (*e.g.*, *Native Son* by Richard Wright, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell) (*see* DE 107-23; DE 107-27; DE 107-41); and

- Works of fiction geared toward the emotional and intellectual challenges of being a teenager or young adult (*e.g.*, *Looking for Alaska* by John Green, *The Hate U Give* by Angie Thomas, *How the García Girls Lost Their Accents* by Julia Alvarez) (*see* DE 107-15; DE 107-23; DE 107-41).

The Prohibitions impose a puritanical pall of orthodoxy[25] because they prohibit students—even high school seniors—from accessing in their school libraries numerous classic and award-winning books or books that are addressed on Advanced Placement exams, merely because those books contain even a single sentence describing sexual conduct or with so-called "pornographic" content as that term has been construed by the State.

That pall of orthodoxy is inconsistent with the purpose of school libraries. It makes no difference whether the content in question was an impetus for legislation concerning sexual assault; was historically significant, such as in an impeachment, presidential campaign, or international event; or was central to character development in an award-winning work of fiction. The Prohibitions are indifferent to the educational and literary qualities in the hundreds of school-library books that they require be removed.

The breadth of the Prohibitions is even greater because they are vague. The prohibition on content that "describes sexual conduct" does not explain what constitutes a description in relation to "sexual conduct" or what level of detail is necessary for that prohibition to apply. And the term "pornographic" has no meaning whatsoever under Florida law. If Florida educators fail to divine what the

---

[25] *See Pico*, 457 U.S. at 870, 877; *Minarcini*, 541 F.2d at 580; *Counts*, 295 F. Supp. 2d at 1004–1005 (quoting *Pico*); *Robbins*, 774 F. Supp. 3d at 1021, 1032.

Prohibitions require, they risk substantial penalties—including, in the Governor's view, being charged with a felony. *See* Fla. Stat. s. 1012.796(1)(a)–(f); DE 107-9 at 11. In that way, the Prohibitions incentivize educators and school districts to err on the side of caution and to remove books liberally.

The vagueness concern is real. Because the State decided not to define the term "pornographic" and the term "describes" in relation to "sexual conduct," it has essentially adopted an "I know it when I see it" approach. (DE 129 at 37 (explaining that "[t]here is a reason that was not the standard the Supreme Court adopted for defining obscenity then" and citing *Jacobellis v. Ohio*, 378 U.S. 184, 191 (1964)).) It is unclear, for example, whether a book that contains the phrase "spent the night together" (or other phrases that might imply a sexual interaction) is descriptive enough to offend the Prohibitions. (*See*, *e.g.*, 107-48 at 8–9.) Nor is it clear whether a book that states that two characters "made passionate love" or "had sexual intercourse" must be removed. Given the draconian penalties for noncompliance, however, those sorts of books are fairly implicated by the Prohibitions. (*Id.*)

It is not necessary to hypothesize about the broad reach of the Prohibitions. Since H.B. 1069 went into effect in July 2023, Florida school districts have removed large numbers of books that are not remotely obscene from school-library shelves under the Prohibitions. (*See*, *e.g.*, DE 107-11–DE 107-42; DE 107-46.) The books that Florida schools have removed or have identified for removal from school

libraries under the Prohibitions exemplify and confirm the law's substantial unconstitutional applications.

Those substantial unconstitutional applications vastly outweigh the few, if any, constitutional applications of the Prohibitions. There are only few, if any, books on school-library shelves that are obscene for minors under the *Miller* test that therefore could permissibly be removed pursuant to the State's mandate. In contrast, the Prohibitions reach far beyond obscenity to prohibit books with *any* description of "sexual conduct" and to prohibit books with *any* so-called "pornographic" content—whatever that means—for *any* age. Because any permissible applications of the Prohibitions are "dwarfed" by their "presumptively impermissible applications," those provisions are "substantially overbroad, and therefore invalid" under the First Amendment. *See Stevens*, 559 U.S. at 481–82. The "pertinent facts in these cases are the same across the board"—the Prohibitions disregard the value of the book as a whole, in violation of the First Amendment. *See Bonta*, 594 U.S. at 618. For these reasons, the Prohibitions are unconstitutional.

## IV. In The Alternative, Construing The Term "Pornographic" To Be Consistent With "Harmful To Minors" Would Save That Provision.

