No. 25-13181

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

PENGUIN RANDOM HOUSE, et al.,

Plaintiffs-Appellees,

v.

BEN GIBSON, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE FLORIDA STATE BOARD OF EDUCATION, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Middle District of Florida
Hon. Carlos E. Mendoza
Case No. 6:24-cv-01573-CEM-RMN

## BRIEF OF *AMICI CURIAE* FREEDOM TO READ FOUNDATION and AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN SUPPORT OF APPELLEES AND AFFIRMANCE

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 218-3389
Fax: (917) 344-1394
owolfe@seyfarth.com

*Attorneys for Amici Curiae Freedom to Read Foundation and American Association of School Librarians*

Dated: February 13, 2026

# DISCLOSURE STATEMENT
## AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* disclose as follows:

1. Freedom to Read Foundation is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

2. American Association of School Librarians is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

Pursuant to Local Rule 26.1-1, *amici curiae* disclose the following interested parties:

1. American Association of School Librarians (*Amicus Curiae*)

2. Alabama (*Amicus Curiae*)

3. Alaska (*Amicus Curiae*)

4. Alvarez, Julia (Plaintiff-Appellee)

5. Anderson, Laurie Halse (Plaintiff-Appellee)

6. ArentFox Schiff LLP (Counsel for Plaintiffs-Appellees)

7. Arkansas (*Amicus Curiae*)

8. Bird, Brenna (Counsel for State *Amici Curiae*)

9. Brenson, Kirstie (Counsel for Plaintiffs-Appellees)

10. Brosemar, Donna, in her official capacity as a member of the Volusia County School Board (Defendant-Appellant)

11. Brown, Derek (Counsel for State *Amici Curiae*)

12. Brown, Monesia, in her official capacity as a member of the Florida State Board of Education (Defendant-Appellant)

13. Byrd, Esther, in her official capacity as a member of the Florida State Board of Education (Defendant-Appellant)

14. Byrd, Melissa, in her official capacity as a member of the Orange County School Board (Defendant-Appellant)

15. Burnette, Anita, in her official capacity as Vice Chair of the Volusia County School Board (Former Defendant-Appellant)

16. Burr & FormanLLP (Counsel for Orange County and Volusia County Defendants-Appellants)

17. Carr, Chris (Counsel for State *Amici Curiae*)

18. Carlton Fields P.A. (Counsel for Plaintiffs-Appellees)

19. CastorDental, Karen, in her official capacity as a member of the Orange County School Board (Former Defendant-Appellant)

20. Christie, Grazie P., in her official capacity as a member of the Florida State Board of Education (Defendant-Appellant)

