No. 25-13181

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

PENGUIN RANDOM HOUSE, HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, MACMILLAN PUBLISHING GROUP,
LLC, SIMON & SCHUSTER, *et al.,*
*Plaintiffs-Appellees,*
*v.*

CHAIR, FLORIDA STATE BOARD OF EDUCATION, VICE CHAIR,
FLORIDA STATE BOARD OF EDUCATION, ESTHER BYRD, GRAZIE P
CHRISTIE, KELLY GARCIA, in their official capacities as members of the
Florida State Board of Education, *et al.,*
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Florida

## BRIEF OF *AMICI CURIAE* FIRST AMENDMENT LAW PROFESSORS IN SUPPORT OF APPELLEES

G.S. Hans
*Counsel of Record*
Civil Rights and Civil Liberties
Clinic
CORNELL LAW SCHOOL
Myron Taylor Hall
Ithaca, N.Y. 14853
(607) 254-5994
gshans@cornell.edu
*Counsel for Amici Curiae*
*First Amendment Law Professors*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case and were omitted from the Certificates of Interested Persons in briefs that were previously filed per 11th Cir. R. 26.1-2(b).

1.  Ball, Carlos A., *Member of Amici Curiae*

2.  Chen, Alan K., *Member of Amici Curiae*

3.  Costello, Nancy A., *Member of Amici Curiae*

4.  Easton, Eric B., *Member of Amici Curiae*

5.  Hans, G.S., *Counsel for Amici Curiae*

6.  Kitrosser, Heidi, *Member of Amici Curiae*

7.  Magarian, Gregory P., *Member of Amici Curiae*

8.  Reid, Amanda, *Member of Amici Curiae*

9.  Weinberg, Jonathan, *Member of Amici Curiae*

Dated: February 14, 2026          s/G.S. Hans

*Counsel for Amici Curiae*
*First Amendment Law Professors*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................... C-1

TABLE OF AUTHORITIES ....................................................................... iii

INTEREST OF AMICI CURIAE ....................................................................1

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................. 3

   I.    Book Banning in Public School Libraries Implicates the First Amendment.  3

   II.   Book Banning in Public School Libraries is Not Government Speech.......... 5

      a.    Government Speech is a Narrow Doctrine. ................................... 6

      b.    Public School Libraries do Not Exercise Editorial Discretion That Constitutes Speech. ....................................................................... 8

      c.    Public School Library Collection Decisions are Not Government Speech Under the *Shurtleff* Factors. ............................................... 11

         i.    Public School Libraries are not Historically Government Speech........ 12

         ii.    The Public is not Likely to Perceive Public School Libraries as Government Speech.................................................................. 14

         iii.    The Government Does Not Exercise Extensive Control Over Public School Library Collection Decisions. ..........................................15

      d.    To Extend Government Speech to Public School Libraries Would Be to Distort Their Very Purpose.............................................................. 16

   III.  *Hazelwood* Does Not Apply in the Public School Library Context, and Even if it Did, Appellant Would Not Meets Its Legitimate Pedagogical Concern Standard. ....................................................................................18

IV. The Court Should Follow the Eighth Circuit's Reasoning in *GLBT Youth* and Decline to Adopt the Fifth Circuit's Erroneous Ruling in *Llano County*..... 21

CONCLUSION ......................................................................................................23

APPENDIX: LIST OF AMICI CURIAE ................................................................ 24

CERTIFICATE OF COMPLIANCE..................................................................... 25

CERTIFICATE OF SERVICE ............................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*,
438 F. Supp. 2d 1242 (S.D. Fla. 2006) ............................................................ 5

*Board of Education, Island Trees Union Free School District No. 26 v. Pico,*
457 U.S. 853 (1982) ......................................... 3, 4, 5, 10, 12, 14, 19, 24

*Brown v. Louisiana*,
383 U.S. 131 (1966) ......................................................................... 14

*Campbell v. St. Tammany Parish School Bd.*,
64 F.3d 184 (5th Cir. 1995) .............................................................. 24

*First Nat. Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ........................................................................ 3

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
114 F. 4th 660 (8th Cir. 2024) .................................................... 2, 23, 24

