# United States Court of Appeals

### for the

# Eleventh Circuit

PENGUIN RANDOM HOUSE LLC, ET AL.,

*Plaintiffs-Appellees,*

*v.*

BEN GIBSON, in his official capacity as Chair of the Florida State
Board of Education, ET AL.,

*Defendants-Appellants,*

On Appeal from the United States District Court
for the Middle District of Florida
No. 6:24-cv-01573-CEM-RMN

## BRIEF OF *AMICI CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## AND FLORIDA FREEDOM TO READ PROJECT
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

RONALD G. LONDON
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

*Attorneys for* Amici Curiae

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Cir. Rules 26.1-1 through 26.1-5 and 29-2, the undersigned counsel for *amici curiae* certifies that in addition to those previously listed by the parties, the following listed persons and entities have an interest in the outcome of this case:

1. Florida Freedom to Read Project

2. Foundation for Individual Rights and Expression

3. London, Ronald G.

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ........................................ C-1

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF *AMICI CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ................................................................ 3

ARGUMENT ........................................................................................ 8

I. The First Amendment Limits the Arbitrary Political Control of Libraries. ................................................................................. 11

    A. The First Amendment recognizes a distinction between a school library and curriculum. ............................................ 13

    B. The First Amendment protects the right to receive information and ideas. ......................................................... 21

II. The Court Should Reject Defendants' Government Speech Argument. ............................................................................... 24

    A. The rich history of public libraries serving an informed public weighs against government speech........................... 25

    B. The public does not perceive the government as speaking through the diverse and divergent array of books at a public library. ................................................... 28

    C. Florida does not actively control public library shelves to shape its messages........................................................... 31

CONCLUSION ................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ................................ 4, 15, 16, 18, 26, 27

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ................................................................ 5

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) ...................................... 4, 12, 15, 17, 18, 19, 26, 30

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ................................................................... 21, 22

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ................................................................... 22, 24

*Butler v. Michigan*,
352 U.S. 380 (1957) ......................................................................... 23

*Commonwealth v. Am. Booksellers Ass'n, Inc.*,
236 Va. 168 (1988) .......................................................................... 23

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ................................................................... 22, 24

*Fayetteville Pub. Libr. v. Crawford County*,
684 F. Supp. 3d 879 (W.D. Ark. 2023) .................................... 13, 17, 18

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) .................................... 4, 15, 28, 30, 31

*HM Fla.-ORL, LLC v. Governor of Fla.*,
137 F.4th 1207 (11th Cir. 2025) ........................................................ 7

*Interactive Digital Software Ass'n v. St. Louis County*,
329 F.3d 954 (8th Cir. 2003) ........................................................... 21

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) ......................................................................... 12

*Kincaid v. Gibson,*
236 F.3d 342 (6th Cir. 2001) ............................................................... 20

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ............................................................................ 21

*Leake v. Drinkard,*
14 F.4th 1242 (11th Cir. 2021)............................................................ 30

*Legal Services Corp. v. Velazquez,*
531 U.S. 533 (2001) ...................................................................... 11, 19

*Little v. Llano County,*
138 F.4th 834 (5th Cir. 2025)........................................... 14, 15, 17, 28

*Mahanoy Area Sch. Dist. v. B.L.,*
594 U.S. 180 (2021) ............................................................................ 24

*Matal v. Tam,*
582 U.S. 218 (2017) ..................................................... 25, 28, 30, 32

*McGriff v. City of Miami Beach,*
84 F.4th 1330 (11th Cir. 2023)...................................................... 29, 30

*Mech v. Sch. Bd. of Palm Beach,*
806 F.3d 1070 (2015)..................................................................... 27, 29

*Mishkin v. New York,*
383 U.S. 502 (1966) ............................................................................ 23

*Moody v. NetChoice,*
603 U.S. 707 (2024) ............................................................................ 32

*Otto v. City of Boca Raton,*
981 F.3d 854 (11th Cir. 2020) ............................................................ 22

*Parnell v. Sch. Bd. of Escambia,*
802 F. Supp. 3d 1361 (N.D. Fla. 2025) ......................................... 26, 27

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) ...................................................................... 12, 28

*Pope v. Illinois,*
481 U.S. 497 (1987) ...................................................................... 26

*Rust v. Sullivan,*
500 U.S. 173 (1991) ...................................................................... 12

*Shurtleff v. Boston,*
596 U.S. 243 (2022) ............................................................... 15, 25

*Stanley v. Georgia,*
394 U.S. 557 (1969) ...................................................................... 21

*Stanley v. Magrath,*
719 F.2d 279 (8th Cir. 1983) ...................................................... 19

*United States v. Am. Library Ass'n, Inc.,*
539 U.S. 194 (2003) ...................................................................... 13

*Virgil v. Sch. Bd. of Columbia Cnty.,*
862 F.2d 1517 (11th Cir. 1989) .................................................. 18

*W. Va. St. Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) .................................................................... 8, 9

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ............................................................... 27, 30

