No. 25-13181

# In The United States Court of Appeals for the Eleventh Circuit

PENGUIN RANDOM HOUSE, ET AL.,

*Plaintiffs-Appellees*

v.

BEN GIBSON,
IN HIS OFFICIAL CAPACITY AS CHAIR OF THE
FLORIDA STATE BOARD OF EDUCATION, ET AL.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Middle District of Florida
No. 6:24-cv-01573-CEM-RMN

## BRIEF OF NATIONAL COALITION AGAINST CENSORSHIP AND FREEDOM TO LEARN FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

Marc A. Fuller
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mfuller@jw.com

Henrik S. Strand
JACKSON WALKER LLP
100 Congress Ave. Suite 1100
Austin, TX 78701
(512) 236-2292
hstrand@jw.com

Lee Rowland
Erika Sanders
NATIONAL COALITION AGAINST CENSORSHIP
29 Broadway #1401
New York, NY 10006

*COUNSEL FOR AMICI CURIAE*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *Amici* provide the following certificate of interested persons, in addition to those listed in the previously filed briefs:

National Coalition Against Censorship (*Amicus Curiae*);

Freedom to Learn Foundation (*Amicus Curiae*);

Marc A. Fuller (counsel for *Amici*); and

Henrik S. Strand (counsel for *Amici*).

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *Amici* state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: February 17, 2026

*/s/ Marc A. Fuller*
Marc A. Fuller
*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ 4

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................. 7

SUMMARY OF THE ARGUMENT ........................................................ 9

ARGUMENT ......................................................................................... 14

I.   The State's government speech argument finds no support in Supreme Court precedent. ........................................................... 18

II.  The *Shurtleff* factors confirm that library book removals censor private speech and thus implicate the First Amendment ............. 24

III. *NetChoice* does not support the government's right to discriminate against disfavored private speech. .......................... 29

IV.  The Fifth Circuit's plurality opinion in *Little* is wrong. ................ 32

CONCLUSION ...................................................................................... 37

CERTIFICATE OF COMPLIANCE ...................................................... 39

CERTIFICATE OF SERVICE ............................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009)........................................................ 10

*Bd. of Edu. v. Pico*,
457 U.S. 853 (1982).............................................................. 10, 11

*Crookshanks v. Elizabeth Sch. Dist.*,
775 F. Supp. 3d 1160 (D. Colo. 2025) ................................................. 35

*GLBT Youth in Iowa Schs. v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ..................................................... 27, 32

*Hurley v. Irish-Amer. Gay, Lesbian and Bisexual Grp. of
Bos., Inc.*,
515 U.S. 557 (1995)................................................................ 32

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)................................................................ 10

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ............................. 18, 32, 33, 34, 35, 36

*Matal v. Tam*,
582 U.S. 218 (2017)........................... 15, 19, 21, 24, 27, 30

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)................................................................ 32

*Miller v. California*,
413 U.S. 15 (1973)................................................................. 17

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................................................... 29, 30, 31

*NEA v. Finley,*
524 U.S. 569 (1998) ...................................................................... 16, 17

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) ................................................... 19, 20, 23, 33, 34

*Rankin v. McPherson,*
483 U.S. 378 (1987) ............................................................................ 16

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ............................................................................ 14

*Shurtleff v. City of Boston, Massachusetts,*
596 U.S. 243 (2022)
.......................................... 13, 15, 19, 22, 23, 24, 26, 28, 29, 30, 31, 36

*Shuttlesworth v. City of Birmingham, Ala.,*
394 U.S. 147 (1969) ............................................................................ 30

*Simon & Schuster, Inc. v. Members of N.Y. State Crime
Victims Bd.,*
502 U.S. 105 (1991) ............................................................................ 17

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ............................................................................ 32

*United States v. American Library Assn., Inc.,*
539 U.S. 194 (2003) ............................................................................ 34

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ...................................... 11, 14, 19, 20, 21, 22, 26

**Statutes**

Fla. Stat. § 847.001(19) ........................................................................ 17

Fla. Stat. § 1006.28(2)(a)2.b(II) ............................................................ 17

## Other Authorities

American Library Association, Library Bill of Rights (2026) ............... 26

Evelyn Geller, *Forbidden Books in American Public
Libraries*: A Study in Cultural Change xv (1984) ............................. 25

