UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 25-13181

_____

PENGUIN RANDOM HOUSE, LLC, ET AL.,
PLAINTIFFS/APPELLEES,


v.


BEN GIBSON, IN HIS OFFICIAL CAPACITY AS CHAIR OF
THE FLORIDA STATE BOARD OF EDUCATION, ET AL.,
DEFENDANTS/APPELLANTS.

_____


ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA.
HON. CARLOS MENDOZA, DISTRICT JUDGE

_____


BRIEF OF PEN AMERICAN CENTER, INC.
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES & AFFIRMANCE, WITH CONSENT

DIANE ELIZABETH BRINKLEY
PEN AMERICAN CENTER, INC.
120 BROADWAY
NEW YORK, NY 10271
TEL: 646-989-3883
EBRINKLEY@PEN.ORG

MICHAEL T. DAVIS
BENEDICT P. KUEHNE
KUEHNE DAVIS LAW, P.A.
100 S.E. 2 ST., SUITE 3650
MIAMI, FL 33131-2154
TEL: 305.789.5989
MDAVIS@KDLAWYERSPA.COM


COUNSEL FOR *AMICUS CURIAE*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, Amicus Curiae certifies the following persons and entities may have an interest in this case:

Anderson, Laurie Halse

Bird, Brenna

Brenson, Kirstie

Brinkley, Diane E., Counsel for Amicus Curiae

Brosemer, Donna

Brown, Derek

Burnette, Anita

Byrd, Esther

Byrd, Melissa

Carr, Chris

Christie, Grazie P.

Colon, Ruben

Cox, Stephen J.

Davis, Michael T., Counsel for Amicus Curiae

Dentel, Karen Castor

DeSousa, Jeffrey

Diederich, Adam

Douglas, Anne

Drummond, Gentner

Farrant, Alicia

Felder, Vicki-Elaine

Florida State Board of Education

Gallo, Angie

Garcia, Kelly

Gibson, Ben

Goodrich, Krista

Gould, Pam

Green, John

Griffin, Tim

Hachette Book Group, LLC

Hanaway, Catherine

HarperCollins Publishers LLC

Hayes, Judith Anne

Haynes, Jamie

Hilgers, Michael T.

Jackley, Marty

Jacobs, Teresa

Karp, David

Kellogg, Heidi

Kelly, Thomas

Knudson, Austin

Kobach, Kris W.

Kuehne, Benedict P., Counsel for Amicus Curiae

Kuehne Davis Law, P.A.

Labrador, Raúl R.

Macmillan Publishing Group, LLC

Magar, MaryLynn

Marks, Howard

Marshall, Steve

McCuskey, John B.

Mendoza, U.S. District Judge Carlos E.

Muehlhoff, Jason

Murrill, Liz

Norway, U.S. Magistrate Judge Robert M.

Orange County School Board

Paxton, Ken

Patterson, Autumn Hamit

Penguin Random House LLC

PEN American Center, Inc., Amicus Curiae

Persis, Carl

Petty, Ryan

Picoult, Jodi

Rokita, Theodore E.

Salamanca, Maria

Simon & Schuster, LLC

Skrmetti, Jonathan

Sourcebooks LLC

Sperling, Frederick

Thakrar, Sheena

Thomas, Angie

Thompson, Jessie

Uthmeier, James

Vanos, Stephanie

Volusia County School Board

Wilson, Alan

Wrigley, Drew H.

Yost, Dave

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................... 1

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES................................................... iii

STATEMENT OF INTEREST...................................................... 1

INTRODUCTION, STATEMENT OF THE CASE, AND SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ....................................................................... 4

    I.    Section 1006.28 is part of a troubling national trend of educational censorship and has already caused substantial harm. ........................................................ 4

    II.    Students have a First Amendment right to receive information in public schools. ....................................... 9

    III.    Section 1006.28 will have a chilling effect on writers and fails to abide by the obscenity doctrine................. 14

        A.    Section 1006.28 will negatively impact writers' ability to reach their intended audiences............. 14

        B.    Section 1006.28 may lead authors to abstain from writing age-appropriate material. ................. 17

        C.    Section 1006.28 completely disregards the obscenity doctrine as to minors.......................... 21

        D.    The standards in Section 1006.28 fail to account for *Miller*'s required consideration of the literary value of the books. ........................... 25

CONCLUSION ................................................................. 28

CERTIFICATE OF COMPLIANCE ............................................... 28

CERTIFICATE OF SERVICE....................................................... 30

# TABLE OF AUTHORITIES

***Cases***

*ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.,*
 557 F.3d 1177 (11th Cir. 2009) ................................................ 11

*Arce v. Douglas,*
 793 F.3d 968 (9th Cir. 2015) ............................................. 11, 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico,*
 457 U.S. 853 (1982) .......................................................... Passim