Although Defendants' construction of the term "pornographic" violates the First Amendment, the Court need not reach that issue because that term is readily susceptible to another and better construction that would save it from

unconstitutionality.  As the district court held—and Defendants did not contest[26]—

the term "pornographic" should be construed to be consistent with "harmful to

minors" as defined by Section 847.001(7).  That construction would make the term

consistent with the Supreme Court's obscenity standard as applied to minors.

The Supreme Court has instructed that the "elementary rule is that every

reasonable construction must be resorted to, in order to save a statute from

unconstitutionality" and that the "corollary doctrine" is that a "statute must be

construed, if fairly possible, so as to avoid not only the conclusion that it is

unconstitutional but also grave doubts upon that score." *Rust*, 500 U.S. at 190–91

(emphasis, quotations, and citations omitted).  To save a statute from

unconstitutionality, courts acknowledge that legislatures frequently use a "belt-and-

suspenders" approach to drafting legislation.  *See McCarthan v. Dir. of Goodwill

Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1087–88 (11th Cir. 2017).  The "belt-and-

suspenders" canon of statutory construction recognizes that the word "or"

"commonly introduces a synonym or definitional equivalent."  *Id.*  (quotation

omitted).  Therefore, where two statutory terms "share the same ordinary meaning"

and are separated by only the word "or," the "better reading of the text" recognizes

---

[26] Without explanation or analysis, Defendants refer to the district court's saving construction by stating briefly only that "[t]he district court's … interpretation of the pornographic standard in HB 1069 … was error." (Br. at 51.)  That passing reference is insufficient to raise the argument, which Defendants have waived.

that the definitions of the two terms "overlap." *Id*. *See also In re Wild*, 994 F.3d 1244, 1268 n.22 (11th Cir. 2021) (explaining that "[d]oublets and triplets abound in legalese, especially given that [legislatures] often use[] a 'belt-and-suspenders' approach when drafting statutes" (internal quotations omitted)).

The "belt-and-suspenders" approach best explains Section 1006.28's prohibition on so-called "pornographic" content. The prohibition on "pornographic" content and the prohibition on content that is "harmful to minors" have long coexisted in the same numbered category of proscribed content in the statute. *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I). Those terms are separated in the statute by only the word "or," indicating that "pornographic" and "prohibited under s. 847.012 [harmful to minors]" are "synonym[s] or definitional equivalent[s]." *See McCarthan*, 851 F.3d at 1087–88. Therefore, not only does the belt-and-suspenders approach compel a statutory construction that the term "pornographic" means the same thing as "harmful to minors" as defined by statute, but it is the "better reading of the text." *See id.* That reading would also be consistent with another canon of statutory interpretation: "*noscitur a sociis*—a word is known by the company it keeps," which instructs courts to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the [a]cts of [legislatures]." *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation and citation omitted).

Construing "pornographic" content as consistent with content that is "harmful to minors" as defined by Florida law would save that provision—which otherwise is vague and overbroad—from unconstitutionality. The Court should affirm this construction.

**CONCLUSION**

For the foregoing reasons, the Court should affirm the district court's decision.

Dated: February 9, 2026

/s/ *Frederick J. Sperling*
Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com

David A. Karp
Carlton Fields P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 539-7280
dkarp@carltonfields.com

*Attorneys for Plaintiffs*

# ADDENDUM

The text of Florida Statutes Section 1006.28 is set forth on the following pages.

Select Year:   2025 ▾   Go

# The 2025 Florida Statutes

Title XLVIII                              Chapter 1006                    View Entire Chapter
EARLY LEARNING-20 EDUCATION CODE            SUPPORT FOR LEARNING

**1006.28    Duties of district school board, district school superintendent; and school principal regarding K-12 instructional materials.—**

[1](1)   DEFINITIONS.—

(a)   As used in this section, the term:

1.   "Adequate instructional materials" means a sufficient number of student or site licenses or sets of materials that are available in bound, unbound, kit, or package form and may consist of hardbacked or softbacked textbooks, electronic content, consumables, learning laboratories, manipulatives, electronic media, and computer courseware or software that serve as the basis for instruction in the core subject areas of mathematics, language arts, social studies, science, reading, and literature.

2.   "Instructional materials" has the same meaning as in s. 1006.29(2).

3.   "Library media center" means any collection of books, ebooks, periodicals, or videos maintained and accessible on the site of a school, including in classrooms.