21. Colón, Ruben, in his official capacity as a member of the Volusia County School Board (Defendant-Appellant)

22. Costello, David (Former counsel for State Defendants-Appellants)

23. Cox, Stephen J. (Counsel for State *Amici Curiae*)

24. DeSousa, Jeffrey Paul (Counsel for State Defendants-Appellants)

25. Diederich, Adam (Counsel for Plaintiffs-Appellees)

26. Douglas, Anne, in her official capacity as a member of the Volusia County School Board (Defendant-Appellant)

27. Drummond, Gentner (Counsel for State *Amici Curiae*)

28. Evans, Gilbert L. (Counsel for Volusia County Defendants-Appellants)

29. Farrant, Alicia, in her official capacity as a member of the Orange County School Board (Defendant-Appellant)

30. Felder, Vicki-Elain, in her official capacity as a member of the Orange County School Board (Defendant-Appellant)

31. Freedom to Read Foundation (*Amicus Curiae*)

32. Gallo, Angie, in her official capacity as a member of the Orange County School Board (Defendant-Appellant)

33. García, Kelly, in her official capacity as a member of the Florida State Board of Education (Defendant-Appellant)

34. Georgia (*Amicus Curiae*)

35. Gibson, Ben, in his official capacity as Chair of the Florida State Board of Education (Defendant-Appellant)

36. Goodrich, Krista, in her official capacity as a member of the Volusia County School Board (Defendant-Appellant)

37. Gould, Pam, in her official capacity as a member of the Orange County School Board (Former Defendant-Appellant)

38. Green, John (Plaintiff-Appellee)

39. Griffin, Tim (Counsel for State *Amici Curiae*)

40. Hachette Book Group, Inc. (Plaintiff-Appellee)

41. Hanaway, Catherine (Counsel for State *Amici Curiae*)

42. HarperCollins Publishers LLC (Plaintiff-Appellee)

43. Hayes, Judith Anne, as parent and next friend of J.H. (Plaintiff-Appellee)

44. Haynes, Jamie, in her official capacity as Chair of the Volusia County School Board (Defendant-Appellant)

45. Hilgers, Michael T. (Counsel for State *Amici Curiae*)

46. Idaho (*Amicus Curiae*)

47. Indiana (*Amicus Curiae*)

48. Iowa (*Amicus Curiae*)

49. Jacobs, Teresa, in her official capacity as Chair of the Orange County School Board (Defendant-Appellant)

50. Jackley, Marty (Counsel for State *Amici Curiae*)

51. Kansas (*Amicus Curiae*)

52. Karp, David A. (Counsel for Plaintiffs-Appellees)

53. Kellogg, Heidi, as parent and next friend of R.K. (Plaintiff-Appellee)

54. Kelly, Thomas F. (Counsel for State Defendants-Appellants)

55. Knudsen, Austin (Counsel for State *Amici Curiae*)

56. Kobach, Kris W. (Counsel for State *Amici Curiae*)

57. Labrador, Raúl R. (Counsel for State *Amici Curiae*)

58. Louisiana (*Amicus Curiae*)

59. Macmillan Publishing Group, LLC (Plaintiff-Appellee)

60. Magar, Marylynn, in her official capacity as a member of the Florida State Board of Education (Defendant-Appellant)

61. Marshall, Steve (Counsel for State *Amici Curiae*)

62. Marks, Howard (Counsel for Orange County and Volusia County Defendants-Appellants)

63. McCuskey, John B. (Counsel for State *Amici Curiae*)

64. Mendoza, Carlos E. (U.S. District Judge)

65. Missouri (*Amicus Curiae*)

66. Montana (*Amicus Curiae*)

67. Moody, Ashley (Former counsel for State of Florida Defendants-Appellants)

68. Muehlhoff, Jason J. (Counsel for State Defendants-Appellants)

69. Murrill, Liz (Counsel for State *Amici Curiae*)

70. Nebraska (*Amicus Curiae*)

71. North Dakota (*Amicus Curiae*)

72. Norway, Robert M. (U.S. Magistrate Judge)

73. O'Hickey, Bridget K. (Former counsel for State of Florida Defendants-Appellants)

74. Ohio (*Amicus Curiae*)

75. Oklahoma (*Amicus Curiae*)

76. Palmerini, John C. (Counsel for Orange County Defendants-Appellants)

77. Patterson, Autumn Hamit (Counsel for State *Amici Curiae*)

78. Paxton, Ken (Counsel for State *Amici Curiae*)

79. Penguin Random House LLC (Plaintiff-Appellee)

80. Persis, Carl, in his official capacity as a member of the Volusia County School Board (Former Defendant-Appellant)

81. Petty, Ryan, in his official capacity as Vice Chair of the Florida State Board of Education (Defendant-Appellant)

82. Picoult, Jodi (Plaintiff-Appellee)

83. Rokita, Theodore E. (Counsel for State *Amici Curiae*)

84. Salamanca, Maria, in her official capacity as a member of the Orange County School Board (Defendant-Appellant)

85. Seyfarth Shaw LLP (Counsel for *Amici Curiae* Freedom to Read Foundation and American Association of School Librarians)

86. Simon & Schuster, LLC (Plaintiff-Appellee)

87. Skrmetti, Jonathan (Counsel for State *Amici Curiae*)

88. Sourcebooks LLC (Plaintiff-Appellee)

89. South Carolina (*Amicus Curiae*)

90. South Dakota (*Amicus Curiae*)

91. Sperling, Frederick J. (Counsel for Plaintiffs-Appellees)

92. Tennessee (*Amicus Curiae*)

93. Texas (*Amicus Curiae*)

94. The Authors Guild (Plaintiff-Appellee)

95. Thakrar, Sheena A. (Counsel for Orange County and Volusia County Defendants-Appellants)

96. Thomas, Angie (Plaintiff-Appellee)

97. Thompson, Jessie, in her official capacity as a member of the Volusia County School Board (Defendant-Appellant)

98. Utah (*Amicus Curiae*)

99. Uthmeier, James (Counsel for State Defendants-Appellants)

100. Vanos, Stephanie, in her official capacity as a member of the Volusia County School Board (Defendant-Appellant)

101. West Virginia (*Amicus Curiae*)

102. Wilson, Alan (Counsel for State *Amici Curiae*)

103. Wolfe, Owen R. (Counsel for *Amici Curiae* Freedom to Read Foundation and American Association of School Librarians)

104. Wrigley, Drew H. (Counsel for State *Amici Curiae*)

105. Yost, Dave (Counsel for State *Amici Curiae*)

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS ..................................................................................... i

TABLE OF CONTENTS ....................................................................... ix

I.      STATEMENT OF INTEREST ................................................... 1

II.     STATEMENT OF CONTRIBUTIONS ....................................... 2

III.    SUMMARY OF THE ARGUMENT ......................................... 3

IV.     ARGUMENT ............................................................................ 5

        A.      Libraries are crucial to American democracy ................. 5

        B.      School libraries are critical to our democracy ............... 6

        C.      Robust school libraries result in better student outcomes ................ 7

        D.      Librarians rely upon set standards to curate school libraries ................ 8

        E.      HB1069 restricts books notwithstanding their educational merit ....... 11

                1.      HB1069 prohibits libraries from carrying books with significant merit ........................... 11

                2.      HB1069 violates the First Amendment by restricting books regardless of their merit ................ 12

        F.      Library curation is not school-sponsored or government speech ....... 15

                1.      School libraries are not "school-sponsored" speech ................ 17

                2.      The government does not speak through the contents of library shelves ................ 20

                3.      The State relies upon inapposite cases .................... 24

        G.      The purported availability of the books from other sources does not prevent a constitutional violation ................. 25

**V.** CONCLUSION..................................................................................29

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ..............................................................16

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)..............................................................14, 16, 17, 26

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)..............................................................................17, 20

*Case v. Unified Sch. Dist. No. 233*,
908 F. Supp. 864 (D. Kan. 1995).......................................................18

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ..............................................28

*Epperson v. State of Ark.*,
393 U.S. 97 (1968).............................................................................13

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas,*
684 F. Supp. 3d 879 (W.D. Ark. 2023) .........................................5, 8, 13, 20, 27

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ......................................................20, 22

*González v. Douglas*,
269 F. Supp. 3d 948 (D. Az. 2017)....................................................27

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)............................................................................13

*Leake v. Drinkard*,
14 F.4th 1242 (11th Cir. 2021) ...................................................24, 25

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) .....................................................25, 28

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021).........................................................................27

*Mahmoud v. Taylor*,
145 S.Ct. 2332 (2025)........................................................................4, 13, 17, 27

*Martin v. City of Struthers*,
319 U.S. 141 (1943)........................................................................13