*Hazelwood School District v. Kuhlmeier*,
48 U.S. 260 (1988) ...................................................... 2, 18, 20, 21, 22, 23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ....................................................................... 10

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967) ...................................................................... 4, 14

*Kreimer v. Bureau of Police*,
958 F.2d 1242 (3d Cir. 1992) ............................................................. 4

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965) ........................................................................ 3

*Legal Services Corporation v. Velazquez*,
531 U.S. 533 (2001) ....................................................................... 17

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) .................................................................2, 23, 24, 25

*Martin v. Struthers*,
319 U.S. 141 (1943) ........................................................................................... 3

*Matal v. Tam*,
582 U.S. 218 (2017) ...........................................................6, 7, 13, 14, 16, 25

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) ........................................................................................10

*Moody v. NetChoice*,
603 U.S. 707 (2024) ......................................................2, 6, 9, 10, 11, 25

*Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
711 F. Supp. 3d 1325 (N.D. Fla. 2024) ....................................................14

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)............................................................................................ 5

*Pleasant Valley Grove v. Summum*,
555 U.S. 460 (2009) ........................................................................ 6, 14, 15, 16

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995) ........................................................................................18

*Searcey v. Harris,*
888 F.2d 1314 (11th Cir. 1989) ..................................................................23

*Shurtleff v. City of Boston, Massachusetts*,
596 U.S. 243 (2022) ............................................................... 6, 12, 16, 17, 25

*Stanley v. Georgia*, 394 U.S. 557, 565 (1969)
394 U.S. 557 (1969) ........................................................................................ 3

*United States v. American Library Assn., Inc.,*
539 U.S. 194 (2003) ...........................................................................15, 16, 18

iv

*Virgil v. School Bd.*,
   862 F.2d 1517 (11th Cir. 1989) ...................................................................20, 21, 22

*Walker v. Sons of Confederate Veterans*,
   576 U.S. 200 (2015) ................................................................................ 6, 13, 15, 16

*West Virginia Board of Education v. Barnette*,
   319 U.S. 624 (1943) ................................................................................................ 4, 18

## OTHER AUTHORITIES

American Library Association, Library Bill of Rights,
   https://www.ala.org/advocacy/intfreedom/librarybill. ...........................................10

Heidi Kitrosser, The Government Speech Doctrine Goes to School, 24-15 Knight
   First Amend. Inst. (Oct. 11, 2024), https://knightcolumbia.org/content/the-
   government-speech-doctrine-goes-to-school. ......................................................19

*Texas parents and teachers worry bills to root out liberal sway from public schools
   pave the way for conservative bias*, Tex. Tribune (June 12, 2025),
   https://www.texastribune.org/2025/06/12/texas-parental-rights-bills....................7

<h1 style="text-align:center">INTEREST OF <em>AMICI</em> CURIAE[1]</h1>

*Amici* are First Amendment scholars and experts who research, write, and teach about the Free Speech Clause. Collectively, amici have written scholarly books and dozens of academic articles on freedom of expression and access to information. Amici write to urge the court to uphold the District Court's ruling and reject appellant's arguments, which misconstrue core principles of First Amendment doctrine.

<h1 style="text-align:center">INTRODUCTION</h1>

In recent years, several federal courts have considered the constitutionality of viewpoint-based removals of books from public school libraries. Nearly all the courts to have considered the question have properly rejected the arguments that such removals do not violate the First Amendment. This court should also reject such arguments.

Amici make three primary points. First, book banning in public school libraries implicates the First Amendment.

---

[1] Counsel for all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. This brief was prepared with the assistance of Paul Janes, Jr., Paige Osgood, and Elaine Timothy, Cornell Law School students enrolled in the Civil Rights and Civil Liberties Clinic.

Second, appellant's reliance upon the government speech doctrine to insulate its decisions from First Amendment review should not succeed. As the District Court properly held, school library curation decisions do not constitute government speech as school libraries do not serve as conduits for government messaging. Public school libraries promote the intellectual development of students, and despite appellant's contentions, the removal policies of school libraries do not implicate the type of editorial discretion rights of private actors discussed in *Moody v. NetChoice*, 603 U.S. 707 (2024).