*Walls v. Sanders,*
144 F.4th 995 (8th Cir. 2025) .................................................... 30

*Whitney v. California,*
274 U.S. 357 (1927) ...................................................................... 25

**Statutes**

Fla. Stat. § 847.001(19) ..................................................................... 6

Fla. Stat. § 1006.28(2)(1) ................................................................. 31

Fla. Stat. § 1006.28(2)(a)2.b ............................................................. 7

Fla. Stat. § 1006.28(2)(d)(1) ........................................................... 31

Fla. Stat. § 1006.28(2)(d)(2) ................................................................ 31

**Rules**

Fla. Admin. Code Ann. r. 6A-4.0251 .............................................. 14, 20

Fla. Admin. Code Ann. r. 6A-7.0713 .................................................. 20

Fla. Admin. Code Ann. r. 6A-10.081(1)(a) ......................................... 13

Fla. Admin. Code Ann. r. 6A-10.081(2)(a)(1) ..................................... 20

Fla. Admin. Code Ann. r. 6A-10.081(2)(a)(2) ..................................... 13

Fla. Admin. Code Ann. r. 6A-10.081(2)(a)(3) ..................................... 13

Fla. Admin. Code Ann. r. 6A-10.081(d) .............................................. 16

Fla. Admin. Code Ann. r. 6A-1006.28(d) ............................................ 16

Fla. Admin. Code Ann. r. 6A-1006.28(d)(2)(b) ................................... 14

Fla. Admin. Code Ann. r. 6A-1006.28(d)(2)(c) ................................... 14

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................... 5

**Other Authorities**

Benjamin Franklin,
  *The Autobiography of Benjamin Franklin* ........................................ 9

Frederick Schauer,
  *Principles, Institutions, and the First Amendment*, 112 Harv. L.
  Rev. 84 (1998) ................................................................................ 12

HB 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ................................. 3

*History of the Libr. of Congress*, Libr. of Congress ........................... 9, 10

*History*, Libr. Co. of Phila ................................................................. 9

*Jefferson's Libr.*, Libr. of Congress .................................................... 10

John Milton,
  *Areopagitica* ................................................................. 9

*Pennsylvania Packet*, June 16, 1789........................................ 32

*Pieces of Iowa's Past: Spaulding's Library Bill of Rights*,
  Legislative Service Agency (Apr. 4, 2018)..................................... 28, 29

Randall P. Bezanson & William G. Buss,
  *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377
  (2001)..................................................................... 12

Robert Corn-Revere,
  *The Mind of the Censor and the Eye of the Beholder: The First
  Amendment and the Censor's Dilemma* (Cambridge Univ. Press
  2021)..................................................................... 6

Thomas Jefferson,
  *Letter to William Roscoe* (Dec. 27, 1820), Founders Online, Nat'l
  Archives & Records Comm'n............................................ 10

**INTEREST OF *AMICI CURIAE*[1]**

**The Foundation for Individual Rights and Expression** (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since its founding in 1999, FIRE has defended these rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate First Amendment freedoms. With decades of experience combating censorship, FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing disfavored viewpoints. FIRE believes that free speech makes free people.

Drawing on decades of experience combating censorship in educational settings, FIRE litigates in defense of First Amendment rights in this Circuit and nationwide. *See, e.g., Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), Nos. 22-13992 & 22-13994 (11th Cir. argued June 17, 2024). FIRE also routinely files *amicus curiae* briefs in cases involving government

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person other than *amici*, their counsel, and their members contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

attempts to exert political control over public libraries. *See, e.g.,* Brief for FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Crookshanks v. Elizabeth Sch. Dist.*, No. 25-1105 (10th Cir. filed June 24, 2025); Brief for FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Penguin Random House v. Robbins*, No. 25-1819 (8th Cir. filed July 25, 2025).

**Florida Freedom to Read Project** is a nonpartisan nonprofit organization led by public school parent volunteers. We bring together parent-led groups from across the state to unite our voices in defense of every student's freedom to read and their right to a comprehensive, unbiased public education. Formed in response to coordinated efforts beginning in 2021 to remove books from Florida school libraries, our organization works to inform evidence-based policy and to protect the constitutional rights of Floridians—especially students—by opposing the removal or restriction of books based on ideological, partisan, or religious objections.

As parents of children in Florida's public schools, we have a direct and substantial interest in this case. Decisions limiting access to books in school libraries affect our children's educational opportunities, intellectual freedom, and exposure to diverse perspectives. Public school

libraries play a critical role in supporting literacy, civic development, and academic growth. The outcome of this case will directly impact the students, families, and educators that we represent, and we therefore have a strong interest in ensuring that library policies remain consistent with constitutional protections and sound educational principles.

*Amici* submit this brief in support of Plaintiffs-Appellees and affirmance.