Helen Norton & Danielle Keats Citron, *Government Speech
2.0*, 87 Denv. U. L. Rev. 899 (2010) .................................................. 20

Kimberlee Wood Colby, *Monumentally Speaking: Pleasant
Grove City v. Summum*, 10 Engage: J. Federalist Soc'y
Prac. Groups 107 (2009) .................................................................. 13

Marc J. Blitz, *Constitutional Safeguards for Silent
Experiments in Living: Libraries, the Right to Read, and A
First Amendment Theory for an Unaccompanied Right to
Receive Information*, 74 UMKC L. Rev. 799 (2006) ..................... 25, 26

Mary-Rose Papandrea, *The Government Brand*, 110 Nw. U.
L. Rev. 1195 (2016) ......................................................................... 30

Rodney A. Smolla, *Freedom of Speech for Libraries and
Librarians*, 85 Law Libr. J. 71 (1993) .............................................. 9

**STATEMENT OF INTEREST OF *AMICI CURIAE*[1]**

National Coalition Against Censorship ("NCAC") is an alliance of more than 60 national nonprofit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC's mission is to protect freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians, artists, students, and others. NCAC is dedicated to defending robust First Amendment protections of the public's access to art, literature, and culture. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

Freedom to Learn Foundation ("FTLF") is a nonprofit organization dedicated to protecting public libraries, public schools, and the educators and librarians who sustain them. FTLF works to ensure these vital

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* certify that counsel for *Amici* authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than amici and their counsel, contributed monetarily to this brief's preparation or submission.

institutions remain strong and accessible to all. FTLF believes that every individual has the right to read, learn, and engage with ideas without censorship. Its mission is to fund and defend libraries and schools, and to support those who safeguard access to knowledge and opportunity.

*Amici* urge the Court to reject the State's argument that a school library's removal of books from its collection constitutes government speech. Such a holding would upend established First Amendment jurisprudence and immunize government censorship of disfavored expression by private speakers in a variety of contexts. *Amici* believe that the Court should affirm the district court on the grounds argued by appellees.

All parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

Book removals are not unique to any political party or cultural movement. In California, school districts have targeted books such as Mark Twain's *Huckleberry Finn*, Harper Lee's *To Kill A Mockingbird*, Theodore Taylor's *The Cay*, and Mildred Taylor's *Roll of Thunder, Hear My Cry* based on concerns of racial insensitivity. In Iowa, officials have removed classic works such as James Joyce's *Ulysses*, William Faulkner's *As I Lay Dying*, and Aldous Huxley's *Brave New World*. In Utah, Kurt Vonnegut's *Slaughterhouse-Five* was recently pulled from school library shelves. As Dean Rodney Smolla observed at the First Amendment's bicentennial, "[w]e are all prone to the natural human instinct to censor—to pronounce speech that is upsetting, disquieting, and offensive as taboo." Rodney A. Smolla, *Freedom of Speech for Libraries and Librarians*, 85 Law Libr. J. 71, 72 (1993).

HB 1069 is merely one of the latest laws succumbing to that human instinct, placing school libraries at the epicenter of a culture war. Holding that the removal of books from school libraries is government speech will inject this culture war into the educational setting. The result will be school library shelves stripped bare of any content that the party in power

finds objectionable. School libraries are vessels for learning, not the pigskin in a game of political football. The ultimate losers of that game are students, who will be subjected to an ever-expanding orthodoxy in precisely the places where they should be exposed to a diversity of ideas.

For decades, courts have grappled with First Amendment challenges to book removals from school libraries and public libraries, including bans of many of the same books that appear in the headlines today. However, they have been steadfast in their recognition that, at a minimum, the First Amendment protects students from government action that seeks to "cast a pall of orthodoxy in the classroom" or school library. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). To effectuate that constitutional protection, courts use a workable, baseline standard: when the government removes books based on disagreement with their ideas, the First Amendment is implicated. *Bd. of Edu. v. Pico*, 457 U.S. 853 (1982).

The durability of this standard derives largely from its flexibility. Book removals based on the application of professional standards, such as factual accuracy, have survived constitutional challenges. *See, e.g.,* *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1202-

30 (11th Cir. 2009) (assuming for the sake of argument that *Pico* applied, but holding that the school board did not violate the First Amendment where factual inaccuracies, rather than disfavored content, motivated a book's removal).