*Brown v. Ent. Merchants Ass'n,*
 564 U.S. 786 (2011) ........................................................ 23, 27

*Brown v. La.,*
 383 U.S. 131 (1966) ................................................................ 13

*Cohen v. California,*
 403 U.S. 15 (1971) .................................................................. 25

*Epperson v. Arkansas,*
 393 U.S. 97 (1968) .................................................................. 12

*Erznoznik v. City of Jacksonville,*
 422 U.S. 205 (1975) .................................................. 22, 23, 27

*Ginsberg v. State of N. Y.,*
 390 U.S. 629 (1968) ................................................... 22, 23, 27

*Keyishian v. Board of Regents of Univ. of State of N.Y.,*
 385 U.S. 589 (1967). ............................................................... 9

*Kreimer v. Bureau of Police,*
 958 F.2d 1242 (3d Cir. 1992) ................................................. 11

*Mahanoy Sch. Dist. v. B.L. ex. rel. Levy,*
594 U.S. 180 (2021) ...................................................................... 13

*Miller v. California,*
413 U.S. 15 (1973) .................................................................. 22, 25

*Minarcini v. Strongsville City Sch. Dist.,*
541 F.2d 577 (6th Cir. 1976) ................................................... 11, 13

*Monteiro v. Tempe Union High Sch. Dist.,*
158 F.3d 1022 (9th Cir. 1998) .......................................................... 11

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.,*
670 F.2d 771 (8th Cir. 1982) ........................................................... 11

*Reno v. ACLU,*
521 U.S. 844 (1997) ................................................................ 23, 27

*Right to Read Defense Comm. v. Sch. Comm.,*
454 F.Supp. 703 (Mass.1978) ........................................................ 13

*Shelton v. Tucker,*
364 U.S. 479 (1960) .......................................................................... 10

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
502 U.S. 105 (1991) ......................................................................... 16

*Thornburgh v. Abbott,*
490 U.S. 401 (1989) ......................................................................... 16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ............................................................................ 9

*Turner Broad. Sys., Inc. v. F.C.C.,*
512 U.S. 622 (1994) ......................................................................... 24

*U.S. v. One Book Entitled Ulysses by James Joyce,*

72 F.2d 705 (2d Cir. 1934) ......................................................... 25

*Virginia v. Hicks*,
 539 U.S. 113 (2003) ............................................................... 21

*W. Va. State Bd. of Educ. v. Barnette*,
 319 U.S. 624 (1943) ...................................................... 9, 11, 13

## Statutes

Section 1006.28 of the Florida Statutes ................................ Passim

## Other Authorities

*Author Tamara Ellis Smith & Illustrator Nancy Whitesides on
 Tackling Stories Close to the Heart*, Cynsations: Celebrating
 Children's & Young Adult Literature (November 2023),
 https://cynthialeitichsmith.com/2023/11/guest-post-author-
 tamara-ellis-smith-illustrator-nancy whitesides-on-tackling-
 stories-close-to-the-heart/. ................................................ 14, 15

Florida Freedom to Read Project, *What You Need to Know about
 1069* (Jan. 19, 2024),
 https://www.fftrp.org/what_you_need_to_know_about_hb_1069.3,
 6

Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium
 (November 14, 2021), https://medium.com/@studiojjk/difficult-
 truths-in-life-and-on-the-page-a8549e0f6492 ..................... 14, 15

Julia Goldberg, *Authors and Illustrators Are Paying a Steep Price for
 Book Bans*, PEN America (January 26, 2026),
 https://pen.org/steep-price-for-book-bans/. *See also*
 EveryLibrary, *How Do Authors Feel About Libraries* (Aug. 17,
 2023),
 https://action.everylibrary.org/how_do_authors_feel_about_librari
 es ............................................................................................ 17

Kasey Meehan, et. al., *Banned in the USA: Beyond the Shelves*, PEN America (November 1, 2024), https://pen.org/report/beyond-the-shelves/ ................................................................................ 5

Lisa Tolin, *More Than 1,600 Books Banned in Escambia County, Florida*, PEN America (January 9, 2024), https://pen.org/escambia-county-florida-banned-books-list/ ..... 7

Madison Markham & Tasslyn Magnusson, *Banned in the USA: Cover to Cover*, PEN America (Feb. 27, 2025), http://pen.org/report/cover-to-cover/ .................................... 4, 5

PEN America, *Book Bans*, https://pen.org/issue/book-bans/ ....... 2

PEN America Book Ban Index Data, https://pen.org/book-bans/pen-america-book-ban-index-data/ ............................. 5, 26

PEN America, *Fearing Legal Action by the State, School Districts in Nine Florida Counties Remove Hundreds of Books from Libraries Ahead of the New School Year* (August 7, 2025), https://pen.org/press-release/fearing-legal-action-by-the-state-school-districts-in-eight-florida-counties-remove-hundreds-of-books-from-libraries-ahead-of-the-new-school-year/ ................... 7