(b)   As used in this section and s. 1006.283, the term "resident" means a person who has maintained his or her residence in this state for the preceding year, has purchased a home that is occupied by him or her as his or her residence, or has established a domicile in this state pursuant to s. 222.17.

(c)   As used in this section and ss. 1006.283, 1006.32, 1006.35, 1006.37, 1006.38, 1006.40, and 1006.42, the term "purchase" includes purchase, lease, license, and acquire.

(2)   DISTRICT SCHOOL BOARD.—The district school board has the constitutional duty and responsibility to select and provide adequate instructional materials for all students in accordance with the requirements of this part. The district school board also has the following specific duties and responsibilities:

(a)   *Courses of study; adoption.*—Adopt courses of study, including instructional materials, for use in the schools of the district.

1.   Each district school board is responsible for the content of all instructional materials and any other materials used in a classroom, made available in a school or classroom library, or included on a reading list, whether adopted and purchased from the state-adopted instructional materials list, adopted and purchased through a district instructional materials program under s. 1006.283, or otherwise purchased or made available.

2.   Each district school board must adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material, which clearly describes a process to handle all objections and provides for resolution. The objection form, as prescribed by State Board of Education rule, and the district school board's process must be easy to read and understand and be easily accessible on the homepage of the school district's website. The objection form must also identify the school district point of contact and contact information for the submission of an objection. The process must provide the parent or resident the opportunity to proffer evidence to the district school board that:

a.   An instructional material does not meet the criteria of s. 1006.31(2) or s. 1006.40(3)(c) if it was selected for use in a course or otherwise made available to students in the school district but was not subject to the public notice, review, comment, and hearing procedures under s. 1006.283(2)(b)8., 9., and 11.

b.   Any material used in a classroom, made available in a school or classroom library, or included on a reading list contains content which:

(I)    Is pornographic or prohibited under s. 847.012;

(II)    Depicts or describes sexual conduct as defined in s. 847.001(19), unless such material is for a course required by s. 1003.46 or s. 1003.42(2)(o)1.g. or 3., or identified by State Board of Education rule;

(III)    Is not suited to student needs and their ability to comprehend the material presented; or

(IV)    Is inappropriate for the grade level and age group for which the material is used.

A resident of the county who is not the parent or guardian of a student with access to school district materials may not object to more than one material per month. The State Board of Education may adopt rules to implement this provision. Any material that is subject to an objection on the basis of sub-sub-subparagraph b.(I) or sub-sub-subparagraph b.(II) must be removed within 5 school days after receipt of the objection and remain unavailable to students of that school until the objection is resolved. Parents shall have the right to read passages from any material that is subject to an objection. If the school board denies a parent the right to read passages due to content that meets the requirements under sub-sub-subparagraph b.(I), the school district shall discontinue the use of the material in the school district. If the district school board finds that any material meets the requirements under sub-subparagraph a. or that any other material contains prohibited content under sub-sub-subparagraph b.(I), the school district shall discontinue use of the material. If the district school board finds that any other material contains prohibited content under sub-sub-subparagraphs b.(II)-(IV), the school district shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable.

3.    Each district school board must establish a process by which the parent of a public school student or a resident of the county may contest the district school board's adoption of a specific instructional material. The parent or resident must file a petition, on a form provided by the school board, within 30 calendar days after the adoption of the instructional material by the school board. The school board must make the form available to the public and publish the form on the school district's website. The form must be signed by the parent or resident, include the required contact information, and state the objection to the instructional material based on the criteria of s. 1006.31(2) or s. 1006.40(3)(c). Within 30 days after the 30-day period has expired, the school board must, for all petitions timely received, conduct at least one open public hearing before an unbiased and qualified hearing officer. The hearing officer may not be an employee or agent of the school district. The hearing is not subject to the provisions of chapter 120; however, the hearing must provide sufficient procedural protections to allow each petitioner an adequate and fair opportunity to be heard and present evidence to the hearing officer. The school board's decision after convening a hearing is final and not subject to further petition or review.

4.    Meetings of committees convened for the purpose of ranking, eliminating, or selecting instructional materials for recommendation to the district school board must be noticed and open to the public in accordance with s. 286.011. Any committees convened for such purposes must include parents of students who will have access to such materials.