*Matal v. Tam*,
582 U.S. 218 (2017)........................................................................21, 22

*McGriff v. City of Miami of Beach*,
84 F.4th 1330 (11th Cir. 2023)........................................................................24, 25

*Packingham v. North Carolina*,
582 U.S. 98 (2017)........................................................................26

*PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*,
711 F. Supp. 3d 1325 (N.D. Fl. 2024)........................................................................20

*Perry Educ. Assn. v. Perry Local Educators' Assn.*,
460 U.S. 37 (1983)........................................................................26, 27

*Right to Read Def. Comm. v. Sch. Comm.*,
454 F. Supp. 703 (D. Mass. 1978)........................................................................18

*Roberts v. Madigan*,
702 F. Supp. 1505 (D. Colo. 1989)........................................................................13

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)........................................................................23, 26

*Sheck v. Baileyville School Committee*,
530 F. Supp. 679 (D. Me. 1982)........................................................................15, 18, 27

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)........................................................................21, 22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)........................................................................13, 27

*U.S. v. Am. Library Ass'n*,
539 U.S. 194 (2003)........................................................................24

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ...............................................................18, 19, 27

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943).................................................................................14

**Other Authorities**

*AASL Standards Framework for Learners*, AM. ASS'N OF SCH.
LIBRARIANS (2017), available at https://standards.aasl.org/wp-content/uploads/2017/11/AASL-Standards-Framework-for-Learners-pamphlet.pdf .............................................................................10

*Access to Resources and Services in the School Library: An
Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N
(2025), available at
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresources ....................................................................................9

BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION
SCIENCES, SCHOOL LIBRARIES (4th ed. 2017).............................................6, 7, 28

Briana Hovendick Francis, et al., *School Librarians Continue to Help
Students Achieve Standards: The Third Colorado Study*, LIBRARY
RESEARCH SERVICE (2010), available at
https://files.eric.ed.gov/fulltext/ED514556.pdf .......................................7

*Code of Ethics*, AM. LIBR. ASS'N (2021), available at
https://www.ala.org/tools/ethics .................................................................8, 10

*Diverse and Inclusive Collections: An Interpretation of the Library
Bill of Rights*, AM. LIBR. ASS'N (2025), available at
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/diversecollections ............................................................................10

Douglas L. Achterman, *Haves, Halves, and Have-Nots: School
Libraries and Student Achievement in California*, U. N. Tex.
(2008), available at
https://digital.library.unt.edu/ark:/67531/metadc9800/ .......................................7

*IFLA Guidelines for Library Services to Children aged 0-18*, INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018), available at https://www.ifla.org/wp-content/uploads/2019/05/assets/libraries-for-children-and-ya/publications/ifla-guidelines-for-library-services-to-children_aged-0-18.pdf ................................................................10

*Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017), available at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations ..............................................................................9

James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822), available at https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text ....................5

Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381 (2012) .............................................................................5

*Jenna On Why Her December Book Club Pick is Meaningful For Her*, TODAY.COM (Nov. 30, 2020), available at https://www.today.com/shop/jenna-december-book-club-t200961 ............. 11-12

Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001), available at https://files.eric.ed.gov/fulltext/ED456861.pdf ................................................. 7-8

Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012), available at https://files.eric.ed.gov/fulltext/ED543418.pdf ...............................7

Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018), available at http://kappanonline.org/lance-kachel-school-librarians-matter-years-research/ ..............................................................................7

Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993) .........................................................7

Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012), available at https://files.eric.ed.gov/fulltext/ED572250.pdf ....................................................7

*Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), available at https://www.ala.org/advocacy/intfreedom/librarybill ................................9, 10

Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1,1 (2012), available at https://www.researchgate.net/profile/Michael-Kevane/publication/265724905_The_Development_of_Public_Libraries_in_the_United_States_1870-1930_A_Quantitative_Assessment/links/549f133a0cf257a635fe7233/The-Development-of-Public-Libraries-in-the-United-States-1870-1930-A-Quantitative-Assessment.pdf?_sg%5B0%5D=started_experiment_milestone&origin=journalDetail&_rtd=e30%3D .........................................................6

Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU EDUC. & L.J. 103 (2005)...........................5, 6

*Slaughterhouse-Five*, PENGUIN RANDOM HOUSE, https://www.penguinrandomhouse.com/books/184345/slaughterhouse-five-by-kurt-vonnegut/ ...............................................................................12

Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89 (1997) ...................................................................................... 28-29

*The Bluest Eye*, PENGUIN RANDOM HOUSE, https://www.penguinrandomhouse.com/books/117662/the-bluest-eye-by-toni-morrison-with-an-introduction-by-jacqueline-woodson/ ......................................................................................11

Thomas Jefferson, *Letter from Thomas Jefferson to Charles Yancey*, NATIONAL ARCHIVES (Jan. 6, 1816), available at https://founders.archives.gov/documents/Jefferson/03-09-02-0209 ....................3

U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL
LIBRARIES: 1953-2000 1 (2005), available at
https://nces.ed.gov/pubs2005/2005324.pdf ...........................................................6

## I. **STATEMENT OF INTEREST**

The Freedom to Read Foundation ("FTRF") was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The American Association of School Librarians ("AASL") is the preeminent national professional association for school librarians. All aspects of the association's work reflect its core values: innovation, learning, collaboration, intellectual freedom, and equity, diversity, and inclusion. AASL is committed to ensuring that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need.

*Amici curiae* believe that viewpoint censorship violates the core value of preserving intellectual freedom and that students have an important First Amendment right to receive information free of viewpoint discrimination. *Amici* thus have a strong interest in the outcome of this case.