Third, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), does not apply in the school library context; even if it did, appellant would not meet *Hazelwood*'s "legitimate pedagogical concerns" standard. *Hazelwood* concerned a high school's control of a student newspaper, which students produced as part of a course. The District Court properly held that appellant's actions do not implicate *Hazelwood* and that, even if *Hazelwood* applied, appellant's determinations cannot constitute legitimate pedagogical concerns justifying the removal of school library books. Amici conclude by observing that the Fifth Circuit's recent decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc), is an outlier in school library cases and misstates multiple First Amendment doctrines; this court should instead look to *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114

F.4th 660 (8th Cir. 2024) and other recent school library cases, to guide its analysis in upholding the District Court's Order.

## ARGUMENT

### I. Book Banning in Public School Libraries Implicates the First Amendment.

The First Amendment guarantees the right to freely express ideas and the right for others to receive them. *Martin v. Struthers*, 319 U.S. 141, 143 (1943) (holding that the right to receive information and ideas is fundamental to a free society); *see also Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."). The Supreme Court has repeatedly held that First Amendment protections encompass access to information, because freedom of expression is only meaningful when individuals are able to read and consider the ideas others seek to convey. *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978); *see also Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("*Pico*") ("More importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) ("This right to receive

information and ideas, regardless of their social worth, is fundamental to our free society.").

Libraries represent a concrete institutional embodiment of this constitutional principle. They exist to ensure equal access to knowledge and to safeguard individuals' ability to exercise their First Amendment rights to read, learn, and think freely. *See Kreimer v. Bureau of Police*, 958 F.2d 1242, 1261 (3d Cir. 1992). Thus, restrictions on books within public school libraries directly implicate the First Amendment. In *West Virginia Board of Education v. Barnette*, the Supreme Court emphasized that schools must provide heightened protection for constitutional freedoms because they educate young citizens:

> That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943). The public-school library plays an especially important role in educating children about free thought and encouraging their intellectual growth. *See Pico*, 457 U.S. at 868–69 ("'[S]tudents must always remain free to inquire, to study and to evaluate, and to gain new maturity and understanding.' The school library is the principal locus of such freedom"), *quoting Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).

Courts have therefore made clear that the removal of books from school libraries for reasons unrelated to legitimate pedagogical concerns violates the First Amendment. *See Pico*, 457 U.S. at 866 (1982); *see also ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 439 F. Supp. 2d 1242, 1272 (S.D. Fla. 2006). In *Escambia County School Board*, a district court in the Northern District of Florida held that the right to receive information was implicated when a school board removed specific books from the school library because the removals were based on ideological disagreements and not legitimate pedagogical concerns. *Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329 (N.D. Fla. 2024).

Together, these cases establish a clear constitutional principle: students possess a First Amendment right to access diverse ideas, and any removal of library materials must be viewpoint neutral.

## II. Book Banning in Public School Libraries is Not Government Speech.

Appellant's argument that the First Amendment does not apply to public school libraries because they are within the government speech doctrine should not succeed. As the District Court properly held, public school libraries serve to encourage the intellectual development of students and are not conduits for government messaging. Further, the government speech doctrine is a poor fit for public school library removal decisions because it is narrow. Removal decisions

are neither akin to the editorial discretion in *Moody v. NetChoice*, nor do they fit within the *Shurtleff* factors.

### a. Government Speech is a Narrow Doctrine.

The government speech doctrine allows government actors and institutions to speak to advance state policies or otherwise to convey the views of the state without implicating the First Amendment. *See, e.g., Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture."); *Walker v. Sons of Confederate Veterans*, 576 U.S. 200, 207–08 (2015) ("[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey") (quoting *Pleasant Valley Grove v. Summum*, 555 U.S. 460, 468 (2009)).

While the government speech doctrine serves a limited purpose, it is, as Justice Alito cautioned in *Tam*, "susceptible to dangerous misuse." 582 U.S. at 235. An overbroad government speech doctrine risks the government manipulating or censoring private speech. By passing off government interference with First Amendment rights as government speech, the government could silence disfavored viewpoints. As Justice Kennedy discussed in his concurrence in *Tam*, the

government speech doctrine, when applied improperly, "might silence dissent and distort the marketplace of ideas." *Id.* at 235.