## SUMMARY OF ARGUMENT[2]

Before enactment of Florida HB 1069, state law entrusted local school boards and professional librarians with the responsibility of selecting library materials. HB 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023). Students could choose whether to read those materials, and parents retained the ability to seek limits on their own children's access. State legislators, however, supplanted that longstanding framework by enacting HB 1069, which mandates the summary removal of library books based on isolated depictions or descriptions of sexual conduct. The law requires school districts to remove within five days any book

---

[2] Record citations are to docket entry number and CM/ECF page number, cited as "DE __ at __."

identified by a parent or resident as describing or depicting sexual conduct—actions the district court correctly held do not constitute government speech and which violate the First Amendment because "there is no constitutional application of a prohibition against books containing material that 'describes sexual conduct.'" DE 129 at 39.

To salvage this law, Defendants argue the removal of library books is government speech exempt from First Amendment scrutiny and ask this Court to clear the way for the removal of books in precisely the "narrowly partisan or political manner" the Supreme Court has warned against. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op.).[3] This Court should reject that request because "the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries," *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) (*Reynolds*), and "[o]ur Constitution does not

---

[3] In a case concerning a single book alleged to have been removed "for legitimate pedagogical reasons such as concerns about [its] accuracy," this Court suggested that "*Pico* is a non-decision so far as *precedent* is concerned." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200, 1202 (11th Cir. 2009) (*ACLU*) (emphasis added). But *Pico*'s plurality opinion nonetheless remains persuasive authority.

permit the official suppression of *ideas*." *Pico*, 457 U.S. at 871 (emphasis in original). The Founders would be offended by politicians' desire to meddle in the local control of libraries by imposing top-down, content-based rules for summary removal of books because of a single depiction or description of sexual conduct. While the government may choose to establish a library in the first place (or not), that power does not authorize transient officeholders to impose their personal political, religious, or philosophical preferences on the community. Thus, "state limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns—especially in a context such as this, where the local school board has already determined that the material at issue adds value to its local school curriculum." *Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015).

Public libraries' role as nonpolitical repositories of public knowledge emerged out of hard lessons of history. Censorship was the norm for millennia, and as civilizations rose and fell, censorship of the works of religious and political enemies was a constant. Our Founders endeavored to end this vicious cycle. They adopted a Bill of Rights with a

First Amendment guarantee that "Congress shall make no law … abridging the freedom of speech, or of the press," U.S. Const. amend. I, and created libraries to ensure widespread dissemination of information on all subjects. To be sure, book censorship continued after the Constitution's ratification, including a period when the government empowered puritanical zealots like Anthony Comstock to enforce Victorian-era standards of obscenity. See Robert Corn-Revere, *The Mind of the Censor and the Eye of the Beholder: The First Amendment and the Censor's Dilemma*, 14–54 (Cambridge Univ. Press 2021). But over time, First Amendment jurisprudence arose from those controversies to preclude the type of censorship now occurring in Florida and elsewhere.

Here, Defendants ask this Court to return America to the days of Comstock's government-sponsored, indiscriminate purge of literary classics for even the slightest sexual content. Specifically, HB 1069 allows any parent or a resident of the county to demand removal from a school library of any book the parent or resident believes "(I) [i]s pornographic or prohibited under s. 847.012 [which statutorily defines material harmful to minors]; [or] (II) [d]epicts or describes sexual conduct as

defined in s. 847.001(19),[4] unless such material is for a course required by s. 1003.46 or s. 1003.42(2)(o)1.g. or 3., or identified by State Board of Education rule." Fla. Stat. § 1006.28(2)(a)2.b. Once reported, the book *must* be removed from the school library within five school days,[5] and if, after review, it is determined the book includes the proscribed content, district school boards must ban the book district wide. *Id.*

This categorical ban applies to all public-school libraries regardless of the ages of the students they educate. Implementation of the law has resulted in removal of classic works of American fiction like *On the Road* by Jack Kerouac, *The Bluest Eye* by Toni Morrison, and many others,

---

[4] Section 847.001(19) encompasses "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed." However, it specifies that a "mother's breastfeeding of her baby does not under any circumstance constitute 'sexual conduct.'"

[5] Although the statute allows school districts to limit discontinuance of material removed pursuant to subsection II to "any grade level or age group for which such use is inappropriate or unsuitable," that provision is illusory. As the district court observed, because "inappropriate" or "unsuitable" are undefined, the law is in practice yet another "I know it when I see it" provision. DE129 at 45 (quoting *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1245 (11th Cir. 2025)) (cleaned up).

including *The Color Purple, Slaughterhouse-Five*, and *The Handmaid's Tale*. DE129 at 3, 47. The law even requires school boards to remove non-fiction books meant to educate and protect minors from sexual assault. All of this adds up to the blunderbuss removal of hundreds if not thousands of books without any consideration for their overall value to public-school library collections and the students whose educations they enrich.

As the First Amendment does not permit such top-down, content-based restrictions on local educators, this Court should affirm the district court's grant of summary judgment.

## ARGUMENT

The history of the First Amendment teaches that laws like HB 1069 are antithetical to the Founders' vision for an educated citizenry. The state's role in "educating the young for citizenship" is all the more reason for "scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). No principle of our government is more basic than the repudiation of censorship.