Appellants ask the Court to jettison even this baseline standard. In defending the constitutionality of HB 1069, the State and its supporting *amici* rely on a radical argument that would eviscerate the First Amendment rights of students and public library patrons. They contend that the removal of books from a publicly funded library is "government speech" to which the First Amendment's Free Speech Clause has "no application." (Dkt. 35 at 11). Under this argument, book removals are "immune from First Amendment scrutiny" because the government is sending the message that the books are not "worth reading." (Dkt. 30 at 13-14).

This argument is as wrong as it is dangerous. The government speech doctrine is of relatively recent vintage, but—as the Supreme Court has made clear—extremely limited application. At its core, the doctrine merely recognizes what its name suggests: the government sometimes speaks. *Walker v. Texas Div., Sons of Confederate Veterans,*

*Inc.*, 576 U.S. 200, 207 (2015). When it does, it is not confined to content or viewpoint neutrality. The government may promote its favored policy over other competing alternatives. It may take positions on controversial public issues, supporting one side of the debate and attacking the other. This "speech" by the government does not trigger First Amendment scrutiny.

But an overly broad conception of government speech risks upending large swaths of long-established First Amendment law. Invidious viewpoint discrimination—the government's suppression of disfavored ideas and beliefs by private speakers—would suddenly be outside the purview of the First Amendment's Free Speech Clause if the government could simply recast its censorship as expression. Government officials could strip school libraries of all books written by Democrats, by socialists, by libertarians, by supporters of the President, or by pro-life advocates on the grounds that such removals express the government's message that those books are not "worth reading." The same argument would apply to public libraries. Institutions that have long been considered zones of freewheeling intellectual inquiry would be transformed into propaganda arms of whichever political party happened

to be in control at the time. And those who might view themselves as "winners" of such a game will inevitably find themselves the "losers" in another time or place. *See* Kimberlee Wood Colby, *Monumentally Speaking: Pleasant Grove City v. Summum*, 10 Engage: J. Federalist Soc'y Prac. Groups 107, 110 (2009) ("government censorship could readily be rehabilitated as government speech, through 'selection' or 'adoption' of preferred private speech, to the exclusion of unpopular conservative or religious speakers").

No federal appellate court has ever held that library book removals are government speech, and this Court should not be the first. Whether the Court applies a holistic analysis or the three factors identified by the Supreme Court in *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 252 (2022), it should make clear that the government does not "speak" by pulling books from library shelves. Censorship is not government speech, and libraries are not viewed by the public as instruments of government messaging. Abandoning judicial review of library book removal decisions will only hasten the pall of orthodoxy that the First Amendment cannot tolerate.

**ARGUMENT**

The government speech doctrine operates as an exception to cornerstone principles of Free Speech Clause jurisprudence. The exception is born of necessity. At the heart of the First Amendment is the general principle that "government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). But the government speech doctrine recognizes that imposing a standard of viewpoint neutrality on the government's own speech would make governing impossible:

> Were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization?

*Walker*, 576 U.S. at 207-08. To avoid this problem, the Supreme Court has held that, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Id.*

At the same time, however, the Supreme Court has warned that the doctrine applies only when the government is actually "*speaking* instead of regulating private expression." *Shurtleff*, 596 U.S. at 262 (Alito, J., concurring). When the doctrine is mistakenly applied to government regulation, it becomes "susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Thus, the Court has moved with "great caution" in this area, carefully examining the context of government action before extending the cloak of government speech immunity. *Id.*

The State's government speech in this case argument eschews the caution that Supreme Court precedent teaches. The State begins by mischaracterizing the relevant government action at issue here. Contrary to the assertions of the State and its *amici*, this case involves library book removals—not library curation.

This distinction has constitutional significance. Several areas of First Amendment law recognize that, when the government establishes a program, it may exercise discretion in curating its constituent parts to

effectuate the purpose of the program—even when those constituent parts consist of private speech, content, or viewpoints. For example, the government may sometimes consider individuals' ideology in selecting public employees or recipients of government grants.