PEN America, *Florida's Incomplete Education: How Censorship Fails Our Students* (August 29, 2025), https://pen.org/floridas-incomplete-education/ ....................................................... 8

Sabrina Baêta, et. al., *Banned in the USA: The Normalization of Book Banning*, PEN America (October 1, 2025), https://pen.org/report/the-normalization-of-book-banning/....... 4

Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing about-my-book-that-is-anything-but-love-mpls-author-responds-

to-texas-book-list ................................................................. 16

PEN America Index of Educational Gag Orders,
https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide/ ............ 2

William Johnson & Stephana Ferrell, *'They're Child Abusers':
Florida's Hillsborough County Faces a Frightening State-Driven
Censorship Campaign,* PEN America (June 9, 2025),
https://pen.org/floridas-hillsborough-county-faces-a-frightening-state-driven-censorship-campaign/ ........................................... 7

**STATEMENT OF INTEREST**

*Amicus Curiae* submits this brief pursuant to Rule 29(b) of the Federal Rules of Appellate Procedure. All parties consent to the filing of the amicus brief pursuant to Rule 29(a)(2). As required by Rule 29(a)(2), amicus curiae states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person, other than amicus curiae, its members, or its counsel, contributed money intended to fund the preparation or submission of this brief.

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. PEN America advocates for free expression and the interests of writers in the United States and abroad. Its membership includes more than 5,000 writers, literary professionals, and readers, with nearly 100 members in the states comprising the Eleventh Circuit, including over 70 members in Florida. PEN America has an office in Miami dedicated to fighting censorship in the state of Florida.

As an advocate for free expression and the interests of writers, PEN America has a particular interest in opposing the suppression

of ideas in literature. Thus, as educational censorship has ballooned in recent years, PEN America has actively monitored efforts like Section 1006.28, Florida Statutes, to remove books from Florida school libraries, believing that any such effort is damaging to a flourishing democracy.

With this brief, *Amicus Curiae* explains the unlawful and deleterious consequences of Section 1006.28 to PEN America and its constituencies if the summary judgment granted by the district court is reversed.

## INTRODUCTION, STATEMENT OF THE CASE, AND SUMMARY OF ARGUMENT

PEN America has been at the forefront of tracking the proliferating book bans nationwide and state legislation enacted to codify them.[1] Legislation requiring book bans, such as Florida's statewide mandate,[2] undermines public education systems in violation of the First Amendment by denying students' rights to

---

[1] *See, e.g.,* PEN America, *Book Bans,* https://pen.org/issue/book-bans/.

[2] *See PEN America Index of Educational Gag Orders,* https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide/.

receive information, infringing on authors' free speech rights, and misapplying the obscenity doctrine.

This brief focuses on the provision of Section 1006.28 of Florida Statutes, as amended by House Bill 1069, prohibiting from school libraries any content that "describes sexual conduct." Fla. Stat. § 1006.28(2)(a)(2)(b)(II) (referred to in this brief as "Section 1006.28"). The law requires the removal of hundreds of books from public school libraries regardless of the age of the student reader or the books' value as a whole—both of which considerations are required by the First Amendment.

Section 1006.28 has led to sweeping book removals and restrictions across Florida[3] because of the "statewide prohibition on vast swathes of the literature." JA-703. Section 1006.28 has superseded the discretion and judgment of educators and schools, and the application of community standards. Its restrictions constitute grave government overreach that has caused substantial harm to Floridian students, the writers who aim to reach them, and

---

[3] Florida Freedom to Read Project, *What You Need to Know about 1069* (Jan. 19, 2024), https://www.fftrp.org/what_you_need_to_know_about_hb_1069.

the larger culture of free expression. It is essential that the law continue to be enjoined to prevent further intrusions upon constitutionally protected freedoms and to stop the dangerous spread of an environment of fear and self-censorship in public schools, as well as to avoid the chilling effect on writers' creative expression. Indeed, the consequences that would follow lifting the injunction would cause further serious and widespread harm fundamentally at odds with the First Amendment.

Accordingly, PEN America urges the Court to affirm the district court's decision on the grounds that: (1) it violates students' rights to receive information and (2) the restrictions will chill authors' speech and are prohibited under the obscenity doctrine.