5.    Meetings of committees convened for the purpose of resolving an objection by a parent or resident to specific materials must be noticed and open to the public in accordance with s. 286.011. Any committees convened for such purposes must include parents of students who will have access to such materials.

6.    If a parent disagrees with the determination made by the district school board on the objection to the use of a specific material, a parent may request the Commissioner of Education to appoint a special magistrate who is a member of The Florida Bar in good standing and who has at least 5 years' experience in administrative law. The special magistrate shall determine facts relating to the school district's determination, consider information provided by the parent and the school district, and render a recommended decision for resolution to the State Board of Education within 30 days after receipt of the request by the parent. The State Board of Education must approve or reject the recommended decision at its next regularly scheduled meeting that is more than 7 calendar days and no more than 30 days after the date the recommended decision is transmitted. The costs of the special magistrate shall be borne by the school district. The State Board of Education shall adopt rules, including forms, necessary to implement this subparagraph.

(b)    *Instructional materials.*—Provide for proper requisitioning, distribution, accounting, storage, care, and use of all instructional materials and furnish such other instructional materials as may be needed. Instructional

materials used must be consistent with the district goals and objectives and the course descriptions established in rule of the State Board of Education, as well as with the applicable state academic standards provided for in s. 1003.41.

(c)  *Other instructional materials.*—Provide such other teaching accessories and aids as are needed for the school district's educational program.

(d)  *School library media services; establishment and maintenance.*—Establish and maintain a program of school library media services for all public schools in the district, including school library media centers, or school library media centers open to the public, and, in addition such traveling or circulating libraries as may be needed for the proper operation of the district school system. School librarians, media specialists, and other personnel involved in the selection of school district library materials must complete the training program developed pursuant to s. 1006.29(6) before reviewing and selecting age-appropriate materials and library resources. Upon written request, a school district shall provide access to any material or book specified in the request that is maintained in a district school system library and is available for review.

1.  Each book made available to students through a school district library media center or included in a recommended or assigned school or grade-level reading list must be selected by a school district employee who holds a valid educational media specialist certificate, regardless of whether the book is purchased, donated, or otherwise made available to students.

2.  Each district school board shall adopt procedures for developing library media center collections and post the procedures on the website for each school within the district. The procedures must:

a.  Require that book selections meet the criteria in s. 1006.40(3)(c).

b.  Require consultation of reputable, professionally recognized reviewing periodicals and school community stakeholders.

c.  Provide for library media center collections, including classroom libraries, based on reader interest, support of state academic standards and aligned curriculum, and the academic needs of students and faculty.

d.  Provide for the regular removal or discontinuance of books based on, at a minimum, physical condition, rate of recent circulation, alignment to state academic standards and relevancy to curriculum, out-of-date content, and required removal pursuant to subparagraph (a)2.

3.  Each elementary school must publish on its website, in a searchable format prescribed by the department, a list of all materials maintained and accessible in the school library media center or a classroom library or required as part of a school or grade-level reading list.

4.  Each district school board shall adopt and publish on its website the process for a parent to limit his or her student's access to materials in the school or classroom library.

(e)  *Public participation.*—Publish on its website, in a searchable format prescribed by the department, a list of all instructional materials, including those used to provide instruction required by s. 1003.42. Each district school board must:

1.  Provide access to all materials, excluding teacher editions, in accordance with s. 1006.283(2)(b)8.a. before the district school board takes any official action on such materials. This process must include reasonable safeguards against the unauthorized use, reproduction, and distribution of instructional materials considered for adoption.

2.  Select, approve, adopt, or purchase all materials as a separate line item on the agenda and provide a reasonable opportunity for public comment. The use of materials described in this paragraph may not be selected, approved, or adopted as part of a consent agenda.

3.  Annually, on June 30, submit to the Commissioner of Education a report that identifies:

a.  Each material for which the school district received an objection pursuant to subparagraph (a)2., including the grade level and course the material was used in, for the school year and the specific objections thereto.

b.  Each material that was removed or discontinued.

c.  Each material that was not removed or discontinued and the rationale for not removing or discontinuing the material.

The department shall publish and regularly update a list of materials that were removed or discontinued, sorted by grade level, as a result of an objection and disseminate the list to school districts for consideration in their selection procedures.