Appellants and Appellee consent to the filing of this *amici curiae* brief.

1

## II. **<u>STATEMENT OF CONTRIBUTIONS</u>**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici curiae* state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the *amici curiae*, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

### III.   SUMMARY OF THE ARGUMENT

"If a nation expects to be ignorant & free…it expects what never was & never will be.  The functionaries of every government have propensities to command at will the liberty & property of their constituents.  There is no safe deposit for these but with the people themselves; ***nor can they be safe with them without information***.  Where the press is free and ***every man able to read, all is safe***."  Thomas Jefferson, *Letter from Thomas Jefferson to Charles Yancey*, NATIONAL ARCHIVES (Jan. 6, 1816) (emphasis added).

House Bill 1069 ("HB1069") undermines the purpose of school libraries.  The statute relies upon overbroad, vague standards not utilized by professional librarians, the extent and reach of which are intentionally unclear.  The District Court's approach, by which the government must take literary, educational, and artistic merit into account, is consistent with the First Amendment and the history and purpose of libraries.

The State Defendants-Appellants (the "State") contend that if the District Court is affirmed, the State will be required to provide "pornography" on library shelves.  That strawman argument is meritless.  No one in this case argues that individuals can require libraries to obtain or purchase particular books.  *Amici* simply contend that once the government chooses to open a library, its curation decisions must be made in accordance with the First Amendment, which includes complying

with precedents like *Miller v. California*, 413 U.S. 15 (1973) and *Ginsberg v. New York*, 390 U.S. 629 (1968).

The State's real argument is that it can remove books from school libraries whenever it wants and for any reason. The State's power over even the school curriculum is not unlimited, however. In *Mahmoud v. Taylor*, 145 S.Ct. 2332 (2025), the Supreme Court held that curriculum decisions cannot override First Amendment rights or impose what Justice Thomas called "ideological conformity." The State's powers over the school library collection are more limited because that collection is not the curriculum: although librarians provide crucial academic support for the entire school community, the school library collection is an extracurricular place of study for optional reading. Moreover, this Court has already held that the First Amendment *does* apply to curation decisions, leaving only the standard of review unresolved.

It is not hyperbole to say if the State's argument is adopted, school libraries in Vermont could decide that children can only see books that criticize President Trump; school libraries in Massachusetts could decide to carry only books that promote Democratic policies; school libraries in Texas could decide to carry only books that praise President Trump; and school libraries in Oklahoma could include only books that promote Republican policies. As those hypotheticals show, the State's argument is anathema to the First Amendment and the purpose of libraries.

4

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." James Madison, *Letter from James Madison to W.T. Barry*, Library Of Congress (Aug. 4, 1822). If the State's argument is adopted, the "Farce" and "Tragedy" Madison feared is upon us and, as Jefferson warned, liberty is not "safe." The District Court should be affirmed.

## IV. <u>ARGUMENT</u>

### A. Libraries are crucial to American democracy.

Public libraries predate our country's establishment, with Benjamin Franklin often credited with founding the first American subscription library in 1731. Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381, 394 (2012). Colonial libraries developed as early as 1770. Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU Educ. & L.J. 103, 112 (2005).

"After the British burned Washington's congressional library during the War of 1812, Thomas Jefferson sold his personal collection…to start what is now the Library of Congress." *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 889 (W.D. Ark. 2023). Jefferson "famously said, 'I have often thought

that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county….'" *Id.*

**B. School libraries are critical to our democracy.**

The emergence of public libraries coincided with the rise of public education and, with it, school libraries. "[P]ublic libraries…were originally conceived as part of the nation's broader educational movement, and it was their educational function that provided the principal justification for public support." Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1, 1 (2012). Melvil Dewey, inventor of the library cataloging system, asserted that:

> [a] collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture. These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying than those set forth in their text-books…. [T]hey familiarize the children with books and their use; and, in any subject, they permit the beginning of that laboratory method which is now considered so essential in all educational work.

Peltz, *supra*, at 114.

Professional school libraries began to emerge in the 1900s. BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCES, SCHOOL LIBRARIES 4000 (4th ed. 2017). Since the early 1950s, more than 30,000 school libraries have been established. U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005).

**C. Robust school libraries result in better student outcomes.**

School libraries' positive impact on students is well-documented. "Research studies" show "student success when schools had libraries, librarians, and resources." WOOLLS, *supra*, at 4004. The quality of, and access to, books at a school library is a powerful predictor of academic achievement. *See, e.g.*, Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012); Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012); Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010); Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008); Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993).

Research consistently confirms that strong library programs increase student achievement. Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018); *see also, e.g.*, Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media*

*Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001).

**D. Librarians rely upon set standards to curate school libraries.**

The American Library Association ("ALA") is the sole accrediting body for U.S. library and information science schools. *Fayetteville*, 684 F. Supp. 3d at 890. "Professional librarians hold advanced degrees from ALA-accredited institutions, and…are taught to adhere to the ALA's Code of Ethics and Library Bill of Rights in their professional lives." *Id.*

The ALA's Code of Ethics "guide[s] the work of librarians," focusing on "the values of intellectual freedom that define the profession of librarianship." *Code of Ethics*, AM. LIBR. ASS'N (2021). Chief among librarians' obligations is the duty ***not*** to limit access to information based on viewpoint:

> 1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.
>
> 2. We uphold the principles of intellectual freedom ***and resist all efforts to censor library resources***.
>
> ***
>
> 6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.
>
> 7. We distinguish between our personal convictions and professional duties ***and do not allow our personal beliefs to interfere*** with…the provision of access to their information resources.

*Id.* (emphasis added).