Importantly, the government speech doctrine only applies to programs in which the government conveys an official message that the public would recognize as such. *Id.* at 216. The threat of censorship is manifest here. If the government speech doctrine applied to public school libraries, the state could purge entire categories of books—civil rights history, religious texts, political philosophy, conservative or liberal publications—under the guise of "choosing its own message."

Other justifications for the government speech doctrine do not justify its expansion to school libraries and are in fact undermined. Allowing the government to express views enables citizens to react to those views in an exercise of democratic accountability. However, in situations where it is not the case that the government is expressing the view—such as when parents object to books in school libraries—democratic accountability is weakened. First, even if the laws permitting such parental control are passed through democratic means, they "allow a very small minority to override and to control the process." Sofia Sorochinskaia, *Texas parents and teachers worry bills to root out liberal sway from public schools pave the way for conservative bias,* Tex. Tribune (June 12, 2025), https://www.texastribune.org/2025/06/12/texas-parental-rights-bills/. To insulate

these laws from scrutiny by considering them an exercise of government speech is to undermine democratic accountability by ascribing the views of a small minority to the government. Furthermore, depriving students of exposure to a diverse range of ideas in their school libraries further erodes the democratic process by weakening students' abilities to think for themselves.

The First Amendment forbids removing or excluding works because the government disfavors the viewpoint expressed. As Justice Brennan stated in *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, "[v]iewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" 460 U.S. 37, 62 (1983) (Brennan, J., dissenting). The government speech doctrine must not be expanded to undermine this principle.

b. **Public School Libraries Do Not Exercise Editorial Discretion That Constitutes Speech.**

In *Moody v. NetChoice, LLC*, the Supreme Court held that "expressive activity includes presenting a curated compilation of speech originally created by others." 603 U.S. 707, 728 (2024). In that case, the Court found that social media companies' filtering, prioritizing, and organization of content constituted expressive activity. *Id.* at 707. Millions of decisions were made each day to exclude, organize, and prioritize content through algorithms. *Id.* The Supreme Court compared these decisions to the judgments of traditional book publishers

8

that "select and shape others' expression" into their own third-party curations. *Id.* at 717.

The platforms' decisions as described in *NetChoice* are wholly unlike the managing of public school library collections. The social media companies made decisions over what content to recommend to their users, which is inherently expressive. *Id.* at 734. School libraries do include and exclude books, but not on the basis of viewpoint. This is unlike social media sites or traditional publishers who include or exclude third-party speech based on their specific views. Importantly, *NetChoice* also held that it was a goal of the First Amendment to preserve the public's "access to a wide range of views," and the government could not further this goal by "tilting public debate in a preferred direction." *Id.* at 741. Allowing the government to tilt public debate in a preferred direction in school libraries would limit the public and students' access to a wide range of views, contrary to this Court's holding in *NetChoice*.

Finally, it would be antithetical to the mission and purpose of school libraries to engage in the kind of viewpoint discrimination that social media companies do. The Supreme Court has emphasized that while the government has discretion over a public school's *curriculum*, the school library is a place for "voluntary inquiry" by students, where they may be exposed to a diverse range of ideas. *Pico*, 457 U.S. 853, 869 (1982).

9

In contrast, newspapers express themselves in ways that convey a particular set of values. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Similarly, organizers of a high-profile public parade are "making some sort of collective point, not just to each other but to bystanders along the way." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568 (1995). And social media platforms make choices that "rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which are less so). And in the aggregate, they give the feed a particular expressive quality." *NetChoice*, 603 U.S. at 738. One social media company may choose to direct itself toward a more conservative audience, another may wish to appeal to a more progressive crowd. One platform may cater to movie lovers, another to aficionados of cat videos. Their choices of what to post give the platforms an identity. They make them who they are.

School libraries take pedagogical concerns into account and may remove books based on educational suitability. A library may remove a book for pervasive vulgarity, or to make room for another book of particular relevance to students.

However, these decisions are not made to "express" the library's viewpoint or message; indeed, these are not messages at all.