As students of history, the Founders were acutely aware that arbitrary government authority over expression was the root of tyranny, so they designed the Constitution "to avoid these ends by avoiding these beginnings." *Id*. at 641. John Milton's classic formulation, "who ever knew Truth put to the wors[e], in a free and open encounter," inspired John Adams and Thomas Jefferson.[6] James Madison enshrined John Locke's understanding of the power of free expression into our Bill of Rights. And as practical men, they built libraries to help realize their vision.

"Books and libraries were essential to America's founding generation," and the Founders demonstrated their commitment to the free flow of information—and libraries in particular—in both word and deed.[7] Benjamin Franklin, for one, founded America's first successful lending library[8] in Philadelphia because, as he put it, "there was not a

---

[6] John Milton, *Areopagitica*, https://milton.host.dartmouth.edu/reading_room/areopagitica/intro/text.shtml.

[7] *History of the Libr. of Congress*, Libr. of Congress, https://www.loc.gov/about/history-of-the-library (last visited February 10, 2026).

[8] *History*, Libr. Co. of Phila., https://librarycompany.org/about-lcp (last visited February 10, 2026).

good bookseller's shop in any of the colonies to the southward of Boston."[9]

As president, John Adams signed legislation creating the Library of Congress in 1800—and when its 3,000 volumes were burned during the War of 1812, Thomas Jefferson sold his personal collection of 6,487 books to Congress to restart it.[10] Jefferson's commitment to maintaining a diversity of accessible knowledge still guides the Library's broad principle of acquisition.[11] Jefferson was similarly dedicated to establishing a system of public education that would "be based on the illimitable freedom of the human mind. For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it."[12]

Franklin, Adams, Jefferson, Madison, and their fellow Founders would readily recognize the threat that governmental restrictions on the

---

[9] Benjamin Franklin, *The Autobiography of Benjamin Franklin*, https://www.gutenberg.org/files/20203/20203-h/20203-h.htm.

[10] *History of the Libr. of Congress, supra* note 7.

[11] *Jefferson's Libr.*, Libr. of Congress, https://www.loc.gov/exhibits/jefferson/jefflib.html (last visited February 10, 2026).

[12] Thomas Jefferson, *Letter to William Roscoe* (Dec. 27, 1820), Founders Online, Nat'l Archives & Records Comm'n, https://founders.archives.gov/documents/Jefferson/03-16-02-0404 (last visited July 18, 2025).

free flow of knowledge present. By making any hint of sex an automatic on/off switch for the acceptability of library books, HB 1069 forces schools to remove books that have even the slightest sexual content without regard to the works' overall literary or educational value. The law's shotgun approach goes too far in its purge of school libraries, contravening the Founders' love of learning and violating well-established First Amendment principles prohibiting the government from arbitrarily censoring materials based on the tastes of those currently holding office.

## I. The First Amendment Limits the Arbitrary Political Control of Libraries.

When the government creates institutions vested with a purpose to make information widely available to the public or to exercise independent editorial judgment, the First Amendment limits its ability to arbitrarily limit access to information "necessary to the proper functioning of those systems." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 544 (2001). Government involvement in expressive activities can take many forms—as speaker, regulator, custodian of a public forum, or sponsor of independently chartered speech enterprises—and that form

determines the applicable constitutional rule. *See generally* Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1384–87 (2001). Where the government is delivering its own message, the First Amendment does not constrain "government speech." *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009); *Rust v. Sullivan*, 500 U.S. 173, 193–94 (1991). But certain government institutions—such as public universities, public museums, public media, and public libraries—are imbued with a "First Amendment aura," limiting political interference so that they function as intended. Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 116 (1998).

Public-school libraries are "the principal locus" of students' freedom to explore the world of ideas beyond the curriculum, *Pico*, 457 U.S. at 868–69, and courts have historically recognized the First Amendment's application to school libraries. Critical to the purpose of libraries is the lack of "any kind of authoritative selection" of ideas by the State. See *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–604 (1967). Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-

functing democracy." *Fayetteville Pub. Libr. v. Crawford County*, 684 F. Supp. 3d 879, 891 (W.D. Ark. 2023) (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003)).

Because school libraries are designed to foster thought by making available to students a wide range of materials that are not included in the required curriculum, state legislators overstep their bounds by imposing arbitrary restrictions on local school libraries.

### A. The First Amendment recognizes a distinction between a school library and curriculum.

For decades, Florida law has prohibited educators from "unreasonably restrain[ing] … student[s] from independent action in pursuit of learning" or "unreasonably deny[ing] … student[s] access to diverse points of view." Fla. Admin. Code Ann. r. 6A-10.081(2)(a). "Guided by … ethical principles," Florida law requires those educators to "value[] the worth and dignity of every person, the *pursuit of truth*, devotion to excellence, *acquisition of knowledge*, and *the nurture of democratic citizenship*" *Id.* at § (1)(a) (emphasis added). "The Florida Department of Education Library Media Reading Guidelines state that one of the goals of the school library media program is to 'provide intellectual and physical access to a broad range of literature and

informational reading materials for personal pleasure and curriculum support.'" Hackey Decl., DE 107-48 at 5. And well before the HB 1069 amendments, local school boards were required to "[p]rovide for library media center collections ... based on reader interest, support of state academic standards and aligned curriculum, and the academic needs of students and faculty." Fla. Admin. Code Ann. r. 6A-1006.28(d)(2)(c).