Such acts of curation do not, however, absolve the government of its obligations under the First Amendment or permit it to discriminate against private speakers once it has created a forum for their expression. This principle holds true across the Supreme Court's First Amendment jurisprudence. In the context of public employment the government may use its discretion in choosing the applicant best suited for a job opening. However, it generally may not then dismiss a public employee for disfavored speech. *See Rankin v. McPherson*, 483 U.S. 378, 380–84 (1987). Likewise, the Supreme Court has permitted the government to establish criteria for selecting grant applicants based on content and viewpoint, while noting that "a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *NEA v. Finley*, 524 U.S. 569, 587 (1998) (quoting

16

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

The same principle holds true in the context of school libraries. It is not necessary for the Court to decide in this case whether library *curation* amounts to government speech. HB 1069 mandates the removal of library books based on their content, divorced from any professional curation process. Book *removal*, therefore, is the correct focal point of the government speech analysis here.[2]

None of the limited circumstances in which the Supreme Court has applied the government speech doctrine are similar to library book removals. And no other court has held that library book removals are government speech. Recognizing this, the State and its *amici* analogize

---

[2] Even if this court were to hold that curation is government speech, the First Amendment inquiry does not end there. The government's duty not to censor or penalize disfavored ideas remains intact. *See Finley*, 524 U.S. at 569. As amended by HB 1069, Fla. Stat. § 1006.28(2)(a)2.b(II) requires the removal of school library books that "describe[] sexual conduct," a clear content-based restriction untethered from the constitutional definition of obscenity. *See* Fla. Stat. § 847.001(19); *Miller v. California*, 413 U.S. 15 (1973). In banning certain content in school library books, HB 1069 targets the speech of private individuals. If this Court blesses the legislature's mandate of book removals as unreviewable government speech, it paves the road toward the pall of orthodoxy that the Supreme Court has warned against.

library curation to social media content moderation, ignoring that social media companies are private entities and that their content moderation, such as the selection of posts to recommend to specific users, is different than merely allowing a library book to remain on library shelves. The State and its *amici* also rely on the Fifth Circuit's plurality opinion in *Little v. Llano County*, 138 F.4th 834, 851-865 (5th Cir. 2025) (en banc), but that opinion is analytically flawed and at odds with Supreme Court precedent. In sum, no binding or persuasive authority supports the State's government speech argument.

## I. The State's government speech argument finds no support in Supreme Court precedent.

Government speech cases generally turn on a question of categorization. If the government is deemed to be regulating private speech, the challenged action is generally held unconstitutional. But if the government is deemed to be the one speaking, the action is constitutionally unproblematic. This categorization is not always easy. Government speech cases often involve some interplay between public and private actors, but the mere involvement by the government is insufficient to transform private speech into government speech.

A review of the Supreme Court's government speech precedent reveals the deliberate caution—and deep concern—with which the Court has applied the doctrine. Although the doctrine traces its roots to earlier cases, the Supreme Court generally cites *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), as the paradigmatic example of government speech. *See, e.g.*, *Shurtleff*, 596 U.S. at 251; *Matal*, 582 U.S. at 234; *Walker*, 576 U.S. at 207. *Summum* involved a display of approximately 15 monuments in a small city park. 555 U.S. at 464. Noting the expressive function of monuments throughout history and the government's role in selecting which monuments to allow on public property, the Court's unanimous opinion also relied heavily on practical considerations. *Id.* at 478–79. Writing for the Court, Justice Alito observed that a public park "can accommodate only a limited number of permanent monuments" and that it would be absurd to force the government to display monuments from all perspectives on a range of issues. *Id.* As the Court explained, the government's display of a Statue of Liberty should not obligate it to display a Statue of Autocracy. *Id.* at 479.

19

The Supreme Court clearly viewed *Summum* as an easy decision—or at least an easy result, even if the analytical framework proved less convincing to some justices. *See, e.g.*, 555 U.S. at 481 (Stevens, J., concurring) (stating that the doctrinal underpinnings of the government speech doctrine were "of doubtful merit"); *see also id.* at 486 (Souter, J., concurring) (warning that, because the doctrine is "'recently minted,' it would do well for us to go slow in setting its bounds, which will affect existing doctrine in ways not yet explored"). Commentators have similarly observed that "[p]erhaps *Summum* was unanimous because the objectionable consequences of a contrary ruling were so clear as a pragmatic matter." Helen Norton & Danielle Keats Citron, *Government Speech 2.0*, 87 Denv. U. L. Rev. 899, 915 (2010).