## ARGUMENT

**I. Section 1006.28 is part of a troubling national trend of educational censorship and has already caused substantial harm.**

Since 2021, state efforts to restrict books in public school libraries have proliferated. Indeed, from July 2021 to June 2025, PEN America's Index of School Book Bans recorded nearly 23,000 instances of book restrictions across 45 states and 451 public school

districts.[4] In that time, over 8,000 unique titles were affected and the work of well over 4,500 authors, illustrators, and translators was censored.[5] In the 2024-2025 school year alone, there were nearly 7,000 recorded instances of book restrictions across the country.[6]

Florida has been at the forefront of the nationwide effort to censor literature in public schools. PEN America's Index of School Book Bans has found that Florida has led the nation in restrictions each school year since the 2022-2023 school year and is responsible for the most restrictions in the country since the organization began tracking in 2021. Florida has earned this dubious distinction in large part due to Section 1006.28.[7]

Section 1006.28 has become a blueprint for censorship across the country. In the 2023-2024 school year, Florida and Iowa alone accounted for over 8,000 of the nearly 10,000 book restrictions

---

[4] Sabrina Baêta, et. al., *Banned in the USA: The Normalization of Book Banning*, PEN America (October 1, 2025), https://pen.org/report/the-normalization-of-book-banning/. *See also* Madison Markham & Tasslyn Magnusson, *Banned in the USA: Cover to Cover*, PEN America (Feb. 27, 2025), http://pen.org/report/cover-to-cover/.

[5] *Id.*

[6] *Id.*

[7] PEN America Book Ban Index Data, https://pen.org/book-bans/pen-america-book-ban-index-data/.

across the country, largely due to Section 1006.28 and Iowa's copycat bill, SF 496.[8] These laws fail to accomplish their supporters' purported goal of protecting children from "harmful" content and instead broadly restrict First Amendment rights.

Like so much of the legislation across the country it has inspired, Section 1006.28 denies students access to critical literature and cultural expression. These censorial laws and edicts ban books that schools have long deemed both appropriate and valuable to students at different ages and educational levels. Indeed, banned books in Florida and across the country include classic works, award-winning literature, historical fiction and nonfiction, and new and captivating works by emerging writers.

Section 1006.28 prohibits any material that "describes or depicts sexual conduct" and utterly ignores pedagogical, literary, or cultural value, in addition to differences in maturity across age and

---

[8] Kasey Meehan, et. al., *Banned in the USA: Beyond the Shelves*, PEN America (November 1, 2024), https://pen.org/report/beyond-the-shelves/. *See also* Madison Markham & Tasslyn Magnusson, *Banned in the USA: Cover to Cover*, PEN America (Feb. 27, 2025), http://pen.org/report/cover-to-cover/.

grade levels. Rather, it is so sweeping that it has been used to censor an extraordinarily wide range of literature.

Indeed, thousands of books have been removed from the shelves of Florida school libraries as a result of Section 1006.28.[9] In December 2023, Escambia County School District removed over 1,600 books from library shelves—among them five dictionaries and eight encyclopedias—due to fears that they violated Section 1006.28.[10] In May 2025, the Florida Department of Education sent a letter to the superintendent of the Hillsborough County School District threatening legal action against them if they failed to remove sexually explicit books from their library on the basis of Section 1006.28, leading to the removal of over 600 titles from school library shelves in the district.[11] These titles had no challenges filed against

[9] Florida Freedom to Read Project, *What You Need to Know about 1069* (Jan. 19, 2024), https://www.fftrp.org/what_you_need_to_know_about_hb_1069.
[10] Lisa Tolin, *More Than 1,600 Books Banned in Escambia County, Florida,* PEN America (January 9, 2024), https://pen.org/escambia-county-florida-banned-books-list/.
[11] William Johnson & Stephana Ferrell, *'They're Child Abusers': Florida's Hillsborough County Faces a Frightening State-Driven Censorship Campaign,* PEN America (June 9, 2025), https://pen.org/floridas-hillsborough-county-faces-a-frightening-state-driven-censorship-campaign/.

them, nor were they the focus of complaints by parents, or violated state law. This letter to one school district also led to a wave of book bans across the state, with at least nine counties pulling titles from shelves.[12] School librarians have described a pervasive sense of fear due to Section 1006.28 and the state's concomitant enforcement of it.

Beyond even the book removals arguably (albeit unconstitutionally) contemplated by the statute, the passage of Section 1006.28 has created a still broader culture of fear that led schools to preemptively censor their own collections rather than potentially run afoul of this strikingly broad law.[13] This censorship and the inevitable self-censorship that accompanies such sweeping bans deprives Florida's youth of access to the written word and voices of some of the world's most treasured writers, artists, and thinkers.

---

[12] PEN America, *Fearing Legal Action by the State, School Districts in Nine Florida Counties Remove Hundreds of Books from Libraries Ahead of the New School Year* (August 7, 2025), https://pen.org/press-release/fearing-legal-action-by-the-state-school-districts-in-eight-florida-counties-remove-hundreds-of-books-from-libraries-ahead-of-the-new-school-year/.
[13] PEN America, *Florida's Incomplete Education: How Censorship Fails Our Students* (August 29, 2025), https://pen.org/floridas-incomplete-education/.