(3)   DISTRICT SCHOOL SUPERINTENDENT.—

(a)   The district school superintendent has the duty to recommend such plans for improving, providing, distributing, accounting for, and caring for instructional materials and other instructional aids as will result in general improvement of the district school system, as prescribed in this part, in accordance with adopted district school board rules prescribing the duties and responsibilities of the district school superintendent regarding the requisition, purchase, receipt, storage, distribution, use, conservation, records, and reports of, and management practices and property accountability concerning, instructional materials, and providing for an evaluation of any instructional materials to be requisitioned that have not been used previously in the district's schools. The district school superintendent must keep adequate records and accounts for all financial transactions for funds collected pursuant to subsection (4).

(b)   Each district school superintendent shall annually notify the department of the state-adopted instructional materials that will be requisitioned for use in his or her school district.

(c)   Annually by August 1, each district school superintendent shall certify to the Commissioner of Education that the district school board has approved a comprehensive staff development plan that supports fidelity of implementation of instructional materials programs, including verification that training was provided, that the materials are being implemented as designed, and that core reading materials and reading intervention materials used in kindergarten through grade 5 meet the requirements of s. 1001.215(8). Such instructional materials, as evaluated and identified pursuant to s. 1001.215(4), may be purchased by school districts without undergoing the adoption procedures in s. 1006.40(4)(b).

(4)   SCHOOL PRINCIPAL.—The school principal has the following duties for the management and care of materials at the school:

(a)   *Proper use of instructional materials.*—The principal shall assure that instructional materials are used to provide instruction to students enrolled at the grade level or levels for which the materials are designed, pursuant to adopted district school board rule. The school principal shall communicate to parents the manner in which instructional materials are used to implement the curricular objectives of the school and the procedures for contesting the adoption and use of instructional materials.

(b)   *Money collected for lost or damaged instructional materials; enforcement.*—The school principal may collect from each student or the student's parent the purchase price of any instructional material the student has lost, destroyed, or unnecessarily damaged and report and transmit the money collected to the district school superintendent. A student who fails to pay such sum may be suspended from participation in extracurricular activities. A student may satisfy the debt through community service activities at the school site as determined by the school principal, pursuant to policies adopted by district school board rule.

(c)   *Sale of instructional materials.*—The school principal, upon request of the parent of a student in the school, shall sell to the parent any instructional materials used in the school. All such sales shall be made pursuant to rule adopted by the district school board, and the principal shall annually provide information to parents that they may purchase instructional materials and how to purchase the materials.

(d)   *Disposition of funds.*—All money collected from the sale, exchange, loss, or damage of instructional materials shall be transmitted to the district school superintendent to be deposited in the district school board fund and added to the district appropriation for instructional materials.

(e)   *Accounting for instructional materials.*—Principals shall see that all instructional materials are fully and properly accounted for as prescribed by adopted rules of the district school board.

(f)   *Selection of library media center materials.*—School principals are responsible for overseeing compliance with school district procedures for selecting school library media center materials at the school to which they are assigned and notifying parents of the process for objecting to the use of specific materials.

**History.**—s. 303, ch. 2002-387; s. 18, ch. 2009-59; s. 1, ch. 2009-222; s. 17, ch. 2010-154; s. 18, ch. 2011-55; s. 1, ch. 2013-237; s. 1, ch. 2014-15; s. 60, ch. 2014-39; s. 2, ch. 2017-177; s. 14, ch. 2021-9; s. 2, ch. 2022-21; s. 167, ch. 2023-8; s. 11, ch. 2023-13; s. 6, ch. 2023-

105; s. 31, ch. 2023-245; s. 84, ch. 2024-2; s. 15, ch. 2024-101; s. 18, ch. 2024-160; s. 107, ch. 2025-6.

[1]**Note.**—Section 1(2), ch. 2025-7, provides that "[i]nstructional materials, as defined in s. 1006.28(1)(a), Florida Statutes, and library media center collections that are adopted or acquired on or after July 1, 2025, by a district school board or charter school governing board must reflect the new federal designation of the 'Gulf of Mexico' as the 'Gulf of America.' "

Copyright © 1995-2026 The Florida Legislature • Privacy Statement • Contact Us

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies that this Answer Brief complies with (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because this response contains 12,321 words, excluding the parts exempted by Fed. R. App. P. 32(f) and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 with Times New Roman 14-point font in the text and footnotes.

/s/ *Kirstie Brenson*
Kirstie Brenson