The ALA's Library Bill of Rights sets forth the "basic policies [that] should guide [library] services," *Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), and is unequivocal in its condemnation of censorship and attempts to limit information based on viewpoint:

> Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

> Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

*Id.* §§ II, III. "'[A]ll people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics." *Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N (2017).

These policies apply to school libraries. *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025). The school library serves to, *inter alia*, "foster intellectual growth and personal development" and "meet learners' recreational reading needs." *Id.* School librarians should make curation decisions "without letting personal beliefs or biases get in the way" so that students and educators "can access a wide range of ideas." *Id.*

The National School Library Standards emphasize the importance of the school library as an essential part of the learning community, preparing students for

college, careers, and life.  *See generally* *AASL Standards Framework for Learners,* AM. ASS'N OF SCH. LIBRARIANS (2017).  School librarians are trained to curate collections in an inclusive, not exclusive, process.  *See generally* *Diverse and Inclusive Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2025).  School librarians do not exclude materials because they are controversial or represent viewpoints with which they disagree, but include books that reflect a diversity of thought.  *See id.*  School librarians curate the library collection, and provide resources and learning tools for an entire school.

When following these principles, librarians are guided by the understanding that there is no "one size fits all" approach to what books are appropriate for a particular school and community:

> Children's libraries should provide a variety of developmentally appropriate materials…to meet the needs of all age groups.  There are no universal standards for the size and content of children's library collections….  A wide range of opinions, values and views should be reflected in the library stock and online accessible materials.

*IFLA Guidelines for Library Services to Children aged 0-18,* INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018).  A librarian engaging in viewpoint discrimination when making curation decisions acts contrary to their training; the Library Bill of Rights and Code of Ethics; and the First Amendment.

**E. HB1069 restricts books notwithstanding their educational merit.**

HB1069's restrictions are contrary to curation principles and the First Amendment.  HB1069 effectively prohibits school libraries from carrying, upon a complaint from a parent, books that, *inter alia*, are award-winners, best-sellers, or have well-recognized merit—the types of books a trained librarian would be expected to select for the school library collection.

> **1.     HB1069 prohibits libraries from carrying books with significant merit.**

HB1069 resulted in the removal of dozen of books that would otherwise be on school library shelves.  App.673.[1]  Two examples underscore the problem.

One book barred here was *The Bluest Eye* by Nobel Prize-winning author Toni Morrison.  *See id.*  Reviewers described the book as having "prose so precise, so faithful to speech and so charged with pain and wonder that the novel becomes poetry," and is "[a] profoundly successful work of fiction."  *See The Bluest Eye,* PENGUIN RANDOM HOUSE.  Parade Magazine listed *The Bluest Eye* as one of the "Best Books of All Time."  *See id.*  Jenna Bush Hager, the Today Show co-host and daughter of former President George W. Bush, included the book in her "Read With Jenna" series:

> I remember where I was sitting when it was assigned to my sophomore English class at Austin High School.  While it started as another homework project, it quickly turned into reading a book I felt

---

[1] References to "App.__" are to the Appendix filed by the State.

I had chosen for myself.  I remember marking it up like I had never marked up any books before.  I was totally in awe of Toni Morrison's ability to make us feel like we were walking in [the protagonist's] footsteps….  It was the first book that really opened my eyes to how literature can create understanding and take you into worlds you don't know.

*Jenna On Why Her December Book Club Pick is Meaningful For Her*, TODAY.COM (Nov. 30, 2020).

Another book barred here was *Slaughterhouse-Five* by Kurt Vonnegut. App.288.  The novel was a bestseller and selected as one of both the Modern Library's 100 best novels of all time and *The Atlantic*'s Great American Novels of the past 100 years.  *Slaughterhouse-Five*, PENGUIN RANDOM HOUSE.  Critics have described it as "[p]oignant and hilarious, threaded with compassion and, behind everything, the cataract of a thundering moral statement." *Id.*

*Amici* could recite similar facts about other books barred by HB1069.  The law effectively restricts dozens of books with significant literary or educational merit that are of interest to students in Florida schools.

### 2. HB1069 violates the First Amendment by restricting books regardless of their merit.

By requiring Florida schools to ignore the merits of books challenged by even one parent, HB1069 violates the First Amendment.  The statute cannot be justified by a mere desire to avoid "controversy." *Contra* State Br. 28.  "Our founding fathers understood that 'novel and unconventional ideas might disturb the complacent'; yet

12

in authoring the First Amendment, they sought to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Fayetteville*, 684 F. Supp. 3d at 891-92 (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). With respect to schools, "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us…. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

"First Amendment rights[] [are] not 'shed…at the schoolhouse gate.'" *Mahmoud*, 145 S.Ct. at 2350 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969)). There "can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any…sect or dogma." *Epperson v. State of Ark.*, 393 U.S. 97, 106 (1968). "[T]o justify prohibition of a particular expression of opinion, [the State] must…show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Otherwise, the government could restrict viewpoints from any part of the political, religious, or social spectrum. *See, e.g., Roberts v. Madigan*, 702 F. Supp. 1505, 1512-13 (D. Colo. 1989) (rejecting attempts to remove the Bible from a school library).

"[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Bd. of Educ. v. Pico*, 457 U.S. 853, 866 (1982) (plurality). "Access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868 (plurality). "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (plurality) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Because the First Amendment "does not permit the official suppression of *ideas*," a majority of the Supreme Court agreed that the removal of books from school library shelves "in a narrowly partisan or political manner" is unconstitutional. *Id.* at 870-71 (plurality); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully" conceding this point).