A school library's function is distinct from that of a newspaper, a parade organizer, or a social media company. It, like a public library's function, is to provide "for the interest, information, and enlightenment of all people of the community the library serves." American Library Association, Library Bill of Rights, https://www.ala.org/advocacy/intfreedom/librarybill. Moreover, making choices to prescribe a certain set of views is antiethical to the role of a school library. The Library Bill of Rights, first adopted by the American Library Association in 1939, specifically admonishes that "[m]aterials should not be excluded because of the origin, background, or views of those contributing to their creation," and that "[m]aterials should not be proscribed or removed because of partisan or doctrinal disapproval." *Id.* Moreover, the Court has held specifically that school libraries may not "prescribe what shall be orthodox in . . . matters of opinion." *Pico*, 457 U.S. at 872.

### c. Public School Library Collection Decisions Are Not Government Speech Under the *Shurtleff* Factors.

Public school library collection decisions are not government speech because public school libraries have not historically conveyed a government message, the public is not likely to perceive library collection decisions in public schools as government speech, and the government does not extensively control

11

public school library collection decisions. In *Shurtleff*, this Court described how to analyze whether government engagement with the public constitutes government speech. *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 252 (2022). *Shurtleff* held that a holistic inquiry into three categories of contextual evidence determines whether the expression is government speech: (1) the history of the challenged expression; (2) the public's likely perception of who is speaking, and; (3) the extent to which the government shapes or controls the expression. *Id.*

### i. Public School Libraries are not Historically Government Speech.

The Government has not historically used school libraries to convey messages to the public; while they may be government entities, they do not communicate policies but rather serve as a public resource. *See Tam*, 582 U.S. at 237 (finding that trademarks have not been used historically to communicate government messages). Public school libraries house and make available the speech of others, the authors whose books they maintain, not their own (or the government's) speech. In contrast, public-facing items such as license plate slogans and monuments in public parks have historically been used to communicate messages from the government. *Walker*, 576 U.S. at 211 (noting that states have traditionally depicted symbolic wildlife; state slogans; and statements promoting tourism, health, and other government interests on license plates),

*Pleasant*, 555 U.S. at 470 ("Governments have long used monuments to speak to the public").

Unlike their practice with license plates, states do not use public school libraries to convey government slogans or policies. *See Walker,* 576 U.S. at 211. This is similarly distinct from the government's use of monuments to commemorate events of civil importance, convey some particular thought, or instill a feeling in those who observe them. *See Summum,* 555 U.S. at 470. Much like the trademark system in *Tam*, expressing a particular government message has not been the historical purpose of school libraries.

Rather, a public school library is "a place dedicated to quiet, to knowledge, and to beauty." *Pico*, 457 U.S. at 868 (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (opinion of Fortas, J.)). The Court further observed in *Pico* that "[t]he school library is the principal locus of [the] freedom to "inquire, to study and to evaluate, to gain new maturity and understanding." 457 U.S. at 868–69 (quoting *Keyishian*, 385 U.S. at 629). While the government has discretion over a public school's *curriculum*, the students' selection of books from the school library is "voluntary." *Pico*, 457 U.S. at 869. Thus, public school libraries cannot be said to communicate the government's *own* message.

### ii. The Public is not Likely to Perceive Public School Libraries as Government Speech.

Patrons—public school students—are not likely to perceive the content of school library books as government speech. Monuments on public land are routinely and reasonably interpreted as conveying a government message. *Summum,* 555 U.S. at 472. But unlike monuments, library books are not selected to convey a particular message based on aesthetics, history, or the local or school culture. *See id.*, *United States v. American Library Assn., Inc. ("ALA")*, 539 U.S. 194, 195 (2003). Library books are similarly distinct from license plate slogans because they are not produced by the government or used by the government for any administrative purpose. *Walker*, 576 U.S. at 212. Like the trademark registry, public school libraries carry books with a wide range of contradictory messages, which would render any government message incoherent from the students' and public's perspective.

School libraries routinely carry broad selections of philosophical texts that contradict one another, books with a wide variety of contradictory political messages, and even extremist manifestos used for educational purposes. Neither the content of these books nor their selection and retention are likely to be perceived by the public as a singular message from the government. School libraries themselves do not even attempt to espouse a unitary message through the books they carry. Instead, they aim, like public libraries more generally, to

"facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *See ALA.*, 539 U.S. at 195.