The values enshrined in these provisions would have met with the Founders' approval. And to facilitate students' independent educational journeys in furtherance of these ideals, school libraries' collections have long been curated by professionals trained in library arts, *see* Fla. Admin. Code Ann. r. 6A-4.0251, responsible for consulting with "reputable, professionally recognized reviewing periodicals and school community stakeholders when selecting books." Fla. Admin. Code Ann. r. 6A-1006.28(d)(2)(b). As these longstanding rules make clear, libraries were not created, as the State now suggests, to deliver a government message under partisan control. *See infra* § II.

Defendants' error on this point is crystallized in their reliance on the Fifth Circuit's decision in *Little v. Llano County*, 138 F.4th 834, 859 (5th Cir. 2025) (en banc), which erroneously treated county libraries as

14

examples of government speech. Only seven judges of the seventeen on the Fifth Circuit's *en banc* panel embraced the government speech theory, 138 F.4th at 859, which Florida now adopts as its own. State Defs.-Appellants' Br. 16–29. *This* Court has never adopted that theory and, as the Eighth Circuit recently held in *Reynolds*, any such approach is foreclosed by Supreme Court precedent. *Reynolds,* 114 F.4th at 667–68 (applying the three-factor government speech test announced in *Shurtleff v. Boston*, 596 U.S. 243, 252 (2022)).

Defendants misapply Supreme Court precedent in asking this Court to withdraw the First Amendment's protections from public school libraries. They ask the Court to ignore the historic purpose and function of libraries and eschew cases like *Pico* and *Reynolds* that directly address book removal. Instead, relying on *Little* and *ACLU*, they argue *Pico* is "of no precedential value" because Justice Brennan spoke for only three justices, and Justice White, author of the narrowest concurring opinion, "said nothing about the First Amendment." *Little*, 138 F.4th at 844.

It is true this Court has previously suggested "*Pico* is a non-decision so far as precedent is concerned." *ACLU*, 557 F.3d at 1200. But in *ACLU*, this Court sidestepped whether the selection of library books constitutes

15

government speech, stating "we have no need to resolve it here," leaving the question of "what standard applies to school library book removal decisions [as] unresolved." *Id.* at 1202. And critically, the *ACLU* Court conducted an independent review of the facts in that case, applying the *Pico* standard nonetheless and finding no First Amendment violation because the School Board removed the book in question because of factual inaccuracies. *Id.* at 1227.

In *ACLU*, this Court deferred the question it now faces: whether the First Amendment prohibits government officials from granting untrained citizens the right to remove a vast collection of books from school libraries based on content they oppose. It does. As the district court correctly held, Florida's blunderbuss ban on books — based solely on the presence of even isolated or fleeting allusions to sexual conduct, and applicable regardless of a work's educational or literary value — violates the First Amendment.[13] DE129 at 29–49.

---

[13] Such summary removal also violates the letter and spirit of existing Fla. Admin. Code Ann. r. 6A-10.0081(d), which prohibits school administrators from preventing student access to library materials without following statutorily defined procedure. The rule correctly recognizes students suffer harm when they are unlawfully denied access to library materials.

But even more broadly, while the statute at issue here involves sexual content, if the operation of public libraries constitutes government speech, the First Amendment would have *no* application, leaving government officials free to remove content from school libraries for any reason whatsoever—including purely partisan ones. This not only violates the First Amendment but is short-sighted public policy, teaching public-school students statewide the wrong lesson about the government's power to restrict access to views and ideas it dislikes.

While *Pico* failed to produce a majority opinion, the plurality's reasoning remains instructive here, where the government argues that forcing librarians to remove books based on disfavored content does not implicate any First Amendment right. As the dissent in *Little* noted, Justice White's *Pico* concurrence "agreed with the plurality, affirming the Second Circuit, that the motivation inquiry presented an issue of fact that was *material to the constitutional analysis*, precluding summary judgment." 138 F.4th at 878 (Higginson, J., dissenting) (emphasis added). If Justice White's concurrence had nothing to do with the First Amendment, then the reasons for the removals would have been irrelevant. *See Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d

879, 909 (W.D. Ark. 2023) ("The majority of justices in *Pico* agreed that the state's censorship power could not be exercised 'in a narrowly partisan or political manner'—*even in a school library setting*.") (quoting *Pico*, 457 U.S. at 870 (plurality op.)).