The unanimity did not last. In *Walker*, the Supreme Court considered whether specialty license plates are government speech. The Court split 5-4, holding that Texas's program was government speech. 576 U.S. at 212–220. Essential to the majority's analysis was its observation that "license plate designs 'are often closely identified in the public mind with the [State]'....Each Texas license plate is a government article serving the government purpose of vehicle registration and

20

identification." *Id.* at 212. The Court noted that the State's name was prominently displayed on each plate, and vehicle owners were required by law to display the plates. *Id.* In this way, "license plates are, essentially, government IDs." *Id.*

That analysis drew a vigorous dissent by Justice Alito, joined by Chief Justice Roberts, Justice Scalia, and Justice Kennedy. *Id.* at 221 (Alito, J., dissenting). The dissent argued that the majority's "capacious understanding of government speech takes a large and painful bite out of the First Amendment." *Id.* at 222. Noting the wide array of designs that had been approved under the Texas program, Justice Alito argued that a reasonable observer would not understand any specific design to be a State-sponsored message. *Id.* at 222–23. Rather, the public would likely view specialty license plates as "little mobile billboards" bearing messages of private expression. *Id.* at 223.

In retrospect, *Walker* appears to have been the high-water mark of the government speech doctrine. *See, e.g.*, *Matal*, 582 U.S. at 238 (*Walker* "likely marks the outer bounds of the government speech doctrine"). Just two years later, the Supreme Court unanimously rejected an argument that the U.S. Patent and Trademark Office's approval of trademarks

transformed the content of those marks into government speech. *Id.* at 235. Noting the diversity of approved marks, the Court quipped that, "[i]f the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently." *Id.* at 236. And it warned that, if registration transforms trademarks into government speech, so would copyright registration transform books into government speech—a result the Supreme Court found to be "most worrisome." *Id.* at 239.

Unanimity prevailed again in *Shurtleff*, where the Supreme Court rejected the argument that a small collection of flags outside Boston City Hall represented government speech. 596 U.S. at 251–260. The Court recognized that, under other circumstances, flags outside a government building could represent government speech. *Id.* at 255. But the City of Boston had "allowed its flag to be lowered and other flags to be raised with some regularity." *Id.* The Supreme Court held that, as to these other flags, a reasonable observer would associate their messages with the private actors who raised them. *Id.* at 255–56. Thus, even though the flags were flown on government grounds, on government-owned

flagpoles, raised with government equipment, and remained subject to government control, they were not government speech. *Id.* at 256.

The State and its *amici* offer no convincing argument that any of these precedents support their position that library book removals are government speech. Indeed, the differences between this case and the two instances in which the Supreme Court applied the government speech doctrine are clear. As to *Summum*, the overriding pragmatic concern that drove the result in that case is absent here. *Summum* appreciated the impossibility of forcing the government to display monuments with competing viewpoints, especially in a collection that numbered barely more than a dozen monuments in a small public park. 555 U.S. at 479. But a library is not similarly constrained. School and public libraries shelve hundreds, if not thousands, of books. Moreover, the fact that this case involves the *removal* of books that were previously available on library shelves confirms that the physical space constraints that dictated the result in *Summum* do not apply here.

Unable to rely on *Summum*, the State and its *amici* cite *Walker*, but their attempts to analogize license plates to library books fail. The State notes that, as in *Walker*, government actors exercise final approval

over whether a book is placed on library shelves. (Dkt. 30 at 21). But the State has made no showing that its removal of books bears any resemblance to the review process in *Walker*. Instead, the creation of a library collection tracks more closely with the trademark program in *Matal* and the flagpoles in *Shurtleff*; the government engages in the final approval of a collection of private speakers, which is insufficient to invoke the government speech doctrine. *Matal*, 582 U.S. at 235–36; *Shurtleff*, 596 U.S. at 257–58. As *Shurtleff* makes plain, the mere fact that the removal takes place on government property or is enabled by government-created infrastructure does not transform it into the government's own speech.

## II. The *Shurtleff* factors confirm that library book removals censor private speech and thus implicate the First Amendment.