Section 1006.28 is not the stuff of democracy, and its baleful impact has already caused significant harm. The law's restriction of students' access to literature flies in the face of First Amendment protections and the values promoted by those protections and sets a dangerous precedent for the suppression of art and thought. PEN America thus urges the Court to consider the harm the statute has already inflicted, the stunning overbreadth of its restrictive sweep, and the still more devastating impact it would have on free expression in Florida should the district court's ruling be reversed.

## II. Students have a First Amendment right to receive information in public schools.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This has long been a guiding principle for courts considering First Amendment rights in public schools. And, although First Amendment rights must be "applied in light of the special characteristics of the school environment," students and teachers do not "shed their constitutional rights to freedom of speech or expression at the

9

schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)*.*

Targeting all—indeed, *any*—descriptions of sex is precisely the type of abuse of discretion in the name of orthodoxy that the Court has squarely condemned. *See Keyishian,* 385 U.S. at 603 ("[T]he First Amendment…does not tolerate laws that cast a pall of orthodoxy over the classroom."). As explained below, students have a First Amendment right to receive information from public school library books that cannot be abridged due to the government's distaste for the content of those books. Nor can Appellants render their infringement of students' rights valid by completely ignoring the requirements of the obscenity doctrine. *See* §§ III(C) and III(D) *infra.*

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker,* 364 U.S. 479, 487 (1960). Students have a First Amendment right to receive the information and ideas that Section 1006.28 seeks to censor. The Supreme Court addressed students' First Amendment rights to receive information with respect to school library materials in *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico,* 457 U.S. 853 (1982). *Pico* concerned the removal of books from a school

district's libraries on the basis that school board members found them "anti-American, anti-Christian, [anti-Semitic], and just plain filthy." *Id.* at 857. Justice Brennan's plurality opinion there, joined by Justices Marshall and Stevens, and in part by Justice Blackmun,[14] set forth the standard that local school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Id.* at 872. In drafting the plurality opinion, Justice Brennan reasoned that students' right to receive information is an "inherent corollary" of their right to free speech, *Id.* at 867, and that school boards may not remove books to "prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion." *Id.* at 871 (quoting *Barnette*, 319 U.S. at 642).

While this Circuit has not recognized *Pico's* standard as having precedential value, several circuits around the country have adopted its standard, and the decision provides useful guidance in

---

[14] Justice Blackmun accepted the standard set forth by the plurality but wrote separately. In his view, the ban was improper not due to a right to receive information, but rather because the "State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Id.* at 878-89.

establishing a standard by which to evaluate school library book removals.[15] *Pico* draws explicitly from the lineage of caselaw on free speech in public schools, which consistently affirms the rights of students to certain free speech protections and access to information, while recognizing the discretion of local school boards concerning curriculum and instruction. *Pico*, 457 U.S. at 868-72.[16]

As Justice Brennan's opinion in *Pico* states, removing books in "a narrowly partisan or political manner" "stand[s] inescapably condemned by our precedents." 457 U.S. at 870.[17] This principle is

---

[15] *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (declining to apply *Pico*). *Cf. Arce v. Douglas*, 793 F.3d 968, 981-82 (9th Cir. 2015) (applying *Pico*); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) (same); *and Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) (same). *See also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) *and Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982) (applying similar standards prior to the Supreme Court's decision in *Pico*).

[16] *See also Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Our courts...have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief.").

[17] It is also worth noting that seven out of nine justices in the *Pico* court agreed that books could not be removed in a "narrowly partisan or political manner," a fact Chief Justice Rehnquist "cheerfully concede[d]" in his dissent. 457 U.S. at 907 (Rehnquist, C.J., dissenting).

also the logical conclusion of decades of case law on the First Amendment and public education.

*Pico*, the lineage of caselaw on which it draws (such as *Barnette, Tinker, Shelton, Keyishian*) and subsequent relevant cases all emphasize the importance of students' right to receive information and the dangers of state intervention to "strangle the free mind at its source." *Barnette*, 319 U.S. at 637. *See, e.g., Arce*, 793 F.3d at 981-84 (9th Cir. 2015); *see also cf. Mahanoy Sch. Dist. v. B.L. ex. rel. Levy*, 594 U.S. 180, 190 (2021) (holding that schools have "an interest in protecting a student's unpopular expression").[18] These cases and the

---

[18] Courts have also recognized the unique quality of libraries in providing patrons and students with sites of individual and extracurricular exploration. *See, e.g., Pico*, 457 U.S. at 869 ("Libraries afford [students] an opportunity at self-education and individual enrichment that is wholly optional"); *Right to Read Defense Comm. v. Sch. Comm.*, 454 F.Supp. 703, 715 (Mass.1978) ("[A] student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum . . . . Th[e] student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom."); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (holding that libraries are widely understood as a public good and a "mighty resource in the free marketplace of ideas"); *and Brown v. La.*, 383 U.S. 131 (1966) (recognizing the significance of the library as "a place dedicated to quiet, to knowledge, and to beauty).

foundational First Amendment principles they reflect underscore that students have a right to receive information.