HB1069 violates the First Amendment because, among other things, it ignores the educational merit of the affected books. *See, e.g., Miller*, 413 U.S. at 22-23 ("in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression"); *Ginsberg*, 390 U.S. at 632 (law prohibiting speech "utterly without redeeming social importance for minors" constitutional). Where "every book

identified by Plaintiffs has either received accolades or been on best seller lists," a school cannot "establish they are harmful to minors pursuant to the *Miller* test." *Parents v. Rockford Public School District*, 2023 Mich. Cir. LEXIS 928, at *10-11 (Kent Cty. Cir. Ct. Oct. 25, 2023); *see also Sheck v. Baileyville School Committee*, 530 F. Supp. 679, 687 (D. Me. 1982) (in school libraries, "the state may not impede individual expression even on obscenity grounds except…[upon] a showing that the challenged expression, taken as a whole, lacks 'serious literary, artistic, political, or scientific value' and 'appeal(s) to the prurient interest in sex,'" citing *Miller* and *Ginsberg*).

Library bookshelves have limited space and cannot include every book published. Certified, trained librarians make decisions about which books should be included based upon the needs of the students and communities they serve. HB1069 overrides those decisions and restricts books without giving any weight to their merit, violating the First Amendment.

**F. Library curation is not school-sponsored or government speech.**

The State attempts to justify its actions through two arguments: ***first***, the government's selection of items for the curriculum is school-sponsored speech, so school library curation must be too; and ***second***, selecting what books go on or off library shelves is akin to selecting a public monument or issuing a license plate for

15

a vehicle.  *See* State Br. 3-4.  These arguments are meritless, but they fail from the outset based upon this Court's prior precedent.

In *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009), this court assumed, for purposes of the case before it, that the *Pico* standard could apply, and it evaluated under the *Pico* standard the question of:

> whether the Board's decision to remove the book from school library shelves was motivated by its inaccuracies concerning life in Cuba or by a desire to promote political orthodoxy and by opposition to the viewpoint of the book.  We find from the evidence in this record, including the School Board majority's consistent statements that it was removing Vamos a Cuba from the school library shelves because of factual inaccuracies and the undisputed fact that the book does contain inaccuracies, that those inaccuracies were what motivated the Board.  If there had been no factual inaccuracies, the book would not have been removed….  The stated motive was not a pretext or a guise for viewpoint discrimination.

*ACLU*, 557 F.3d at 1227.  Far from holding that the First Amendment did not apply to library curation, the *ACLU* Court held that the First Amendment ***did*** apply, but the plaintiffs lost because, even under the *Pico* standard, the removal in question did not violate the First Amendment.  *See id.*

That outcome makes sense.  Removing an atlas published in 1980 because it refers to countries that no longer exist, or a 1950 book of tax codes containing statutes and regulations because the statutes and regulations therein were repealed or amended decades ago, does not violate the First Amendment.  Contrary to the State's hyperbole (State Br. 4), no one contends that schools are required to provide

inaccurate books or books that are developmentally inappropriate for the particular reading community. The State and school libraries are merely required to comply with the First Amendment when making curation decisions, consistent with this Court's prior precedent.

### 1. School libraries are not "school-sponsored" speech.

The State's argument (State Br. 39-43) that selecting the school curriculum is "school-sponsored" speech, and therefore curating a school library collection is too, fails. "No doubt a State possesses legitimate power to protect children from harm," but "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 (2011) (Scalia, J.).

Even in connection with the curriculum, "[g]overnment schools…may not place unconstitutional burdens on" First Amendment rights. *Mahmoud*, 145 S.Ct. at 2350. Schools cannot use the curriculum to "exert upon children a psychological 'pressure to conform' to…specific viewpoints." *Id.* at 2355; *see also id.* at 2378 (Thomas, J., concurring) (school cannot use curriculum to "pursue…ideological conformity"). But the government's power over curriculum is not relevant because school libraries are *extracurricular*.

Library books are not required reading, but are available for students to explore with the guidance of trained librarians. *See Pico*, 457 U.S. at 862 (Brennan,

J.) ("the only books at issue…are *library* books that by their nature are optional rather than required reading"); *Walls v. Sanders*, 144 F.4th 995, 1004 (8th Cir. 2025) ("distinguish[ing] the school library from the classroom"; "books in a library" are different than "in-classroom instruction and materials"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have "absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry…hold[s] sway"); *Sheck*, 530 F. Supp. at 689 (discussing "the extracurricular environment of the school library"; "information and ideas in books placed in a school library by proper authority are protected speech and the first amendment right of students to receive that information and those ideas is entitled to constitutional protection").

> As another court explained:

> The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment…. [A] library is a place to **test or expand upon ideas** presented to him, **in or out of the classroom**. The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control.

*Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978) (emphasis added). Although school librarians support the entire school community and are instrumental beyond the library, school library collections are not part of the curriculum.

*Virgil v. Sch. Bd. Of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) (cited in State Br. 40-41) confirms this distinction. This Court concluded that certain books could be removed ***from the classroom*** as part of the school's power over "curricular decisions." *Id.* 1521-22. Crucial to the Court's holding was the fact that the books "***are available in the school library***. No student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property." *Id.* at 1525 (emphasis added). *Virgil* confirms that removing books from the classroom is one thing; removing them from the school library is another.

*Hazelwood Sch. Dist. v. Kuhlmeier* (State Br. 4, 16, 39-41) is inapposite because it involved articles in a school-created, school-sponsored newspaper, integrated into "the educational curriculum" and controlled by the school's journalism teacher. 484 U.S. 260, 268 (1988). Here, the books on school library shelves were not printed or edited by the government. Moreover, the Eighth Circuit and other courts have held that *Hazelwood* applies only to the "regulation of *student* speech in school-sponsored settings," but library books are obviously not "student speech." *Walls*, 144 F.4th at 1005 (italics in original); *see* also App.700-01. *Hazelwood* is inapplicable.