### iii. The Government Does Not Exercise Extensive Control Over Public School Library Collection Decisions.

The government does not exercise extensive control over books available in the school library, nor does it shape the messages sent by the books. Monuments placed in a city park are government speech partially because the city selected which monuments it would place in the park based on the message their selection would send. *Summum*, 555 U.S. at 472-73. Similarly, states directly control which messages are allowed on license plates. *Walker,* 576 U.S. at 212. Conversely, the PTO registers all marks and does not consider their message, thereby not exercising control over the message conveyed by the trademark roll. *Tam*, 582 U.S. at 237. In *Shurtleff*, the "most salient feature" was that Boston did not exercise control over the content and meaning of the flags, so they were not government speech. *Shurtleff*, 596 U.S. at 256.

Unlike monuments in public parks and license plates, public school libraries do not curate their collections based on a coherent message regarding local or state culture or history. Public school libraries aim to achieve viewpoint neutral objectives like facilitating general education and entertainment and do not exercise control over the messages in books they select. *See ALA*, 539 U.S. at 195. The control exercised by public school libraries is more similar to the control exercised

by Boston in *Shurtleff,* since both Boston and the library do not aim to convey a coherent message through the flags flown and the books provided. *See Shurtleff*, 596 U.S. at 256.

### d. To Extend Government Speech to Public School Libraries Would Be to Distort Their Very Purpose.

Caselaw provides further reasons to limit the government speech doctrine and not apply it to public school libraries: to do so would be to distort the very purpose of public school libraries. The Court has repeatedly cautioned against government regulation of speech in programs where that regulation would distort the nature of the program, or against the regulation of a limited forum if that regulation would violate the boundaries the government set for the forum.

The Court issued its most explicit warning in *Legal Services Corporation v. Velazquez,* 531 U.S. 533 (2001). In *Velazquez*, the Court held that federally funded legal services corporation attorneys were not acting as government speakers when they made arguments in litigation on behalf of their clients. The Court further held that a statutory provision limiting the arguments that those attorneys could make when they performed federally funded legal services was unconstitutional. The provision, said the Court, "distorts the legal system by altering the traditional role of the attorneys" as advocates, *id.* at 544, prohibiting them from engaging in "speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id.* at 545.

16

The Supreme Court has extended its caution against distortion to both public libraries and educational settings. In *ALA*, the Court examined the constitutionality of a regulation on public library computers by "first examin[ing] the role of libraries in our society. 539 U.S. at 194. In *Rosenberger v. Rector and Visitors of the University of Virginia*, the Court held that the University of Virginia's system for subsidizing student groups is akin to a limited public forum. 515 U.S. 819 (1995). Thus, the subsidies could not be allocated on the basis of viewpoint or in a manner unreasonable in light of the program's purpose. *Id.*

In primary and secondary schooling, the Court has balanced concern for school administration and community input in education with the importance of students having access to a diverse range of ideas to develop free thought and critical thinking. In such decisions, the Court has emphasized that it is of vital importance that First Amendment rights attach in schools lest students "discount important principles of our government as mere platitudes.'" *Barnette*, 319 U.S. at 637. Furthermore, in *Hazelwood School District v. Kuhlmeier*, the Supreme Court sided with school officials in considering students' First Amendment rights in curricular speech but did so only after concluding that "their actions [were] reasonably related to legitimate pedagogical concerns." 484 U.S. at 260.

Finally, in its sole consideration of public school libraries, the Court found that public schools were "vitally important 'in the preparation of individuals for

participation as citizens,'" but that "the discretion of the States and the local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Pico*, 457 U.S. at 864 (plurality op. by Brennan). These two points need not be in opposition with one another. Understanding the two through an anti-distortion lens provides that, for example, politically motivated book removals would distort a major purpose of public schooling, which is to encourage democratic values.

Here, like in *Pico*, treating public school library decisions as government speech would distort the libraries' very nature and purpose. In order to foster democratic values, public schools and their libraries must subject students to a range of ideas. To permit viewpoint-based book removals in public school libraries would be to deny students access to the very ideas and exchanges that these institutions are supposed to foster in the first place.