In fact, of the nine Justices deciding *Pico*, eight agreed that removal of books from library shelves to silence disfavored ideas implicates the Speech Clause, which forecloses application of the government speech doctrine to eliminate all First Amendment protection. *Id.* This Court's discussion of *Pico* in *ACLU* is not to the contrary, as it determined "the Board's motive was what it stated—that the book was ordered removed from school libraries because it is full of factual errors." *ACLU*, 557 F.3d at 1211. To say *Pico* is of no value here is simply incorrect, and *ACLU's* treatment of it illustrates the unique status of public-school libraries, where students freely explore ideas outside of the mandatory curriculum.

For decades, courts have recognized this distinction between public-school libraries and the state-prescribed curriculum. *See Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1522–25 (11th Cir. 1989) (distinguishing between removal of curricular and school-library books). School libraries are simply not like "the compulsory environment of the

classroom," where state officials control the curriculum. *Pico*, 457 U.S. at 869. Rather, they have traditionally been places where "a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Id.*

Put another way: Libraries are governed by constitutional doctrine responsive to their purpose. As the Supreme Court observed in *Velazquez*, 531 U.S. at 543, "[w]here the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations." The First Amendment does not permit the government "to suppress speech inherent in the nature of the medium" or to "distort its usual functioning." *Id.* But a broad ban on a disfavored subject, like the one at issue here, produces exactly that suppression and distortion.

This First Amendment principle generally governs expressive institutions created to provide independent voices. Applying it in the educational context, courts have held, for example, the government cannot censor print publications it has vested with independent editorial judgment. *See, e.g.*, *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983)

(cutting student newspaper's funding because of disfavored content violates the First Amendment); *Kincaid v. Gibson*, 236 F.3d 342, 355 (6th Cir. 2001) (*en banc*) (confiscation of student yearbook violated the First Amendment). Here, subjecting school library collections to a political veto without regard to pedagogical value conflicts with educators' "[o]bligation" to "not unreasonably restrain a student from independent action in pursuit of learning" and to "not unreasonably deny a student access to diverse points of view." Fla. Admin. Code Ann. r. 6A-10.081 (2)(a). Further, it denies students the benefits of having a diverse collection of fiction and nonfiction materials curated by professional educational media specialists, required under Florida law to hold a degree or thirty semester hours in educational media or library science. Fla. Admin. Code Ann. r. 6A-4.0251. The system is designed to rely on the expertise of educators, not the changing whims of politicians.

Today's political victors may not subvert the purpose of public-school libraries—institutions meant to enrich the learning environment for students by offering a broad spectrum of ideas free of censorship—just because they hold temporary positions of power.

**B.    The First Amendment protects the right to receive information and ideas.**

By interfering with Florida's public school libraries' institutional purpose, Defendants short-change students' "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). As Milton and Locke knew, the free exchange of ideas generates knowledge and cultivates understanding—and as Madison and Jefferson recognized, it is vital for democratic governance. "The First Amendment means that Government has no power to thwart the process of free discussion, to 'abridge' the freedoms necessary to make that process work." *Kleindienst v. Mandel*, 408 U.S. 753, 776 (1972) (Marshall, J., dissenting).

The fact that Defendants here assert control over public *school* libraries makes this point more pressing, not less. The State has a legitimate interest in "teaching students the boundaries of socially appropriate behavior," to be sure. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). But that interest does not provide "an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 959–60 (8th Cir. 2003). And while the sensitive nature of discussions of human sexuality means schools may ensure student access to library materials

involving sexuality is age-appropriate, those individual determinations are best made by librarians, parents, and local school boards, not state legislatures imposing one-size-fits-all bans, even ones that enlist parents and residents to identify books for removal. *See, e.g., Fraser*, 478 U.S. at 683 (1986) (noting authority to regulate exposure to "inappropriate" expression "properly rests with the school board").

This Court recognizes that "local governments … have a strong interest in protecting children." *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020). "[A]uthority to protect children, however, 'does not include a free-floating power to restrict the ideas to which children may be exposed.'" *Id.* (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011)). "[W]hile protecting children is a crucial government interest, speech 'cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975)). To be sure, Florida has an interest in ensuring public-school library materials are age appropriate. But HB 1069's across-the-board ban on a broad category of content does not serve that interest because it requires

schools to apply the same standards for a high school senior and a second grader.

When courts evaluate restrictions intended to shield minors from sexually oriented material inappropriate for their level of development, "the focus of the inquiry is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class." *Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168, 176 (1988); *see also Mishkin v. New York*, 383 U.S. 502, 508–09 (1966) (rejecting the "inadequacy of the most-susceptible-person facet of the *Hicklin* test"). Instead, "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Am. Booksellers Ass'n, Inc.*, 236 Va. at 177.

HB 1069's requirement that local educators remove from high school libraries such essential works of the literary canon as Vonnegut's *Slaughterhouse-Five* is a quintessential case of "burn[ing] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). From comic books to video games, dime novels to heavy metal, blaming artistic

expression for society's ills and the perceived corruption of children is an old trope. *See Brown,* 564 U.S. at 797–98. But whether seeking knowledge, news, or entertainment, it has long been settled that "minors are entitled to a significant measure of First Amendment protection." *Erznoznik*, 422 U.S. at 212.