The State's argument fares no better when considering the three factors that the Supreme Court has identified to guide the government speech analysis. *See Shurtleff*, 596 U.S. at 252. These indicia include: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

Here, all of these factors confirm that the removal of books from publicly funded libraries is government regulation of private expression, not government speech.

As to the first factor, the history is not nearly as static as the State and its *amici* contend. As one scholar has explained, "[e]ven near the beginning of public library history in America, … one finds evidence of the individualism and respect for reader autonomy that would later become a hallmark of the profession." Marc J. Blitz, *Constitutional Safeguards for Silent Experiments in Living: Libraries, the Right to Read, and A First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. Rev. 799, 829 (2006). Early on, that individualism competed with the elitist paternalism of those who "'endorsed the librarian as moral censor'" for the masses. *Id.* at 836 (quoting Evelyn Geller, *Forbidden Books in American Public Libraries*, 1876-1939: A Study in Cultural Change xv (1984)). It is this anachronistic paternalism that the State *amici* highlight. (Dkt. 35 at 7) (citing practices from the 1800s to support assertion that "[p]ublic libraries have long shaped their collections to express the government's view regarding what

materials are 'edifying' and would be likely to promote morality and civil virtue").

As the 20th century progressed, respect for individual liberty prevailed over paternalism. In 1939, the American Library Association "'adopted its first Library Bill of Rights' defining librarians as 'guardian[s] of the freedom to read.'" *Id.* at 838–839 (quoting Geller at xv). Today's Library Bill of Rights continues this commitment, stating that "[l]ibraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval." American Library Association, Library Bill of Rights (2026), https://www.ala.org/advocacy/intfreedom/librarybill. It is this modern view that provides the correct frame of reference for the Court, given the government speech doctrine's focus on the perspective of the present-day observer. *See, e.g.*, 576 U.S. at 229-230 (Alito, J., dissenting) (focusing on post-1990s changes in Texas's license-plate program, not the early 20th century origin of the program); *cf. Shurtleff*, 596 U.S. at 255 (focusing on City's recent practice of allowing private actors to raise their own flags).

As to the second factor, the State and its *amici* do not contend that a reasonable observer would view the government as speaking through each book in the library's collection. Any such suggestion has been soundly rejected, and for good reason. As the Eighth Circuit observed, a well-appointed school library "could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America.*" *GLBT Youth in Iowa Schs. v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024). If including these books on the shelves of a publicly funded library constitutes government speech, the State "'is babbling prodigiously and incoherently.'" *Id.* (quoting *Matal*, 582 U.S. at 236).

So the State and its *amici* focus instead on the government's curation of a library collection as being the relevant speech, not the books themselves. They argue that the "message" sent by the collection in its entirety is that the books on library shelves are "worthwhile" or "worth reading." (Dkt. 35 at 8); (Dkt. 30 at 22). But neither the State nor its *amici* offer any further contextual analysis to support this argument. They ignore, for example, that all the books removed pursuant to HB

1069 were previously on library shelves. According to the government's own reasoning, this prior availability would have communicated the government's message that these books are, in fact, worth reading. Nor can the government rely—as the State *amici* do—on the message of the government's decision to remove the books. (Dkt. 35 at 10). As Justice Alito has noted, such an argument illustrates the primary danger and core fallacy of an overbroad conception of government speech, which mistakes the expressive nature of content and viewpoint discrimination as government "speech." *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring).

Finally, as to the third factor—the extent to which the government has actively shaped or controlled the expression—the State clearly has no role in the expression contained in the books themselves. Neither the State nor its *amici* argue otherwise. And the curation by professional librarians of the thousands of books on various topics and diverse perspectives reflects a level of control more similar to the approach of the City of Boston to flags or the PTO to trademark registration. Thus, none of the *Shurtleff* factors supports the State's government speech argument.

**III. *NetChoice* does not support the government's right to discriminate against disfavored private speech.**

Ignoring the limited application of the government speech doctrine and the stark warnings of its potential for misuse, the State and its *amici* rely heavily on the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). (Dkt. 35 at 12) (*NetChoice* "resolves this appeal"). But *NetChoice* is not a government speech case. In *NetChoice*, the Supreme Court recognized that the First Amendment protects social media companies' exercise of certain editorial functions, including the determination of which content to promote to users of their platforms. *Id.* at 718, 734-35. According to the State and its *amici*, the Supreme Court's characterization of such editorial discretion as "speech activity" means that the government's curation of library books must also be "speech activity." (Dkt. 35 at 12).