Section 1006.28 imposes on all public school children, whether kindergartners or high school seniors, a blanket ban of any material that "depicts or describes sexual conduct" Fla. Stat. § 1006.28(a)(2)(b)(II), and does so regardless of context and without any consideration of artistic, intellectual, or cultural value. This has resulted in books being pulled from the shelves that have been regarded for decades as classics of youth literature —including *1984* by George Orwell, *Beloved* by Toni Morrison, *Invisible Man* by Ralph Ellison, and *Brave New World* by Aldous Huxley.

In short, Section 1006.28 hinders access to vital content by preventing all students, of any age or grade level, from reading literature that grows alongside them, failing to recognize that as readers mature, they need and have a right to access books with more mature and complex ideas.

**III. Section 1006.28 will have a chilling effect on writers and fails to abide by the obscenity doctrine.**

    **A. Section 1006.28 will negatively impact writers' ability to reach their intended audiences.**

Writers of children's and young adult books often speak of their

work with a sense of vocation. Reaching young readers is of paramount importance to them and is essential to fulfill their artistic purpose. These authors write for different audiences, but Section 1006.28 is a blunt instrument that treats all public-school students as if they were the same age and thus carries significant repercussions for the authors.

Young children's book author Tamara Ellis Smith writes that "a book is not finished until the reader reads it. If I've done my job, I've left enough space to let this alchemy happen between the reader and the story."[19] Jarrett J. Krosoczka, National Book Award finalist for *Hey Kiddo*, wrote his middle-grade illustrated memoir to help young people feel less alone, based on his own experience. "Books are like life preservers," he writes. "I, along with my colleagues, write for the teenagers we once were. And we defend a [student's] right to read because we know these books would have made our lives that much

---

[19] *Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy-whitesides-on-tackling-stories-close-to-the-heart/.

easier growing up."[20]

Junauda Petrus, author of the young adult novel *The Stars and the Blackness Between Them,* writes that her work "is so love-filled and wants to affirm, and make people feel safe and included and like they exist," and echoes the sentiments of many children's and young adult authors who write because of what books meant to them when they were young. "There was just so much love that I put into [my book], because I was a kid who loved to read. To me books are where I went to feel safe."[21]

Laws that prevent or hinder their books from reaching school libraries foreclose one of the most important ways writers find and engage with their audiences, and thus thwart their artistic goals, intended reach, and financial well-being.

The Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from

---

[20] Jarret J. Krosoczka, *Difficult Truths in Life and on the Page,* Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492.
[21] Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list,* MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing-about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list.

reaching their intended audience or impose financial disincentives on their work. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (holding that publishers could challenge prison regulations limiting access to written materials); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (explaining that publishers and authors are interchangeable with respect to making First Amendment challenges to laws that impose content-based restrictions).

In order to reach their readers, writers rely on libraries, and by removing authors' books from school libraries, Section 1006.28 closes off a critical channel through which authors can find their audiences and a critical source of income.[22] Without this avenue for reaching readers, authors' First Amendment rights are curtailed. This harm to authors is another reason why this court should affirm the preliminary injunction.

### B. Section 1006.28 may lead authors to abstain from writing age-appropriate material.

---

[22] Julia Goldberg, *Authors and Illustrators Are Paying a Steep Price for Book Bans*, PEN America (January 26, 2026), https://pen.org/steep-price-for-book-bans/. *See also* EveryLibrary, *How Do Authors Feel About Libraries* (Aug. 17, 2023), https://action.everylibrary.org/how_do_authors_feel_about_libraries.

Legislation like Section 1006.28 will undoubtedly have a chilling effect on writers and their publishers. Blunt instruments like the statute's broad and indiscriminate ban restrict access for a huge population of students without respect to their maturity and reading level, and this likewise fundamentally restricts the reach of authors (and their publishers). As a result, publishers who rely on library sales may become cautious in what and whom they choose to publish, in turn further limiting and chilling authors' speech and reach, as well as their financial horizons. Authors will likewise be incentivized to self-censor to avoid their works being removed and stigmatized.

In its work with affected authors, PEN America has heard time and again the chilling effect book restrictions have had on authors, particularly young adult authors.[23] Award-winning children's author Robin Stevenson asserts that "self-censorship is the huge invisible iceberg beneath the bans we read about." Author and illustrator Sarah S. Brannen recalls that being the target of book removals was exhausting, and that it infected her free expression in conceiving of future projects: "I can't help thinking, 'Is this book going to be

---

[23] The following quotes are taken from interviews PEN America conducted with authors in September 2025.

banned?' . . . . [I]t kills creativity to think about that." Author Katryn Bury says she has "stopped writing kid's books altogether." And author Sarah Gailey observes, "Every author and publishing professional I know— myself included—takes book challenges and book banning into account now. Fear of prosecution and retribution against ourselves, and against the librarians and booksellers who champion our work, is a constant presence as we discuss how to create the literature we feel the world needs right now."