*Hazelwood* would not help the State anyway; it requires that the government's actions be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484

U.S. at 273.  HB1069 is not reasonable; it is, effectively, a blanket prohibition on books that are "pornographic" or "describe[] sexual conduct"—vague terms or phrases that have sown confusion—without accounting for the merit of affected books or the age and maturity of the students.  *See* App.283 (describing the "confusion, frustration, and fear").

HB1069 is a forbidden attempt to exercise a "free-floating power to restrict the ideas to which children may be exposed."  *Brown*, 564 U.S. at 794-95.  The District Court should be affirmed.

> **2. The government does not speak through the contents of library shelves.**

The State's attempt to equate library curation to government speech fails.  *See* State Br. 16-36.  The Eighth Circuit has rejected this argument.  *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667-68 (8th Cir. 2024) ("placement and removal of books in public school libraries" not government speech).  In fact, no majority of any court has ever adopted this view.  *See* App.690-91; *see also PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fl. 2024) ("The Court is not persuaded that decisions regarding the content of school libraries is 'government speech' that is not subject to any constitutional constraints"); *Crookshanks v. Elizabeth School District*, 775 F. Supp. 3d 1160, 1174-75 (D. Colo. 2025) ("Caselaw does not support the District's position" that "curation decisions are government speech immune from First Amendment scrutiny"); *Fayetteville*, 684

F. Supp. 3d at 909 (discussing lack of "legal precedent to suggest that the state may censor non-obscene materials in a public library because such censorship is a form of government speech"). This Court should follow the Eighth Circuit and these other courts.

"[T]he real question in government-speech cases [is] whether the government is *speaking* instead of regulating private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 262 (2022) (Alito, J., concurring). Justice Alito warned that "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint,'" cautioning that "the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Id.* at 262-63; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle…disfavored viewpoints").

The Supreme Court articulated three factors to determine whether an action is government speech: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244.

In *Matal*, the Supreme Court held that the government's registration of trademarks is not government speech. 582 U.S. at 235-39. The Court reasoned that

"[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration." *Id.* at 235. If the marks were government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *Id.* at 236; *see also GLBT Youth*, 114 F.4th at 668. Moreover, "[t]rademarks have not traditionally been used to convey a Government message…[a]nd there is no evidence that the public associates the contents of trademarks with the Federal Government." *Matal*, 582 U.S. at 238; *see also, e.g., Shurtleff*, 596 U.S. at 254-56 (city did not control messages on flags on government property and public would not believe city endorsed those messages).

The State did not "dream up" or "edit" the books in the school library. *See Matal*, 582 U.S. at 235. If putting books on a shelf is government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *See id.* Florida libraries are not sending any cognizable message by, *e.g.*, including on their shelves both *Mein Kampf* and books celebrating Jewish faith.[2]

---

[2] *See Mein Kampf*, Jacksonville Public Library Catalog, https://jaxpl.na4.iiivega.com/search/card?id=5abd27f8-ac68-5435-8d38-bcde905dbacf&entityType=FormatGroup (last visited Feb. 12, 2026); *The Everything Judaism Book*, Jacksonville Public Library Catalog, https://jaxpl.na4.iiivega.com/search/card?id=6c8c1269-d221-5a63-b842-c66d180ffd13&entityType=FormatGroup (last visited Feb. 12, 2026).

The government has not traditionally conveyed messages to the public through library shelves. *See id.* at 238. Rather, as set forth above at pgs. 5-10, *supra*, HB1069 is antithetical to school libraries' history and mission. Nor would the public reasonably perceive that the government speaks by placing particular books on library shelves. Selecting books for libraries is a situation where the government "expends funds to encourage a diversity of views from private speakers." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833-34 (1995) (cited in State Br. 19). That conduct is ***not*** government speech. *Id.* at 833-86.

The State's assertion (State Br. 4, 18) that the government historically used libraries to convey the message that all of the books on the shelves are "appropriate" is wrong. Unlike a private actor who curates newspaper articles or social media posts expressing certain viewpoints or content, one of a library's major objectives is to make available a wide array of books, regardless of viewpoint. *See* pgs. 8-10, *supra*. Libraries curate collections based upon the interests of the communities they serve and historically have curated collections with diverse viewpoints to meet the needs of the entire community. *See id.* Thus, no one seeing *Mein Kampf* on the shelves would think the government is conveying the message that it is an "appropriate" book everyone should read, as the State seems to suggest. Library curation does not send any comprehensible message to the public. Library collections are not government speech.

### 3. The State relies upon inapposite cases.

The State relies upon plurality and concurring opinions in *U.S. v. Am. Library Ass'n*, 539 U.S. 194 (2003) ("*ALA*"). State Br. 14, 24. The plurality in *ALA* never held that the government speaks through library shelves. *See ALA*, 539 U.S. at 206. The case involved filters on Internet-enabled computers in libraries meant to block three categories of ***unprotected*** speech: "'visual depictions' that constitute 'obscenity' or 'child pornography,' and…'visual depictions' that are 'harmful to minors.'" *See, e.g., id.* at 201, 208-09. *ALA* says nothing about whether library curation constitutes "government speech."

The State's heavy reliance on *McGriff v. City of Miami of Beach*, 84 F.4th 1330 (11th Cir. 2023) (cited in State Br. 14, 18, 26-29, 31) is equally misplaced. Among other things, *McGriff* involved an art exhibition in which the government "contracted to commission and fund the artists' work" so that the artists would produce works specifically intended for the exhibition. *McGriff*, 84 F.4th at 1334. Similarly, *Leake v. Drinkard*, 14 F.4th 1242 (11th Cir. 2021) (cited in State Br. 13-14, 18, 20, 26-27, 30, 32) involved a parade, held by the government every year since 1952, with a specific message—"honor[ing] and celebrat[ing] American war veterans"—in which the government was the "only significant financial sponsor" and required all participants to submit an application for the government to approve their intended parade message. *Id.* at 1248-53.