For the foregoing reasons, public school libraries cannot, and should not, constitute government speech.

**III.** ***Hazelwood* Does Not Apply in the Public School Library Context, and Even if it Did, Appellant Would Not Meets Its Legitimate Pedagogical Concern Standard.**

The District Court properly observed that the Supreme Court's ruling in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), does not apply in the instant case. Applying the *Hazelwood* standard to a statewide law would be

inapt, the District Court notes, and even more "out of place" where students themselves are not speaking. Despite this, Appellants contend that *Hazelwood* and *Virgil v. School Bd*—in which a school board was permitted to remove a book for vulgarity because this was reasonably related to pedagogical concerns—should govern, and that the district court improperly skirted applying those standards. *Hazelwood*, 484 U.S. 260; *Virgil v. School Bd.*, 862 F.2d 1517 (11th Cir. 1989). *Virgil* itself emphasizes that the speech at issue was curricular, "[f]irst, we conclude that the Board decisions at issue were curricular decisions. The materials removed were part of the textbook used in a regularly scheduled course of study in the school." *Virgil,* 862 F.2d at 1522.

Amici write to emphasize the District Court's holding. Specifically, we explain that the *Hazelwood* standard is not a rubber stamp, and it is certainly not the government speech doctrine by another name. *Hazelwood*, and by extension *Virgil*, at minimum charges courts to determine whether a purported exercise of pedagogical judgment is simply a pretext for viewpoint discrimination. The District Court rightly did not apply this standard, and even when applied the defendant school district cannot withstand this inquiry.

*Hazelwood* concerned a high school principal's decision, made after consulting with the school's journalism teacher, to remove two stories from an edition of the school newspaper before it went to print. The Supreme Court did not

reach its conclusion — that the stories' removal reflected reasonable pedagogical concerns — lightly. Rather, it cited several supporting factors, including: the school newspaper was produced as part of the school's Journalism II course, the principal's stated concerns entailed journalistic ethics and best practices, and the paper's faculty advisors concurred with the principal's judgment. The Court also observed, in a footnote, that a former professional journalist had testified at the trial and had agreed that the removed stories did not meet journalistic standards. *Hazelwood*, 484 U.S. 260, 262–64 and 273–76; Heidi Kitrosser, The Government Speech Doctrine Goes to School, 24-15 Knight First Amend. Inst. (Oct. 11, 2024), https://knightcolumbia.org/content/the-government-speech-doctrine-goes-to-school (text accompanying nn. 103-110)].

Similarly, *Virgil* concerned a school board removing portions of a previously approved textbook that was used in an elective high school course. *Virgil*, 862 F.2d at 1519. While the course itself, "Humanities to 1500" was an elective, the textbook was required reading for students who chose to take the course. *Id.* Importantly, only two required readings were removed from the course, but the board "recommended that the textbook be retained in the curriculum." *Id.* Even after the textbook was removed from the course, against the board's recommendation, it remained available to check out in the school library. *Id.* Unlike the book removals authorized by the state law at issue here, the

government's decision in *Virgil* was unequivocally curricular. Even after the *Virgil* court found no constitutional concerns, they still wrote "[o]f course, we do not endorse the Board's decision. Like the district court, we seriously question how young persons just below the age of majority can be harmed by these masterpieces of Western literature." *Id.* at 1526. This statement by the *Virgil* court emphasizes Amici's position, *Hazelwood* is not a standard that gets extended lightly. It requires evidence of a pedagogical purpose, which Appellants lack, but even when a pedagogical purpose is there, courts are reluctant to apply *Hazelwood*.

Such reluctance is seen in *Searcey v. Harris*, where the Eleventh Circuit interpreted *Hazelwood* to only be an application of the nonpublic forum standard—that regulations must be reasonable in light of the forum's purposes—and not that *Hazelwood* "changes the First Amendment analysis applied to school officials' decisions relating to curricular programs." 888 F.2d 1314, 1319 (11th Cir. 1989). Furthermore, the *Searcey* court interpreted Hazelwood's grant of control to school officials over curricular expression to only be narrow exception to the "more stringent standard applied to student speech in noncurricular activities."