Because "America's public schools are the nurseries of democracy," and because "[o]ur representative democracy only works if we protect the 'marketplace of ideas,'" public schools have a "strong interest in ensuring" the protection of even "unpopular ideas." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). In other words, "public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government." *Id.* at 195 (Alito, J., concurring). By making a variety of books available to minors, that is the interest that school libraries serve and the duty they fulfill.

## II. The Court Should Reject Defendants' Government Speech Argument.

The district court correctly rejected Defendants' argument that the placement and removal of books in public school libraries is government speech, wisely heeding the Supreme Court's warning that "while the government-speech doctrine is important—indeed, essential—it is a

doctrine that is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Now, Defendants ask the Court to ignore precedent and extend the government speech doctrine in a manner that offends our national commitment to free expression.

Under the Supreme Court's "holistic inquiry" for whether expression is government speech, the history of public-school libraries, the public perception of who is speaking through their shelves, and the extent to which Florida uses school libraries to send a message all show that they do not engage in government speech. *See Shurtleff,* 596 U.S. at 252. This Court should thus not take Defendants up on their invitation to deem the removal of books from school libraries government speech immune from all First Amendment scrutiny.

### A.  The rich history of public libraries serving an informed public weighs against government speech.

Historically, the purpose of libraries has been to make a diverse body of knowledge freely available to the public, not to convey a message of governmental endorsement. The Founders strove to prevent an ignorant public—especially one force-fed government-approved ideas. *Whitney v. California,* 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). A public-school library cannot fulfill the objective of giving students

25

access to a wide range of ideas and perspectives if the government proscribes or limits materials "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870.

As Justice Blackmun observed, "the First Amendment does not permit a majority to dictate to discrete segments of the population—be they composed of art critics, literary scholars, or scientists—the value that may be found in various pieces of work." *Pope v. Illinois*, 481 U.S. 497, 506 (1987) (Blackmun, J., concurring). Yet, H.R. 1069 does exactly that by usurping the power historically assigned to local school boards to control the content of their libraries and ceding that power to politicians with the assistance of any single resident-censor sufficiently motivated to comb the library shelves and identify forbidden books.

This Circuit has not determined whether selecting and removing books from a library constitutes government speech. *Parnell v. Sch. Bd. of Escambia*, 802 F. Supp. 3d 1361, 1367 (N.D. Fla. 2025) ("[I]t is unclear whether making library books available in school libraries constitutes expression."); *ACLU*, 557 F.3d at 1202 ("The question of what standard applies to school library book removal decisions is unresolved."). But courts have recognized that categorizing libraries as conduits for

26

government speech would remove all First Amendment protection from the locations that are historically the reflective center of the bustling marketplace of ideas. "If the collection constitutes government speech, then Plaintiffs' speech rights are not implicated." *Parnell* at 1365. "Because characterizing speech as government speech 'strips it of all First Amendment protection' under the Free Speech Clause we do not do so lightly." *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (internal citation omitted) (quoting *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) (Alito, J., dissenting)). Therefore, courts in this Circuit have thus far avoided the question of whether libraries represent government speech. *Parnell,* 802 F. Supp. 3d at 1367 ("The good news is I need not decide the difficult government-speech issue to resolve the case."); *ACLU,* 557 F.3d at 1202 ("[W]e have no need to resolve it here.").

But the reasoning of other courts is instructive. The Eighth Circuit applied the government speech doctrine and correctly observed a historical distinction exists between a city selecting monuments for a park, with "governments hav[ing] used monuments to speak to the public since ancient times," and public-school libraries, which have not ever

been thought to carry a uniform government message, save providing simple encouragement to the students it serves to find a book they find interesting. *Reynolds*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 238 and distinguishing *Pleasant Grove*). This Court should follow its sister Circuit and affirm this obvious distinction.

> **B.    The public does not perceive the government as speaking through the diverse and divergent array of books at a public library.**

Defendants ignore history and libraries' purpose to claim they exist for the government to communicate "its own speech." Defs.-Appellants' Br. 16–36. In making this argument, Defendants rely on the Fifth Circuit's statement that the "expressive activity at issue is choosing some books and presenting them as worthwhile literature." *Id.* at 29 (quoting *Little*, 138 F.4th at 865). This claim collapses when confronted by history and common sense.