This argument fails because "government speech" is not equivalent to private speech. Private individuals and entities have First Amendment rights to engage in content or viewpoint discrimination in numerous contexts in which the government plainly cannot. The State and its *amici* cite no authority in which a court has held the government's

suppression of disfavored speech is permitted under the First Amendment simply because a private actor would have a First Amendment right to engage in similar conduct. No such case exists. As Justice Alito noted in *Shurtleff*, the government speech doctrine "is not based on the view … that governmental entities have First Amendment rights." 596 U.S. at 268 (Alito, J., concurring). It is thus incorrect to view the speech rights of government and private entities as coterminous, just as it is incorrect to define the contours of "government speech" by reference to the scope of First Amendment protections for private speakers. *See, e.g.*, Mary-Rose Papandrea, *The Government Brand*, 110 Nw. U. L. Rev. 1195, 1225-26 (2016) (describing as "strange" the notion "that the government has First Amendment rights just like individuals").

For example, as *NetChoice* recognized, a private entity organizing a parade has a First Amendment right to feature—and to exclude— whichever viewpoints it chooses. *Id.* at 730. But the government does not have the same right to exercise viewpoint discrimination in determining whether a parade organizer receives a public permit. *See, e.g.*, *Matal*, 582 U.S. at 233-34. Indeed, the First Amendment prohibits the government entirely from engaging in such viewpoint discrimination. *Shuttlesworth*

*v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969). That's not because the denial of the permit to a disfavored speaker fails to convey a message. In fact, the message of such censorship is clear. By denying the permit, the government is saying: "*your expression is not worthy*." As Justice Alito explains, "[n]aked censorship of a speaker based on viewpoint … might well constitute 'expression' in the thin sense that it conveys the government's disapproval of the speaker's message. But plainly that kind of action cannot fall beyond the reach of the First Amendment." *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring).

Even if government speech could be defined as expansively as private speech, the State and its *amici* are wrong to equate social media companies' content moderation activities with the curation of a library's book collection. As *NetChoice* explained, social media companies deliver to each user a "personalized collection" of content, based largely on the user's prior likes and dislikes. 603 U.S. at 734-35. By contrast, the "curation" at issue in this case does not involve personalized recommendations by a librarian or school. It is merely about whether a book will remain available on the shelves, alongside hundreds or thousands of other volumes. In sum, the continued availability of a

library book is far less expressive than the content moderation activities cited by the Supreme Court in *NetChoice.*

## IV.   The Fifth Circuit's plurality opinion in *Little* is wrong.

No court has embraced the State's government speech argument. Like the district court, the Eighth Circuit rejected the argument that school library curation is government speech. *Reynolds*, 114 F.4th at 668. As the State and its *amici* note, however, a plurality of the Fifth Circuit recently argued that public library collection was government speech. *See Little*, 138 F.4th at 851-865. For several reasons, the Fifth Circuit plurality's analysis is unpersuasive.

First, the plurality made the same error as the State and its *amici* when it cited what it viewed as the "most instructive cases," placing *NetChoice* at the top of the list. *Id.* at 852. Like *NetChoice*, every other case cited by the plurality involved *private* speech, not government speech. *Id.* (citing *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); *Hurley v. Irish-Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995)). But the plurality did not cite any case holding that government speech is coextensive with private speech.

Second, the plurality asserted that *Summum* "maps neatly" onto cases involving library book removals, but it ignored the practical considerations that drove the result in *Summum*. The *Little* plurality said nothing of the physical constraints associated with displaying large monuments in a small public park, and it ignored the differences between a government's review of monuments for potential display in a small public park and a public library's receipt and display of thousands of books on a range of topics and expressing a range of viewpoints on those many topics.

The *Little* plurality also mischaracterized *Summum*'s reasoning. In support of its forced analogy between monuments and library books, the *Little* plurality asserted that the "relevant expression" in *Summum* was not the monuments themselves, but the city's curation and collection of monuments. *Id.* at 853. According to the *Little* plurality, the Supreme Court in *Summum* did not view the government as endorsing the message of the monuments displayed on public property. *Id.*

This is not a faithful reading of *Summum*, which clearly *did* view the government as endorsing the message of the monuments on display. *Summum* expressly states that "[j]ust as government-commissioned and

government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land." 555 U.S. at 470-71. This is because the public understands that it "is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* at 471. Indeed, *Summum* explained that the mere presence of a monument on public land so unmistakably communicates government endorsement that a formal proclamation officially endorsing that message would be redundant. *Id.* at 474 ("The City's actions provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand, unmistakably signifying to all Park visitors that the City intends the monument to speak on its behalf.").[3]

---

[3] The *Little* plurality also erroneously relied on public forum doctrine to support its government speech analysis. *See* 138 F.4th at 858 ("Another way of looking at the government speech issue is to ask whether a library, by selecting books, creates a public forum….[T]he government speech and public forum doctrines are often two sides of the same coin."). But *Summum* rejects equating forum analysis with government speech. 555 U.S. at 478 ("public forum principles ... are out of place in the context of

Libraries are fundamentally different in this way. Publicly funded libraries stock all kinds of books with messages that the government does not endorse. No reasonable observer would believe that *Mein Kampf* or *Das Kapital* is on a library shelf in Florida because the government supports its message. *See Crookshanks v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) ("No one would seriously argue that placing *Mein Kampf* in a school library constitutes government speech."). Even *Little* rejects that view. 138 F.4th at 864 ("No one even claims that."). Thus, *Summum* does not "map neatly" onto *Little*. To the contrary, it relies on a conception of government endorsement that *Little*—and the State here—expressly disclaim.

Third, the Fifth Circuit plurality argued unconvincingly that the message the government was expressing through its library curation was that the books on the shelves were "worth reading" and that the removed books were not. *Id.* at 854. In this way, the plurality analogized a library's book collection to an art museum's collection of paintings, noting that a librarian's job is to ensure that books are of a "suitable and worthwhile

this case." *quoting United States v. American Library Assn., Inc.*, 539 U.S. 194, 205 (2003) (plurality op.)).

material." *Id.* But the plurality ignored that, as in this case, *Little* did not involve a challenge to the library's actual curation decisions. The books had already been on library shelves, and the district court found that their removal did not comply with the professional standards that guide a librarian's weeding of genuinely unsuitable books from a collection. *Id.* at 853. Moreover, the removed books at issue in *Little* included award-winning works of history and culture, so no reasonable observer would have interpreted their removals as being based on a lack of quality. *Id.* at 873 (Higginson, J., dissenting) (noting district court finding that removed books included "well-regarded, prize-winning" works). Instead, the only reasonable message that the government's removal of these books would have expressed to the public is that the racial and sexual themes in them were disfavored. That is censorship, and "plainly that kind of action cannot fall beyond the reach of the First Amendment." *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring).

In sum, the Fifth Circuit plurality's opinion in *Little* is legally and factually unsupported. Embracing its analysis would open the door for even the most naked viewpoint discrimination—in school libraries and public libraries alike—against authors who express messages that the

government disapproves. This is precisely what Justice Alito and other Supreme Court justices have repeatedly warned about since *Summum*. It is no model for this Court.

## CONCLUSION

*Amici* respectfully urge the Court to affirm the district court and hold that the government speech doctrine does not apply to the removal of school and public library books.

DATED: February 17, 2026

Respectfully submitted,


*/s/ Marc A. Fuller*
Marc A. Fuller
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mfuller@jw.com

Henrik S. Strand
JACKSON WALKER LLP
100 Congress Ave. Suite 1100
Austin, TX 78701
(512) 236-2292
hstrand@jw.com

Lee Rowland
Erika Sanders
NATIONAL COALITION AGAINST
CENSORSHIP
29 Broadway #1401
New York, NY 10006
lee@ncac.org
erika@ncac.org

**COUNSEL FOR *AMICI CURIAE***

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the typeface and volume limits of Fed. R. App. P. 32(a).

1. This brief contains 5,616 words, excluding the sections exempted by Fed. R. App. P. 32(f) and, which is less than fifty percent of that allotted for the Appellees' brief pursuant to Fed. R. App. P. 29.

2. This brief has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Office Word 2016.

/s/ Marc A. Fuller
Marc A. Fuller

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Marc A. Fuller*
Marc A. Fuller