Writing children's and young adult books requires tailoring the material for the age range of the writer's intended audience: what kind of language their readers can understand, what kind of subjects may hold their interest, and what content is appropriate for them to read. This is the heart of the important artistic work that authors do in writing books for young children, middle graders, and young adults.

Freedom of expression and freedom of thought require young readers being able to access the material that is appropriate for them. But Section 1006.28 does not allow for this necessary access. Instead, it limits all children to a narrow range of books in one of the bluntest and broadest ways possible, denying them the chance to grow and mature, at their own pace, with literature. The plurality

opinion in *Pico*, by contrast, recognized that the important "opportunity at self-education and individual enrichment" that school libraries afford students is of particular concern to First Amendment values. 457 U.S. 853, 869 (1982) (plurality).

As a result of Section 1006.28 and similar laws writers hoping to maximize their reach may be incentivized to avoid more complex topics that may be of critical importance to young readers. Authors are already limiting what they write due to this climate of censorship. Allowing this chilling effect to continue would cause even further damage to children's and young adult literature, impeding writers' abilities to confront difficult ideas and truths and hampering students' abilities to grow and evolve as critical thinkers and readers. So many of the books we have come to treasure in this country's rich literary heritage and culture initially broke boundaries, introducing and guiding young people to and through the world they encounter and often struggle to navigate.[24]

---

[24] For example, *The Adventures of Huckleberry Finn* by Mark Twain, *The Catcher in the Rye* by J.D. Salinger, *To Kill a Mockingbird* by Harper Lee, and *Are You There God? It's Me, Margaret* by Judy Blume were all controversial upon their publication and have remained subject to controversy and censorship.

Preventing writers from reaching and speaking to their intended readers constitutes what may be seen as ancillary damage caused by Section 1006.28, but it is still enormous in its potential harm and chilling effect. It is thus an important corollary to the misguided and unconstitutional restriction on students' own rights to receive information and harms authors' constitutionally protected rights as well.

### C. Section 1006.28 completely disregards the obscenity doctrine as to minors.

Section 1006.28's complete prohibition on any "depicts or describes sexual conduct" also constitutes far too broad[25] an intrusion into student and author First Amendment rights because it fails to properly apply an obscenity test for minors. The result is that countless books have and will be stigmatized because a single

---

[25] While PEN America focuses here primarily on Section 1006.28's violation of the obscenity doctrine for minors, we note that its overbreadth, made all the more problematic by its vagueness, also violates the First Amendment. The overbreadth doctrine prevents enforcement of a law that "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal citations omitted). This is manifestly applicable here, given the language and sweep of Section 1006.28.

instance of a sex act automatically renders a book worthy of prohibition regardless of context.

Obscenity, of course, is not protected speech. Under the general test for obscenity, famously articulated in 1973 in *Miller v. California*, a work is obscene—and thus unprotected—if (1) the "'average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest," (2) it "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law", and (3) the work, "taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. 15, 24 (1973) (internal citations omitted).

The Supreme Court has clarified that because of the state interest in preventing minors' access to harmful material, the state may adjust standards of obscenity based on the recipient: "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined." *Ginsberg v. State of N.Y.*, 390 U.S. 629, 636 (1968). The *Ginsberg* Court explained that "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed." *Id.*

After *Ginsberg,* and continuing after *Miller* was decided a few years later, the Supreme Court continued to interpret the First Amendment rights of minors through the lens of *Ginsberg.* For instance, two years after the *Miller* decision, in *Erznoznik,* the Supreme Court struck down a local ordinance banning all movies with nudity from drive-in theaters, finding that "[c]learly all nudity cannot be deemed obscene even as to minors." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 213-14 (1975) (citing *Ginsberg).* That decision held that "minors are entitled to a significant measure of First Amendment protection" and the legislature cannot ban minors from access to constitutionally protected information or speech simply because it finds it "unsuitable" for them. *Id.* at 212-14.

In *Reno v. ACLU*, the Supreme Court struck certain provisions of the Communications Decency Act, decrying the "unacceptably heavy burden on protected speech" because it was not narrowly tailored to serve the statute's stated interest in protecting minors from harmful information on the internet. 521 U.S. 844, 882 (1997). In so doing, the Court specifically identified the lack of consideration

of *Miller*'s third prong—the literary, artistic, political, or scientific value of the censored works.[26]  *Id.*

The above line of cases shows that, in restricting minors' access to speech and information, courts must consider an obscenity standard tailored to minors rather than an all-out ban of sexual content. *See. e.g., Ginsberg*, 390 U.S. at 634-40 (1968).

Not considering literary and educational value has the impermissible effect of deeming all descriptions of sex inappropriate and harmful. *Cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994) ("Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."). Second, as the progeny of *Ginsberg*, including *Miller, Reno, Erznoznik, Brown,* and *Upper Midwest Booksellers*, reminds us, disgust and discomfort with sex are not valid justifications for infringing on minors' First Amendment freedoms.

---

[26] The Supreme Court also acknowledged *Ginsberg's* continuing force in *Brown v. Ent. Merchants Ass'n*, where it explained that the State "possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. 786,794 (2011) (internal citations omitted).

**D. The standards in Section 1006.28 fail to account for *Miller*'s required consideration of the literary value of the books.**

Sweeping restrictions on sexual conduct regardless of context and literary and pedagogical value, like that which undergirds Section 1006.28, are also inconsistent with First Amendment jurisprudence and free expression principles that protect the literary and artistic process – that is, the ways in which artists use and develop language. Instead, Section 1006.28 flattens this impermissibly and unrecognizably to a brute and simplistic equation that *any material* that depicts sex is *a priori* inappropriate and therefore must be banned for all children. Among other problems, this reflects a facile understanding of literature that fails to account for artistic value and the meaning of the work as a whole, one that *Miller* and other Supreme Court precedent have rejected.

As a writers' organization, *Amicus* has a significant interest in protecting authors' artistic processes. The censorship of writers' work without consideration of literary value or authorial intent is a gross violation of artistic freedom and has a chilling effect on literary imagination. Writers count on robust First Amendment freedoms and the value that our culture places on free expression when writing

25

about new ideas and experimenting with form and style. *See Miller*, 413 U.S. at 23 (noting the "inherent dangers of undertaking to regulate any form of expression").[27] In the absence of these protections, writers may shy away from innovation and bold exploration of challenging topics.

This failure to consider artistic meaning, the artistic expressiveness of language, and the literary value of a book as a whole are all detrimental to the public and to culture at large, with real and devastating effects for authors and readers alike—including students in Florida's public schools. Section 1006.28 denies Florida students critical access to complex literature and information, and every author whose works are implicated in the state's schools will

---

[27] *See also Cohen v. California*, 403 U.S. 15 (1971) ("[O]ne man's vulgarity is another's lyric. . . [I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual….[M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well.") *and U.S. v. One Book Called "Ulysses"*, 5 F.Supp. 182, 183 (S.D.N.Y. 1933), aff'd sub nom., *U.S. v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934) (recognizing the necessity of a sophisticated understanding of how content functions artistically within a work in determining obscenity).

experience the stigmatizing effect of their books' removal and the adverse consequences of having their creative expression chilled.

This is not an abstract or theoretical danger. The far-reaching censorship of books has included canonical literature and books long considered rites of passage for middle- and high-schoolers, leading some Florida school districts to strike such classics as *The Bluest Eye* by Nobel Prize winner Toni Morrison, *The Sun Also Rises* by Nobel Prize winner Ernest Hemingway, *I Know Why the Caged Bird Sings* by Pulitzer Prize-winner Maya Angelou, Gustav Flaubert's *Madame Bovary*, and *The Taming of the Shrew* and *The Merchant of Venice* by William Shakespeare.[28] Meanwhile, authors describe a profound chilling effect on their creative process as a result of statutes like Section 1006.28 restricting books in school libraries.[29]

This result is contrary to a First Amendment that demands that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks

---

[28] PEN America Book Ban Index Data, https://pen.org/book-bans/pen-america-book-ban-index-data/.
[29] *See* author interviews *supra* § IIIB.

unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. Section 1006.28's blanket discrimination against sexual content is exactly the kind of censorship the *Miller* test and obscenity standards for minors were designed to avoid. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 564 U.S. 786, 798 (2011); *Reno*, 521 U.S. at 865; *Ginsberg*, 390 U.S. at 636. Section 1006.28 fails to abide by the requirements of the obscenity doctrine that recognize the complexity of literature and its multiplicity of meaning and should remain enjoined.

## CONCLUSION

State mandated prohibitions of books are anathema to the First Amendment and its interest in public education's important role in American society. Section 1006.28 is nothing short of an intrusion on key liberties, harming Floridians and authors from around the world in violation of the First Amendment. We respectfully encourage this Court to affirm.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief is printed in Bookman Old Style 14-point font and contains 5,501 words, as counted by MS Word.

Respectfully submitted,

_S/ Diane Elizabeth Brinkley_
**DIANE ELIZABETH BRINKLEY**
New York Bar No. 6217160
**PEN AMERICAN CENTER**
120 Broadway, 26th Fl. North
New York, NY 10271
Tel: 646-989-3883
ebrinkley@pen.org

_S/ Michael T. Davis_
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3650
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
Mdavis@KDLawyersPA.com
efiling@KDLawyersPA.com

**CERTIFICATE OF SERVICE**

I CERTIFY that on February 17, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By: *S/ Michael T. Davis*
**MICHAEL T. DAVIS**