Here, the State did not enter into contracts with Toni Morrison and Kurt Vonnegut by which Florida provided them within funding to produce books specifically intended for Florida school libraries. Nor did the authors have to apply to the government to get approval for the words in their books before publishing them. And, again, library collections do not convey any cognizable message. *McGriff* and *Leake* are inapposite.

Finally, the State relies upon a minority opinion regarding government speech from seven (out of 17) judges of the *en banc* Fifth Circuit in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025). That minority opinion is not binding anywhere, including the Fifth Circuit, and was *dicta* because the majority dismissed plaintiffs' claims on other grounds. *See id.* at 850-51. The *Llano* minority's analysis was also flawed for the same reasons as the State's arguments, described above.

The State's argument is the sort of "dangerous misuse" of the "government speech" doctrine about which Justice Alito warned. The District Court should be affirmed.

### G. The purported availability of the books from other sources does not prevent a constitutional violation.

The District Court properly rejected the State's argument that the statute is constitutional because students can obtain the barred books from other sources. *See* App.697-98. The State's argument ignores the First Amendment right to receive

25

information without viewpoint discrimination and the practical importance of school libraries to children.

Consistent with the views of Jefferson and Madison, *supra*, the "right to receive information and ideas" is protected by the Constitution as an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Pico*, 457 U.S. at 867. The Supreme Court recognized this right before and after *Pico*: "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak ***and listen*** …." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (emphasis added); *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (recognizing "the right to receive information and ideas"); *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences").

Accordingly, once the government opens a library, patrons have rights that the government cannot take away without complying with the Constitution. *See, e.g., Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983) ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum"); *Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum…the State must [not]…discriminate against speech on the basis of its

26

viewpoint"). [3]  Where "the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975).

This right applies to minors in schools.  *See, e.g., Fayetteville*, 684 F. Supp. 3d at 909-10 ("it is well established that 'minors are entitled to a significant measure of First Amendment protection' and the government may restrict these rights 'only in relatively narrow and well-defined circumstances'"); *see also Mahmoud*, 145 S.Ct. at 2350 (reaffirming *Tinker*); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) ("Minors are entitled to a significant measure of First Amendment protection" (internal quotation and brackets omitted)); *Walls*, 144 F.4th at 1002 (recognizing "reciprocal right to receive…information," which "do[es] not disappear inside public schools"); *Sheck*, 530 F. Supp. at 689 ("the first amendment right of students to receive that information and those ideas is entitled to constitutional protection"); *González v. Douglas*, 269 F. Supp. 3d 948, 972-73 (D.

---

[3] School libraries should be considered "designated" or "limited" public forums the government has designated for access to a broad range of extracurricular information.  *See, e.g., Perry*, 460 U.S. at 45-46 (where government opens forum "for use by the public…content-based prohibition[s] must be narrowly drawn to effectuate a compelling state interest").  Even if content-based restrictions in the school library only needed to be "reasonable," HB1069 is still unconstitutional because it is unreasonable to exclude works of significant merit, given the role of the school library to make available a broad array of content of use and interest to students.  *See* pgs. 5-10, *supra*.

Ariz. 2017) ("Students have a First Amendment right to receive information and ideas").  The fact that students "cannot simply go in the library, take the books off the shelf and thumb through them…is a restriction on [their] access" and an "impermissible infringement[] of First Amendment rights."  *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003).

Again, the right to receive information does not mean that the State is required to provide a particular book merely because an individual demanded it—a point that both the State and the Fifth Circuit in *Llano*, *supra*, misapprehended.  The point is that once the government chooses to open a library, the government must comply with the First Amendment when making curation decisions, including by avoiding viewpoint discrimination and complying with the *Miller-Ginsberg* test.  Otherwise, if the State's view is adopted, legislatures in "blue" states could enact blanket bans on all Republican books, and legislatures in "red" states could ban all Democratic books.  That cannot be the law and is a far cry from what the Founders intended.

As a practical matter, the State also ignores the fact that some children cannot visit public libraries or purchase books.  "[G]etting to the public library may be difficult for children and for those who live in homes without Internet access, the school library may be their only access to the digital world."  WOOLLS, *supra*, at 4004.  "Because many families cannot afford to purchase children's books, it becomes all the more important to make community resources…easily and readily

28

available….”  Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89, 527-37 (1997).

School libraries and librarians are critical resources for children.  For many, the school library is their primary or only means of accessing books.  The fact that restricted books *might* be available elsewhere is not a substitute for students’ access in the school library.

## V. <u>CONCLUSION</u>

It is no mere rhetorical flourish to say that school libraries are citadels of American democracy.  The State’s actions undermined those citadels, in violation of the First Amendment.  The District Court should be affirmed.

Respectfully submitted,

**FREEDOM TO READ FOUNDATION AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS**

By their attorneys,

*/s/ Owen R. Wolfe*

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel:  (212) 218-3389
Fax:  (917) 344-1394

*Attorneys for Amici Curiae,*
*Freedom to Read Foundation and American*
*Association of School Librarians*

Dated:  February 13, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS AND VIRUS-FREE CERTIFICATION**

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 6,490 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

*/s/ Owen R. Wolfe*
Owen R. Wolfe

Dated: February 13, 2026

**CERTIFICATE OF SERVICE**

I certify that on February 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Owen R. Wolfe*
Owen R. Wolfe