IV. **The Court Should Follow the Eighth Circuit's Reasoning in *GLBT Youth* and Decline to Adopt the Fifth Circuit's Erroneous Ruling in *Llano County*.**

Appellants contend that this Court should follow the holding from the U.S. Court of Appeals for the Fifth Circuit in *Little v. Llano County*, upholding a school

library's removal of books. Amici encourage this court to reject the Fifth Circuit's faulty reasoning in *Llano County* and instead follow the Eighth Circuit's approach in *GLBT Youth in Iowa Schools Task Force v. Reynolds*. The Eighth Circuit's reasoning better reflects the state of First Amendment doctrine, and the Fifth Circuit's ruling errs in its analysis. In 2024, the Eighth Circuit ruled in *GLBT Youth* that the government speech doctrine did not apply to school libraries. *GLBT Youth*, 114 F.4th at 668. A year later, in *Llano County*, the Fifth Circuit overturned its own precedent and disavowed the *Pico* standard. *Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc).

Of these two paths, the Eighth Circuit's approach is the better option, as discussed *supra* Part I. The Fifth Circuit, in addition to issuing a decision inconsistent with every court in recent years that has addressed the question, overruled its own thirty-year old precedent to reach that result. *Id.* at 837 (overruling *Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184 (5th Cir. 1995)). The *Llano County* court decided to do so because *Campbell* decided to adopt the reasoning of *Pico* and because the Fifth Circuit has rarely cited it. *Id.* The *Llano County* court misread both *Campbell* and Justice Brennan's *Pico* opinion to mandate an affirmative right for libraries to carry books from a range of perspectives rather than prohibiting removal on the basis of content. *Llano County*, 138 F.4th at 845–56. This mistake reflects a classic elementary error in First

Amendment law — confusing a positive right to speak (which the Supreme Court has never recognized) with a negative right prohibiting most government actions based on content. A plurality of the en banc court also extended government speech doctrine to cover the removal practices of school libraries, inferring that *NetChoice* grants editorial discretion rights for those removal practices. As discussed *supra* Part I.B, that misreads *NetChoice*; it also ignores the repeated guidance of the Supreme Court in *Tam* and *Shurtleff*. The Fifth Circuit's ruling in *Llano County* misreads core First Amendment principles and cases to reach a result inconsistent with other courts examining the issues. This court should therefore decline to adopt its reasoning.

## CONCLUSION

For the foregoing reasons, this Court should reject appellant's arguments and affirm the District Court's ruling.

Dated:      February 14, 2026      Respectfully submitted,

*/s/ G.S. Hans*
G.S. Hans
*Counsel of Record*
CORNELL LAW SCHOOL
Myron Taylor Hall
Ithaca, N.Y. 14853
(607) 254-5994
gshans@cornell.edu
*Counsel for Amici Curiae*
*First Amendment Law Professors*

# APPENDIX: LIST OF AMICI CURIAE

Amici are listed in alphabetical order. Amici's law school affiliations are stated for purposes of identification only. The views expressed herein represent the views of the individual signatories and should not be taken as the views of their universities.

**Carlos A. Ball**
Distinguished Professor of Law and Judge Frederick Lacey Scholar
Rutgers Law School

**Alan K. Chen**
Thompson G. Marsh Law Alumni Professor
University of Denver Sturm College of Law

**Nancy A. Costello**
Director, First Amendment Law Clinic
Michigan State University College of Law

**Eric B. Easton**
Professor of Law Emeritus
University of Baltimore School of Law

**Heidi Kitrosser**
William W. Gurley Professor of Law
Northwestern Pritzker School of Law

**Gregory P. Magarian**
Thomas and Karole Green Professor of Law
Washington University in St. Louis School of Law

**Amanda Reid**
Associate Professor
The University of North Carolina at Chapel Hill

**Jonathan Weinberg**
Distinguished Professor of Law
Wayne State University

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,170 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R 32-4.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

Dated: February 14, 2026

*/s/G.S. Hans*
G.S. Hans

**CERTIFICATE OF SERVICE**

On February 14, 2026, this brief was served via CM/ECF on all registered

counsel and transmitted to the clerk of the court.

*/s/G.S. Hans*
G.S. Hans