In 1938, Forest Spaulding wrote the Library Bill of Rights, which the American Library Association adopted in 1938. *Pieces of Iowa's Past: Spaulding's Library Bill of Rights*, Iowa Legislative Services Agency (Apr. 4, 2018), https://www.legis.iowa.gov/docs/publications/TB/961350.pdf. It included the principle that "[l]ibraries should provide

materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval." *Id.* Spaulding's refusal to remove Adolf Hitler's *Mein Kampf* from library shelves in the early years of the Second World War was not—as Defendants' argument suggests—governmental endorsement of *Mein Kampf* as worthy reading material. Rather, in declining to bend to the censors' wishes, Spaulding demonstrated the principles he laid out in the Library Bill of Rights would not suddenly become flexible when they became uncomfortable. *Id.* His principled stand was the "fulfillment of [a library's] responsibility to provide information and enlightenment" on all terms, not just when it suited him. *Id.*

Defendants effectively view each book in a school library as having the government stamp of approval. But library books are categorically different from the advertising banners hung on school fences at issue in *Mech*, which contained the school district's seal of approval on their face in the form of the school's initials. *Mech*, 806 F.3d at 1077. Nor are readers likely to consider library books to be connected to the government in the same way as government-commissioned sculptures, *McGriff v. City*

*of Miami Beach*, 84 F.4th 1330 (11th Cir. 2023), a government-organized parade, *Leake v. Drinkard*, 14 F.4th 1242 (11th Cir. 2021), or a government issued license plate, *Walker*. As the Eighth Circuit reasoned, if placing books like Barack Obama's *The Audacity of Hope* and *Mein Kampf* in the library means the government is attributing worthiness to both books, then "the State 'is babbling prodigiously and incoherently.'" *Reynolds*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 219 and highlighting the divergent political science books found at school libraries).

Likewise, the Supreme Court in *Pico* "distinguished the school library from the classroom and recognized that the government has a 'claim of absolute discretion in matters of *curriculum*' and 'the compulsory environment of the classroom' to carry out its 'duty to inculcate community values.'" *Walls v. Sanders,* 144 F.4th 995, 1004 (8th Cir. 2025) (quoting *Pico*, 457 U.S. at 862, 868–69). This distinction between books assigned in class and those available for voluntary perusal in a library is a matter of common sense. A high school teacher assigning a book as part of a mandatory curriculum implies that the school believes the book is worthwhile. In contrast, a school librarian placing a book on

30

a school library shelf does not endorse its message, communicating only that the book is available to read.[14] Ultimately, a commonsense understanding of the relationship between students and the books on school library shelves renders it "doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *Reynolds*, 114 F.4th at 668.

### C. Florida does not actively control public library shelves to shape its messages.

Historically, Florida law does not subject school libraries to the whims of partisan control. The responsibility for material made available in school libraries rests with the district school boards. Fla. Stat. § 1006.28(2)(1). Every book made available to students in a school library must be selected by a school district employee holding a valid educational media specialist certificate. Fla. Stat. § 1006.28(2)(d)(1). Every school district adopts procedures for developing library collections. Fla. Stat. § 1006.28(2)(d)(2). Notably absent from this system is any requirement

---

[14] The state's argument that the government is speaking via library book removals is further undermined by the lack of clarity as to *which* government, inasmuch as individual county school boards make shelving and removal decisions, which differ by county, while the state (through the law at issue) may dictate different outcomes from what local government actors might otherwise decide.

that the school board or librarian reject books disapproved by politicians.[15]

As Madison explained, "the great object" of a bill of rights was "to limit and qualify the powers of government." *Pennsylvania Packet*, June 16, 1789 (reporting on congressional session). That includes limiting the power to control ideas. Yet Defendants ask the Court to discard that foundational principle and condone a system in which the government can turn protection for private speech on its head to justify censorship.

At bottom, if public institutions that exist to promote knowledge and ideas "could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235. That result cannot be squared with the First Amendment, let alone our historical

---

[15] Defendants' reliance on *Moody v. NetChoice,* 603 U.S. 707 (2024), is misplaced. Nothing in *NetChoice* supports the proposition that public library book decisions can be classified as "government speech." Defs.-Appellants' Br. 27. *NetChoice* says nothing whatsoever about the government speech doctrine. To the contrary, it reaffirmed strong First Amendment protections for *private* actors "compiling and curating others' speech" against *government* attempts to regulate their editorial discretion. 603 U.S. 707, 731–32 (2024).

understanding of public libraries. But passing off arbitrary censorship at public libraries as "government speech" is what Defendants are trying to sell. This Court should educate Florida's public-school students — tomorrow's leaders — in the value of liberty by rejecting this argument.

## CONCLUSION

Public school libraries must remain sanctuaries of knowledge, where students can explore ideas simply because they are interested in them, not because they are assigned to do so in a class. The Court should affirm the importance of these institutions as bastions of free thought, protecting them from arbitrary censorship and reaffirming our commitment to the free exchange of ideas.

Dated: February 17, 2026

*/s/ Ronald G. London*

RONALD G. LONDON
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

Counsel for *Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 6,481 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: February 17, 2026

*/s/ Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

# CERTIFICATE OF SERVICE

The undersigned certifies that on February 17, 2026, an electronic copy of the Brief of *Amici Curiae* Foundation for Individual Rights and Expression and Florida Freedom to Read Project in Support of Appellees and Affirmance was filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: February 17, 2026

*/s/ Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION